**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RADIYA BUCHANAN
c/o Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036;

ANN DAGRIN
c/o Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036;

LINDSAY FIELD
c/o Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036;

*Plaintiffs*,

    v.

DONALD J. TRUMP,
In his official capacity as
President of the United States
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500;

WILLIAM P. BARR,
In his individual capacity and official capacity as
U.S. Attorney General
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530;

MARK T. ESPER,
In his official capacity as
U.S. Secretary of Defense
1400 Defense Pentagon
Washington, D.C. 20301;

MAJOR GENERAL WILLIAM J. WALKER
In his official capacity as
Commanding General of the District of
Columbia National Guard
2001 E. Capitol Street, S.E.
Washington, D.C. 20003;

**Case No. 20-cv-1542-DLF**

GREGORY T. MONAHAN
In his individual capacity and official capacity as
Acting Chief of the United States Park Police
1100 Ohio Drive, S.W.
Washington, D.C. 20242;

JAMES M. MURRAY
In his official capacity as
Director, U.S. Secret Service
950 H Street, N.W., Suite 7800
Washington, D.C. 20223;

MICHAEL CARVAJAL
In his official capacity as
Director of the Federal Bureau of Prisons
320 First Street, N.W.
Washington, D.C. 20534;

RUSSELL FENNELLY,
In his individual capacity and official capacity as
Captain of the United States Park Police,
1100 Ohio Drive, S.W.
Washington, D.C. 20242;

MARK ADAMCHIK,
In his individual capacity and official capacity as
Incident Commander of the United States Park
Police,
1100 Ohio Drive, S.W.
Washington, D.C. 20242;

FNU SEBERLING,
In his individual capacity and official capacity as an
officer of the United States Park Police,
c/o United States Park Police,
1100 Ohio Drive, S.W.
Washington, D.C. 20242;

PETER NEWSHAM
In his official capacity as
Chief of the Metropolitan Police Department of the
District of Columbia
300 Indiana Avenue, N.W., Room 5059,
Washington, D.C. 20001;

JEFFERY CARROLL
In his individual capacity and official capacity as
Assistant Chief of Metropolitan Police Department of
the District of Columbia
c/o Metropolitan Police Department
300 Indiana Avenue, N.W., Room 5059,
Washington, D.C. 20001;

ANTHONY ALIOTO
In his individual capacity and official capacity as an
officer of Metropolitan Police Department of the
District of Columbia
c/o Metropolitan Police Department
300 Indiana Avenue, N.W., Room 5059,
Washington, D.C. 20001;

S. BUCHANAN
In his individual capacity and official capacity as an
officer of Metropolitan Police Department of the
District of Columbia
c/o Metropolitan Police Department
300 Indiana Avenue, N.W., Room 5059,
Washington, D.C. 20001;

FNU HARGROVE
In his individual capacity and official capacity as an
officer of Metropolitan Police Department of the
District of Columbia
c/o Metropolitan Police Department
300 Indiana Avenue, N.W., Room 5059,
Washington, D.C. 20001;

C. W. MEYER
In his individual capacity and official capacity as an
officer of Metropolitan Police Department of the
District of Columbia
c/o Metropolitan Police Department
300 Indiana Avenue, N.W., Room 5059,
Washington, D.C. 20001;

CLIFTON MURPHY
In his individual capacity and official capacity as an
officer of Metropolitan Police Department of the
District of Columbia
c/o Metropolitan Police Department

300 Indiana Avenue, N.W., Room 5059,
Washington, D.C. 20001;

THOMAS PAYNE
In his individual capacity and official capacity as an
officer of Metropolitan Police Department of the
District of Columbia
c/o Metropolitan Police Department
300 Indiana Avenue, N.W., Room 5059,
Washington, D.C. 20001;

FNU TAYLOR
In his individual capacity and official capacity as an
officer of Metropolitan Police Department of the
District of Columbia
c/o Metropolitan Police Department
300 Indiana Avenue, N.W., Room 5059,
Washington, D.C. 20001;

DANIEL THAU
In his individual capacity and official capacity as an
officer of Metropolitan Police Department of the
District of Columbia
c/o Metropolitan Police Department
300 Indiana Avenue, N.W., Room 5059,
Washington, D.C. 20001;

ANTHONY A. WILLIS
In his individual capacity and official capacity as an
officer of Metropolitan Police Department of the
District of Columbia
c/o Metropolitan Police Department
300 Indiana Avenue, N.W., Room 5059,
Washington, D.C. 20001;

WAYNE VINCENT
In his individual capacity and official capacity as a
captain of the Arlington County Police Department,
c/o Arlington County Police Department
1425 N Courthouse Rd,
Arlington, VA 22201

RYAN BLACK,
In his individual capacity and official capacity as an
officer of the Arlington County Police Department,
c/o Arlington County Police Department

1425 N Courthouse Rd,
Arlington, VA 22201

RYAN ALLEN,
In his individual capacity and official capacity as an
officer of the Arlington County Police Department,
c/o Arlington County Police Department
1425 N Courthouse Rd,
Arlington, VA 22201

JOHN & JANE DOES 1–50;

JOHN & JANE POES 1-50;

and

JOHN & JANE ROES 1-50,

*Defendants*.

## FIRST AMENDED COMPLAINT

1.      This case concerns a day that will live in infamy.  It's the day that our federal executive branch unleashed a military and paramilitary force on a band of peaceful protesters assembled in historic Lafayette Park across from the White House.  The officials, wielding batons, sprayed the crowd with tear gas, flash-bang grenades, smoke bombs, and rubber bullets, causing frightened protesters to flee, fearing for their lives and hobbled by their injuries.  And what prompted this military attack on peaceful civilian targets?  President Trump's desire to walk through the park a few minutes later to stage a photo-op publicity stunt holding a bible as a political prop in front of a nearby church.  It was a gross abuse of executive power that violated First Amendment free speech rights, Fourth Amendment protections against unreasonable force, Fifth Amendment due process rights, and long-standing federal law prohibiting use of such military force on domestic targets.  This must never happen again.

2.      On June 1, 2020, peaceful protesters gathered in Lafayette Park, a public park adjacent to the White House, to call for racial justice and police reform following the recent homicide of George Floyd and too many other black people at the hands of law enforcement.  The atmosphere in the park that day was peaceful, with some people singing, some dancing, and others kneeling in silence.  Some protesters had even brought their young children and pets.  They carried signs with messages like "Black Lives Matter" and "I Can't Breathe," and called on local police officers present to take a knee in solidarity with the protests.  Others questioned why the police wore militarized equipment, chanting "We don't see a riot here.  Why are you in riot gear?"

3.      Lafayette Park—the people's park—is situated at the White House's doorstep.  It provides a unique and important venue for protesters to have their grievances heard by the President of the United States and the nation's other most powerful leaders.  Although it was once used as a place to sell and house slaves, it has since been the site of many of the most influential protests in American history, including the Women's Suffrage Protests of the early 1900s, the Civil Rights Protests of the mid-1960s, and the Vietnam War Protests of the late 1960s and early 1970s.  Those protesters could not be ignored, peaceably assembling within earshot of Presidents and in plain view of the White House.  Lafayette Park is one of the few places in the country where the American people can speak to the executive branch directly.  It is for this reason that courts in this District have called Lafayette Park one of the "most conspicuous public for[a] in the nation," and a truly "unique situs for the exercise of First Amendment rights."  Thus, it came as no surprise that, as demands for racial justice recently swept the country, peaceful protesters once again made their way to Lafayette Park to speak directly to the President and the nation.

4.      As the peaceful protests that day continued into the early evening of June 1, 2020, President Trump, unbeknownst to the protesters, was preparing himself to cross through Lafayette

Park en route to a photo opportunity in front of nearby St. John's Episcopal Church across the street.  At that time, members of the United States Park Police, the United States Secret Service, the District of Columbia National Guard, the Bureau of Prisons, Metropolitan Police Department, Arlington County Police Department, and others who appeared to be military were already surrounding the protesters.  Indeed, the President had recently deployed active duty troops to Washington, D.C., in an effort to suppress protests.  Just minutes before the President arrived at Lafayette Park, Attorney General Barr, at the behest of the President, ordered these military and paramilitary forces to clear Lafayette Park.

5.      Suddenly and without warning, this military force launched a vicious attack on the protesters that one witness, a military veteran, described as "like being back in combat."  The police—wearing riot gear, wielding batons, carrying firearms, and displaying "Military Police" shields—released a gaseous chemical irritant that the federal government later claimed wasn't "tear gas," even though it caused tears.  The officers, some of whom were on horseback, fired rubber bullets into the crowd, as the bruises and welts all over protesters' bodies confirmed.  And the officers threw flash-bang grenades and smoke bombs into the crowd, filling the air with fire and smoke, and leaving protesters burned in their wake.  The scene was utter chaos, with many screaming as they ran for cover, others vomiting or blinded by the tear gas, and some trampled by horses and the crush of the fleeing crowd.

6.      The federal government's actions drew condemnation from across the political spectrum.  General James Mattis, President Trump's former Secretary of Defense, wrote that he never "dream[ed] that troops taking th[e] [] oath [to defend the United States Constitution] would be ordered under any circumstance to violate the Constitutional rights of their fellow citizens— much less to provide a bizarre photo op for the elected commander-in-chief, with military

leadership standing alongside."  And the Right Reverend Mariann Budde, Bishop of the Episcopal Diocese of Washington, stated that she was "outraged" that she "was not given even a courtesy call that they would be clearing [Lafayette Park] with tear gas so they could use one of our churches as a prop, holding a Bible, one that declares that God is love and when everything [the President] has said and done is to inflame violence."

7.     For his part, President Trump has "no regrets"  about this attack on peaceful protesters in the shadow of the White House.  In fact, the next day, he lauded the "domination" and "overwhelming force" that was used on these peaceful protesters, and he congratulated himself in the third person for deploying it, tweeting ***"thank you President Trump***!"  And on the very morning Plaintiffs filed this action (June 11, 2020), President Trump tweeted: "Our great National Guard Troops who took care of the area around the White House could hardly believe how easy it was.  'A walk in the park', one said.  The protesters, agitators, anarchists (ANTIFA), and others, were handled VERY easily by the Guard, D.C. Police, & S.S. GREAT JOB!"  Later that morning, though, General Mark Milley, the Chairman of the Joint Chiefs of Staff, publicly apologized for his role in the Lafayette Park incident: "I should not have been there.  My presence in that moment and in that environment created a perception of the military involved in domestic politics.  As a commissioned uniformed officer, it was a mistake that I have learned from, and I sincerely hope we all can learn from it."

8.     There was no justification, however, for this brutal attack on peaceful civilian targets.  In fact, Attorney General Barr has effectively conceded that the violence was unnecessary—admitting that "[t]his was not an operation to respond to that particular crowd."  The media and others captured on video the passionate but peaceful nature of this protest, followed by officers' assault on protesters.  Videos of the incident itself confirmed the timing; officers began

using munitions on peaceful protesters approximately 25 minutes *before* a curfew set by the District of Columbia was about to go into effect, meaning they could not have been enforcing any curfew violation, as the White House later claimed. Similarly, the other justifications that federal officials offered for their conduct—that, for instance, they wanted to expand the White House security perimeter, or that the President needed space to walk to his photo op in front of St. John's Episcopal Church—fail to explain or justify the violence used or the park's closing. Indeed, by that rationale, it seems these protesters were removed simply because they were there, impeding the President's path to his staged media event. But it also seems they were removed simply because they were offering a message of racial justice and equality different from the President's. Indeed, the President has described racial justice protesters as "thugs" who need to be "dominat[ed,]" while earlier characterizing neo-Nazi rallies in Charlottesville, Virginia, as the grievances of "very fine people" on both sides.

9. A whistleblower—a National Guardsman who had been present at Lafayette Park on June 1—may have put it best when he testified before Congress in late July about the Defendants' attack on the peaceful protesters:

> Having served in a combat zone, and understanding how to assess threat environments, at no time did I feel threatened by the protesters or assess them to be violent. In addition, considering the principles of proportionality of force and the fundamental strategy of graduated responses specific to civil disturbance operations, it was my observation that the use of force against demonstrators in the clearing operation was an unnecessary escalation of the use of force. From my observation, those demonstrators—our fellow American citizens—were engaged in the peaceful expression of their First Amendment rights. Yet they were subjected to an unprovoked escalation and excessive use of force.

10. The whistleblower is right. The decision to disperse these peaceful protesters in Lafayette Park so suddenly and violently was arbitrary, unlawful, and unconstitutional for many independent reasons. *First*, it violates the First Amendment's guarantees of free speech and

peaceable assembly.  It was an all-out assault on core democratic freedoms the Founders embedded into the Constitution.  And it was undertaken for no rational reason, let alone any compelling one, as the Constitution requires.  *Second*, the attack on protesters violates the Fourth Amendment's prohibition on unlawful seizures and the unreasonable use of force.  *Third*, this attack on protesters violates the Due Process Clause of the Fifth Amendment by depriving them of their First Amendment expressive liberty interests arbitrarily and through egregiously excessive force.  If ever there was a case that "shocks the conscience" sufficient to demonstrate a Due Process violation, this would be it.  *Fourth*, these federal officials' conduct was *ultra vires*, as the protesters were attacked by unlawfully deployed troops sent to Washington, D.C. in violation of the Posse Comitatus Act, 18 U.S.C. § 1385.

11.     "[P]eaceful opposition is guaranteed to [the American] people and is recognized as a symbol of independent thought containing the promise of progress."  *Stromberg v. People of State of Cal.*, 283 U.S. 359, 366 (1931).  That federal officials, including the President and the Attorney General, sanctioned an attack on a group of unarmed peaceful American protesters is tantamount to an attack on American democracy. They must be held accountable for these unconscionable acts.  And Lafayette Park, fenced off immediately after this horrifying incident, must remain open to the public, including those who want to peaceably assemble there.  To those who thought such an atrocity couldn't happen here, it now has.  But never again.

## PARTIES

12.     Plaintiff Radiya Buchanan is a resident of Washington, D.C., who was demonstrating peaceably in Lafayette Park on June 1, 2020.

13.     Plaintiff Ann Dagrin is a resident of Washington, D.C. who was demonstrating peaceably in Lafayette Park on June 1, 2020.

14.     Plaintiff Lindsay Field is a resident of Washington, D.C., who was demonstrating peaceably in Lafayette Park on June 1, 2020.

15.     Defendant Donald J. Trump is the President of the United States.  He is sued his official capacity.

16.     Defendant William P. Barr is the Attorney General of the United States.  He is sued in his official capacity and his individual capacity.

17.     Defendant Mark T. Esper is the United States Secretary of Defense.  He is sued in his official capacity.

18.     Defendant William J. Walker is the Commanding General of the District of Columbia National Guard.  He is sued in his official capacity.

19.     Defendant Gregory Monahan is the Acting Chief of the United States Park Police. He is sued in his official capacity and his individual capacity.

20.     Defendant James M. Murray is the Director of the United States Secret Service.  He is sued in his official capacity.

21.     Defendant Michael Carvajal is the Director of the Federal Bureau of Prisons. He is sued in his official capacity.

22.     Defendant Peter Newsham is the Chief of the District of Columbia Metropolitan Police Department.  He is sued in his official capacity.

23.     Russell Fennelly is a Captain of the United States Park Police.  He is sued in his official capacity and his individual capacity.

24.     Defendant Mark Adamchik is the Incident Commander of the United States Park Police.  He is sued in his official capacity and his individual capacity.

25.     Defendant FNU (First Name Unknown) Seberling is an officer of the United States Park Police.  He is sued in his individual capacity and his official capacity.

26.     Defendant Anthony Alioto is an officer of the Metropolitan Police Department.  He is sued in his official capacity and his individual capacity.

27.     Defendant S. Buchanan (helmet number 4790) is an officer of the Metropolitan Police Department.  He is sued in his official capacity and his individual capacity.

28.     Defendant Jeffery Carroll is an Assistant Chief of the Metropolitan Police Department.  He is sued in his official capacity and his individual capacity.

29.     Defendant FNU (First Name Unknown) Hargrove (helmet number 3176) is an officer of the Metropolitan Police Department.  He is sued in his official capacity and his individual capacity.

30.     Defendant C. W. Meyer (helmet number 4895) is an officer of the Metropolitan Police Department.  He is sued in his official capacity and his individual capacity.

31.     Defendant Clifton Murphy (helmet number S800) is an officer of the Metropolitan Police Department.  He is sued in his official capacity and his individual capacity.

32.     Defendant Thomas Payne (helmet number 5751) is an officer of the Metropolitan Police Department.  He is sued in his official capacity and his individual capacity.

33.     Defendant FNU (First Name Unknown) Taylor (helmet number 5705) is an officer of the Metropolitan Police Department.  He is sued in his official capacity and his individual capacity.

34.     Defendant Daniel Thau is an officer of the Metropolitan Police Department.  He is sued in his official capacity and his individual capacity.

35.    Defendant Anthony A. Willis (helmet number 5453) is an officer of the Metropolitan Police Department.  He is sued in his official capacity and his individual capacity.

36.    Defendant Wayne Vincent is a captain in the Arlington County Police Department. He is sued in his official capacity and his individual capacity.

37.    Defendant Ryan Black is an officer of the Arlington County Police Department. He is sued in his official capacity and his individual capacity.

38.    Defendant Ryan Allen is an officer of the Arlington County Police Department.  He is sued in his individual capacity and his official capacity.

39.    Defendants John and Jane Does Nos. 1–50 are members of the federal law enforcement agencies who were present in Lafayette Park on the evening of June 1, 2020, and authorized, planned, and participated in the violent attack on Plaintiffs and other protesters in the park.  On information and belief, included among John and Jane Does are United States Park Police Officers wearing helmet numbers A702, A704, A706, B714, C711, C723,  and S735 and arm patch numbers BT09, JD97, and SK10, all of whom personally cleared protesters from Lafayette Park through means such as wielding shields and batons and charging protesters. They are sued in their official capacities and their individual capacities.

40.    Defendants John and Jane Poes Nos. 1–50 are members of non-federal law enforcement agencies from jurisdictions other than the District of Columbia, including the Arlington County Police Department, who were present in Lafayette Park on the evening of June 1, 2020, and authorized, planned, and participated in the violent attack on Plaintiffs and other protesters in the park.  They are sued in their official capacities and their individual capacities.

41.    Defendants John and Jane Roes Nos. 1–50 are members of the Metropolitan Police Department who were present in Lafayette Park on the evening of June 1, 2020, and authorized,

planned, and participated in the violent attack on Plaintiffs and other protesters in the park.  They are sued in their official capacities and their individual capacities.

## JURISDICTION AND VENUE

42.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

43.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1).  A substantial part of the events giving rise to this claim occurred in this District, and Defendants are officers of the United States sued in their official and individual capacities.

## FACTS

### *Racially Motivated Killings of Black Americans Spark Peaceful National Protests.*

44.     On May 25, 2020, George Floyd, a black man, died after a Minneapolis Police Department officer kneeled on his neck for nearly nine minutes, despite his repeated cries explaining that he could not breathe.  The police officer who held his knee to Mr. Floyd's neck, and three other officers who were present, have all since been charged with second- and third-degree murder, second-degree manslaughter, and aiding and abetting the same.  Mr. Floyd's cruel death was captured on video, sparking widespread outrage and protests around the world.

45.     Mr. Floyd's death followed on the heels of several other racially charged killings of black Americans, including the fatal shootings of Ahmaud Arbery, who was shot while jogging near his home, and Breonna Taylor, who was shot by plain-clothed police officers executing a "no-knock" search warrant in Taylor's home.  And, of course, the deaths of Mr. Floyd, Mr. Arbery, and Ms. Taylor are not isolated incidents.  In recent years, Trayvon Martin, Eric Garner, Michael Brown, Sandra Bland, Tamir Rice, Philando Castile, Botham Jean, and countless others have suffered tragic and senseless deaths, sparking protests and demonstrations in their own right.

46.     Large protests against police brutality and the differential treatment of people of color broke out, first in Minneapolis, where Mr. Floyd was killed, then in communities across the country.  Although the overwhelming majority of demonstrations were peaceful, during this time period, some localities experienced rioting, looting, and property damage.

### The President Urges Government to Crush These Peaceful Protests Violently.

47.     President Trump responded to the unrest occurring in some localities by publicly urging an aggressive and violent law enforcement response.  On May 29, 2020, President Trump tweeted from his official account: "Either the very weak Radical Left Mayor, Jacob Frey, get his act together and bring the City [of Minneapolis] under control, or I will send in the National Guard & get the job done right . . . .  These THUGS are dishonoring the memory of George Floyd, and I won't let that happen.  Just spoke to Governor Tim Walz and told him that the Military is with him all the way.  Any difficulty and we will assume control but, *when the looting starts, the shooting starts.*  Thank you!"

48.     The next day, May 30, 2020, President Trump tweeted about a protest outside the White House the previous night, stating, "Big crowd, professionally organized, but nobody came close to breaching the fence.  If they had they would . . . have been *greeted with the most vicious dogs, and most ominous weapons, I have ever seen.*  That's when people would have been really badly hurt, at least.  Many Secret Service agents just waiting for action."  Later that day, President Trump tweeted, "Crossing State lines to incite violence is a FEDERAL CRIME!  Liberal Governors and Mayors must get MUCH tougher or the Federal Government will step in and do what has to be done, and *that includes using the unlimited power of our Military* and many arrests.  Thank you!"  The same day he also "retweeted" another account's statement that "[t]his isn't going to stop until the good guys are willing to *use overwhelming force* against the bad guys."

14

49.    On May 31, 2020, President Trump retweeted another account's statement that "The radical-left formally divorced itself from America last night.  ***They are domestic terrorists and enemies of the United States.  They should be treated as such.***"  Later that day, President Trump announced that "The United States of America will be designating ANTIFA as a Terrorist Organization."  And on June 5, 2020, President Trump retweeted yet another statement denigrating the protesters and their message, expressing feeling "sicken[ed]" by "[t]he fact that [George Floyd] has been held up as a martyr."

***Lafayette Park:  Peaceful Protests Are Met with Police Assaults on June 1, 2020.***

50.    Large protests in Washington, D.C. began by May 29, 2020, and continued to grow over the ensuing days.  Although most of the protests were peaceful, instances of looting and vandalism did occur, including a fire that broke out in the basement of the historic St. John's Episcopal Church, adjacent to Lafayette Park, on the night of May 31, 2020.  Ultimately, Mayor Muriel Bowser of the District of Columbia announced a citywide curfew beginning at 7:00 p.m. on June 1, 2020 and ending at 6:00 a.m. on June 2, 2020.

51.    On the morning of June 1, 2020, the President held a conference call with the nation's governors regarding the protests.  Rather than discussing the protesters' grievances, the heinous murders, or the need for racial justice and systematic reform, the President, according to media accounts, "berated [several of] the nation's governors," "describ[ing] them as 'weak' in the face of growing racial unrest and urg[ed] them to take an aggressive stand against unruly protests."  The President explained, "***You have to dominate.  If you don't dominate, you're wasting your time*** . . . .  They're going to run over you.  You're going to look like a bunch of jerks."  He continued, "You have to do retribution . . . .  You can't do the deal where they get one week in jail.  ***These are terrorists.  These are terrorists.***"  On the same conference call, Secretary of Defense

15

Mark Esper stated "*[W]e need to dominate the battle space* . . . .  I think the sooner that you . . . dominate the battle space, the quicker this dissipates and we can get back to the right normal."  In all of these discussions, the "terrorists" were American protesters exercising their First Amendment freedoms.  The "battle space[s]" were American cities and public fora.

52.    As the day continued, with large protests ongoing throughout Washington, D.C., numerous protesters gathered in Lafayette Park.  Lafayette Park is located directly north of the White House.  Because of this location, Lafayette Park has long been the sight of many influential protests—including for women's suffrage and civil rights, and against the Vietnam War—among many other causes, serving as "a focal point for the expression of American ideals."  Lafayette Park has a particularly salient history of hosting protests following the extrajudicial killing of black Americans, including a thousand-person rally in Lafayette Park in August 1946 to demand that the Truman administration prosecute recent "terroristic attacks on Negro citizens," and rallies throughout the 1960s to protest similar atrocities.  With the "White House as the[] valued audience," Lafayette Park is an invaluable "stage" upon which "citizens continue to exercise their rights of free speech"—"a safe place for congregation and the demonstration of grievances."[1] Courts have long recognized Lafayette Park as a quintessential traditional public forum.  *See, e.g.*, *United States v. Doe*, 968 F.2d 86, 87 (D.C. Cir. 1992) ("[N]o one disputes that Lafayette Park is a 'quintessential public forum.'"); *United States v. Musser*, 873 F.2d 1513, 1517 (D.C. Cir. 1989) ("Lafayette Park . . . is the type of public place traditionally associated with [the exercise of First Amendment Rights.]"); *A Quaker Action Grp. v. Morton*, 516 F.2d 717, 736 (D.C. Cir. 1975) ("[T]he White House sidewalk and Lafayette Park are 'a unique situs for the exercise of First

---

[1]    *President's Park: A History of Protest at the White House*, WHITE HOUSE HISTORICAL ASS'N, https://www.white househistory.org/presidents-park-a-history-of-protest-at-the-white-house (last visited June 10, 2020).

Amendment rights' . . . ."); *Thomas v. News World Commc'ns*, 681 F. Supp. 55, 64 (D.D.C. 1988) ("Lafayette Park . . . [is] possibly the most conspicuous public forum in the Nation.").

53.     By 6:00 p.m., a large crowd of peaceful demonstrators had gathered in Lafayette Park to protest against racial injustice and police brutality.  Each of the Plaintiffs were included in that crowd.  By all accounts, the gathering was calm and peaceful, and the crowd included children and pets.  One report emphasized that "people [were] dancing and singing to a woman playing a guitar instead of knocking over barricades."

54.     At about 6:04 p.m., the White House communications office notified reporters that an event had been added to the President's calendar—a 6:15 p.m. news briefing in the Rose Garden.  Four minutes later, Attorney General William Barr arrived at Lafayette Park from the White House and appeared behind the surrounding law enforcement barricade.  President Trump had appointed Attorney General Barr to lead "federal law enforcement efforts to assist in the restoration of order to the District of Columbia."[2]

55.     Shortly thereafter, Barr personally ordered law enforcement personnel to extend the security perimeter around the White House and clear the streets around Lafayette Park—directing law enforcement to clear protesters from the park.  Video shows Barr giving the order to, among others, Defendant United States Park Police Captain Russell Fennelly.  Members of the District of Columbia National Guard, United States Park Police mounted on horses, the Unites States Secret Service, Bureau of Prisons "riot teams," and, on information and belief, the U.S. military were all present at the scene.[3]  United States Park Police Major Mark Adamchik was the "incident

---

[2]   Reuters, *U.S. Justice Dept. Deploys Its Police Agencies in Washington to Quell Rioting,* U.S. NEWS (June 1, 2020), https://www.usnews.com/news/us/articles/2020-06-01/us-justice-dept-deploys-its-police-agencies-in-washington-to-quell-rioting.

[3]   Plaintiffs cannot presently identify each officer that attacked them and other peaceful protesters in Lafayette Park, as many officers did not wear badges or even clear agency markers.  The Trump Administration has also been

commander" during this event and gave directives to and had authority over other officers present. Major Adamchik also made changes to the United States Park Police's normal "rules of engagement" for the purpose of clearing the people assembled in Lafayette Park and briefed other commanders on the rules of engagement for that day.  Defendant Monahan, who was on site, personally "concurred with the[se] change[s]."

56.     According to federal officials, sometime between 6:23 p.m. and 6:30 p.m., an officer, began giving "warnings" to the people assembled in Lafayette Park.  Several officers knelt briefly as they donned gas masks.  While some officials claimed that three "warnings" were supposedly given in total, those warnings—if given at all—were futile and inadequate.  Among other things, the "warnings" were given via a megaphone from approximately 50 yards away from the closest protesters, with many protesters located much farther away.  According to a member of the D.C. National Guard standing only 30 yards from the officer with the megaphone, the "warnings" were barely audible even at his distance.[4]  In recent weeks, in fact, multiple witnesses

---

conspicuously opaque in discussing which agencies were involved in the dispersal of protesters at Lafayette Park, prompting the chairmen of four House committees to jointly demand an answer as to "[w]hich federal agencies had a physical presence at Lafayette Park?"  Letter from Jerrold Nadler, Chairman, House Comm. on the Judiciary et al. to Attorney Gen. William Barr et al. (June 3, 2020), https://judiciary.house.gov/uploadedfiles/2020-06-03_ ltr_to_barr_esper_bernhardt_wolf_regarding_lafayette_square.pdf.  *See also* Zolan Kanno-Youngs, *Unidentified Federal Police Prompt Fears Amidst Protests in Washington*, N.Y. TIMES (June 4, 2020), https://www.nytimes. com/2020/06/04/us/politics/unidentified-police-protests.html. Plaintiffs allege on information and belief that the U.S. Military was also involved in the vicious attack on protesters given the copious use of riot shields bearing the moniker "Military Police" and given that the Pentagon ordered national guard helicopters to accost protesters in Washington, D.C. on June 1.  Thomas Gibbons-Neff & Eric Schmitt, *Pentagon Ordered National Guard Helicopters' Aggressive Response in D.C.*, N.Y. TIMES (June 6, 2020), https://www.nytimes.com/2020/06/ us/politics/protests-trump-helicopters-national-guard.html.  The two helicopters (a Lakota and Black Hawk) flew as low as 45 feet above street level, causing strong gusts of wind that snapped tree branches and sent debris flying. Such tactics are typically used to frighten and disperse enemy combatants in a warzone.  Alex Horton, et al., *A low-flying 'show of force'*, WASH. POST (June 23, 2020), https://www.washingtonpost.com/graphics/2020/in vestigations/helicopter-protests-washington-dc-national-guard/.

[4]  This failure to ensure that the "warnings" were audible is separately a violation of a class settlement ordered by the Honorable Emmet G. Sullivan of this Court in a case against, among others, the Metropolitan Police Department and the U.S. Park Police.  *See Barham v. Ramsey*, No. 02-cv-2283-EGS (D.D.C.), ECF No. 1040 (July 7, 2015).

have testified under oath before Congress that they did not hear any "warning" or "instructions to move" before the police "began charging forward at a sprinting pace."

57.     Minutes later, at approximately 6:35 p.m., Defendants' attack on the protesters commenced on Major Adamchik's order.  Law enforcement officers, both on foot and mounted, rushed the protesters, began striking them with riot shields and batons, shooting them with rubber bullets, and firing canisters of tear gas, smoke bombs, and flash-bang grenades into the crowd in order to clear the park.  Joined by reinforcements on horseback, military and law enforcement officers began beating people with clubs and riot shields and shooting tear gas, "stinger" balls that shoot out rubber pellets, and flash-bang grenades into the crowd—all within the span of minutes— in order to clear Lafayette Park.  On information and belief, Metropolitan Police Department Assistant Chief Jeffery Carroll and Metropolitan Police Department Officers Anthony Alioto; S. Buchanan, wearing helmet number 4790; FNU Hargrove, wearing helmet number 3176; C. W. Meyer, wearing helmet number 4895; Clifton Murphy, wearing helmet number S800; Thomas Payne, wearing helmet number 5751; FNU Taylor, wearing helmet number 5705; Daniel Thau; and Anthony A. Willis, wearing helmet number 5453, were present in Lafayette Park and personally cleared protesters by using means that included deploying tear gas, wielding batons and shields, and charging protesters.  Specifically, Carroll and Alioto directed and oversaw the deployment of the tear gas down 17th Street NW by Metropolitan Police Department Officers. Meanwhile, United States Park Police Officers mounted on horseback, including FNU Seberling, charged protesters, who were trying to escape.  Arlington County Police Department Officers, including Ryan Black and Ryan Allen, wielding police batons, also participated in the attacks under the command of Arlington County Police Department Captain Wayne Vincent.

58.     The unprovoked violence caused what news reports described as a "blind panic" as the crowd attempted to flee westward.  Chemical gasses in the air caused people to cough and vomit as they fled the scene.  Rubber bullets hit protesters, causing immense pain and lasting injuries for some.  The violent law enforcement response was captured on video from many vantage points, some of which were broadcast on live, national television.[5]  In one video, a line of Metropolitan Police Department officers walking down 17th Street NW toward G Street deployed tear gas on peaceful protesters.   In another video, two United States Park Police officers can be seen beating two Australian journalists who were covering the protest with batons and riot shields, even after they repeatedly identified themselves as media.  One of those journalists, Amelia Brace, testified before the House Committee on Natural Resources that she felt terrified and trapped given the bottleneck created by the United States Park Police line,  and that she continued to be attacked by United States Park Police officers even as she was running away.  As of July 28, 2020, these two officers were the subject of an investigation by the United States Park Police Office of Professional Responsibility.

### President Trump Poses for Photo Opportunity at St. John's Episcopal Church.

59.     President Trump ordered law enforcement officers to take the actions described herein in order to forcibly drive protesters from Lafayette Park.   Indeed, President Trump all but stated as much.

60.     Around 6:43 p.m., even as protesters were still being shot at and gassed just across the street, President Trump began delivering prepared remarks in the Rose Garden, in which he vowed to "protect the rights of law-abiding Americans, including your Second Amendment

---

[5]     One such example, depicting the peaceful protest and the subsequent violent dispersal, can be found here: Reuters, *Graphic Warning: Peaceful Protesters Fired at with Tear Gas, Rubber Bullets by U.S. Military Police*, YOUTUBE (June 1, 2020), https://www.youtube.com/watch?v=UrMoqSPZym0.

rights."  He urged  "every governor to deploy the National Guard in sufficient numbers that we dominate the streets . . . [and] establish[] an overwhelming law enforcement presence until the violence has been quelled.  If the city or state refuses to take the actions that are necessary to defend the life and property of their residence, then I will deploy the United States military and quickly solve the problem for them."

61.     President Trump continued by saying that "The following measures are going into effect immediately.  First, we are ending the riots . . . . I am also taking swift and decisive action to protect our great capital, Washington, D.C.  As we speak, I am dispatching thousands and thousands of heavily-armed soldiers, military personnel, and law enforcement officers, to stop the rioting, looting, vandalism, assaults, and the wanton destruction of property."  He concluded his remarks by stating, "[N]ow I am going to pay my respects to a very, very special place."

62.     The "very, very special place" was the historic St. John's Episcopal Church, located across Lafayette Park from the White House, which had suffered some fire damage the night before.  On information and belief, President Trump first raised the possibility of walking across the street from the White House to visit St. John's on the morning of June 1, 2020, "determined to show he was still in charge" after the demonstrations of the preceding days.[6]  Although the decision to visit the church was made some hours before the Rose Garden address, members of the press and local law enforcement were not informed until shortly before the crackdown on demonstrators in Lafayette Park, if at all.

63.     At around 7:01 p.m., President Trump emerged from the White House, accompanied by security personnel and members of the administration, including Defendant Barr,

---

[6]     *See* Kevin Liptak et al., *60 Minutes of Mayhem: How Aggressive Politics and Policing Turned a Peaceful Protest into a Violent Confrontation*, CNN (June 2, 2020), https://www.cnn.com/2020/06/02/politics/trump-white-house-protest-police-church-photo-op/index.html.

and walked through the now-cleared Lafayette Park.  The President arrived at St. John's at around 7:06 p.m., where he remained outside for approximately five minutes posing for photographs while holding a bible in front of the church.  The President did not mention the protesters or the attack that law enforcement had just undertaken at his direction.

64.     The next morning, June 2, 2020, President Trump tweeted "D.C. had no problems last night.  Many arrests.  Great job done by all.  ***Overwhelming force.  Domination. . . .  [T]hank you President Trump***!"  On June 4, he tweeted a letter calling the protesters "terrorists."  Days later, White House Press Secretary Kayleigh McEnany reaffirmed the President's view, noting that the White House "stand[s] by [the] actions" of the federal law enforcement officers who violently removed protesters from Lafayette Park on June 1 and has "***no regrets***" about the measures used.

### These Unlawful Acts Harmed Plaintiffs and Many Others.

### Plaintiff Radiya Buchanan

65.     Plaintiff Radiya Buchanan is a 27-year-old black woman who lives in Washington, D.C.  Ms. Buchanan holds a bachelor's degree in sociology and psychology, and a master's degree in non-profit management.  She recently relocated to Washington, D.C. to work for an education non-profit organization that aims to close the opportunity gap for middle school students in underserved communities.  Ms. Buchanan participated in peaceful demonstrations protesting the murder of George Floyd, police brutality, and racism on Sunday, May 31, 2020 and Monday, June 1, 2020 in Washington, D.C.  Ms. Buchanan has long been a passionate advocate for racial equality and social justice.  For example, as an undergraduate at St. John's University in 2012, Ms. Buchanan and her teammates on the track and field team participated in a peaceful demonstration protesting the murder of Trayvon Martin.

66.     Ms. Buchanan felt particularly compelled to join the protests in Lafayette Park on May 31, 2020 and June 1, 2020 to protest the murder of George Floyd at the hands of the police because she herself has experienced police brutality firsthand.  When she was only 13 years old, just a few days after her eighth grade graduation, police arrested Ms. Buchanan after an older white man at a movie theater accused her of talking too loud before the movie began.  The manager kicked Ms. Buchanan and her young friends out of the theater and called the police.  As the girls waited outside for Ms. Buchanan's mother to pick them up, the police arrived and ordered Ms. Buchanan to get off the phone with her mother.  One of the officers shook his handcuffs in Ms. Buchanan's face and then lunged at her, knocking her to the ground and sitting on her pelvis as he tried to handcuff her.  Another officer came over, flipped Ms. Buchanan onto her stomach, and sat on her back while the officers handcuffed her, bruising her wrists.  The officers then pushed her into their car and brought her to the police station, where they made disparaging remarks about her and her upbringing.

67.     Based on this incident, Ms. Buchanan was charged with trespassing and assault on a police with a deadly weapon (i.e., her leg, which she purportedly had used to kick the officer when he threw her to the ground), even though she was the *victim* of the police's unwarranted attack.  The police report was riddled with inaccuracies, and Ms. Buchanan spent the next nine months attending court hearings to defend herself and refute the police officers' lies.  Eventually, the judge dismissed the case in its entirety.

68.     Ms. Buchanan therefore joined recent protests not only because she supports racial justice and sympathizes with victims of police violence, but because she can empathize directly with these victims' experiences.  Ms. Buchanan knows what it feels like to experience police brutality, and to have the police lie and insist you are guilty when you are in fact innocent.  She

feels deeply for those people who end up in these situations through no fault of their own—an officer decides they are guilty, so their innocence is taken away and their voice goes unheard.  Ms. Buchanan believes that it is important for her in this moment to join everyone speaking out against this injustice and to have her voice heard and her presence known.

69.     On Monday, June 1, 2020, Ms. Buchanan and her roommate, Plaintiff Ann Dagrin, arrived at the protest at Lafayette Park before 6:00 p.m.  The atmosphere felt very different from the demonstration that Ms. Buchanan and Ms. Dagrin had attended on Sunday, May 31, 2020, when protesters were more vocal and a few young kids in the crowd were agitating police officers by throwing things, though other protesters discouraged them from doing do.  By contrast, on Monday, the demonstration was peaceful and organized.  There was no violence whatsoever.

70.     That changed at about 6:30 p.m., when law enforcement suddenly began to shoot canisters of tear gas into the crowd, and officers on horses started to yell "Move!" and advanced forward into the crowd of protesters.  There was no warning of the officers' attack—one minute people were protesting peacefully, and the next minute the air was filled with smoke and people were screaming and running away from the officers.

71.     Ms. Buchanan and Ms. Dagrin walked quickly down the street away from the officers.  They tried not to run to avoid trampling others.  When they got to a nearby street corner, officers began throwing flash-bang grenades and spraying more tear gas.  Ms. Buchanan and Ms. Dagrin poured water on the washcloths they had packed and used them to shield their faces and protect their eyes.  Nevertheless, they were still impacted by the gas and were coughing as they walked back to their car.  They saw a lot of protesters limping and being carried away from the crowd, and many who needed a solution poured in their eyes to flush out the chemical irritants.

72.     Ms. Buchanan's experience at the protest has affected her profoundly both emotionally and psychologically.  She has a heightened level of anxiety and has had considerable difficulty sleeping.  She is haunted by recurring memories of the attack, particularly the startling noise of the tear gas canisters exploding.  She says that it felt kind of like being in a war zone.

73.     Despite her anxiety and fear, Ms. Buchanan is determined to continue protesting at Lafayette Park.  She has demonstrated near there almost every day since June 1, though the park itself was blocked by fencing for a substantial period of time in June.  The decision to return to Lafayette Park was not easy, as Ms. Buchanan worries that at any moment, law enforcement may decide that they do not want the protesters there and use violence to get rid of them and indeed has seen peaceful protesters attacked violently like she was throughout the country.  However, Ms. Buchanan believes that the cause of racial justice is too important for her to stay silent.

**Plaintiff Ann Dagrin**

74.     Ann Dagrin is a 26-year-old black woman who lives in Washington, D.C.  She currently teaches seventh grade reading and writing at KIPP DC Charter Schools.  She previously taught writing at another charter school in Providence, Rhode Island.  Ms. Dagrin is currently completing a master's program in education from Providence College and earned a Bachelor of Science degree in health care administration from St. John's University, where she participated in track and field.  Prior to May 31, 2020, Ms. Dagrin had not attended a large scale protest, but had attended smaller protests in Providence, Rhode Island, where she previously resided.  Ms. Dagrin participated in peaceful demonstrations at Lafayette Park protesting the murder of George Floyd, police brutality, and racism on Sunday, May 31, 2020 and Monday, June 1, 2020.

75.     On Monday, June 1, 2020, Ms. Dagrin arrived at Lafayette Park before 6:00 p.m. with three friends, including Plaintiff Radiya Buchanan.  She observed that the crowd consisted

mostly of young professionals but also included families with young children and pets. The atmosphere was peaceful and much calmer than the atmosphere in Lafayette Park the night before. Ms. Dagrin observed a large police and/or military presence at the park as soon as she arrived. Ms. Dagrin did not see projectiles being thrown by protesters at law enforcement personnel.

76.     Around 6:30 p.m., Ms. Dagrin heard a loud explosion. She saw law enforcement officers, both on foot and mounted on horses, charge towards the crowd and deploy tear gas and flash-bang grenades on protesters. Ms. Dagrin heard no warning before law enforcement charged at the protesters. Ms. Dagrin became overwhelmed with fear and began crying. One of her friends grabbed her and told her that they needed to go. She agreed, following closely behind her friends as they quickly retreated with the crowd. As she fled the scene, Ms. Dagrin continued to sob and began experiencing a panic attack. At one point, a smoke bomb exploded a few feet in front of her. While leaving the park, Ms. Dagrin observed two male protesters carrying another female protester who appeared to be injured.

77.     Ms. Dagrin saw law enforcement officers deploy tear gas in all directions, and continue pursuing protesters even as they fled from Lafayette Park. Shortly after Ms. Dagrin and her friends made it past I Street, approximately one block away from Lafayette Park, they were struck by a cloud of tear gas. As a result, Ms. Dagrin began coughing and experienced terrible pain in her throat, symptoms that persisted through the next day. Ms. Dagrin and her friends kept running until they finally reached a safe location.

78.     Ms. Dagrin has experienced significant emotional distress since law enforcement's unprovoked attack on her and other protesters. On June 2, 2020, Ms. Dagrin experienced a second panic attack shortly after she joined a protest outside of the fence surrounding Lafayette Park. Ms.

Dagrin had to leave the protest immediately.  Ms. Dagrin has also had trouble sleeping and has felt jumpy and on-edge, which she believes may be early symptoms of Post-Traumatic Stress Disorder.  For example, on June 2, 2020, Ms. Dagrin dropped to the floor in her bedroom after hearing a bottle drop into the trash can in her apartment.  Ms. Dagrin feels that the unprovoked attack on June 1, 2020 was the most dehumanizing moment of her life.

79.     Ms. Dagrin also attended Black Lives Matter protests outside of the fence that had been surrounding Lafayette Park on June 3, 2020 and June 4, 2020.  She plans to continue attending similar demonstrations outside of Lafayette Park in the future, though she has substantial fears that law enforcement could return and attack her and other peaceful protesters as they did on June 1 and have at peaceful protests throughout the country.

**Plaintiff Lindsay Field**

80.      Lindsay Field is a 32-year-old white woman who lives in Washington, D.C.  She graduated from Pennsylvania State University in 2010 with a Bachelor of Science degree in human development and family studies and earned a Master of Education degree from Johns Hopkins University in 2019.  Ms. Field grew up in Washington, D.C., and currently teaches kindergarten at Lafayette Elementary School, a D.C. public school.  She previously taught kindergarten and first grade at charter schools in New Orleans, Louisiana.  Ms. Field participated in peaceful demonstrations at Lafayette Park  protesting the murder of George Floyd, police brutality, and racism on May 29, 2020 and June 1, 2020.

81.     Ms. Field attended Black Lives Matter demonstrations twice before to protest the murders of black men by police.  In 2014, Ms. Field participated in peaceful demonstrations in Washington, D.C. protesting the murder of Michael Brown in Ferguson, Missouri.  In 2016, she participated in peaceful demonstrations in New Orleans protesting the murders of Alton Sterling

in Baton Rouge, Louisiana and Philando Castile in St. Paul, Minnesota—both black men who were killed by police.

82.     On Monday, June 1, 2020, Ms. Field arrived at Lafayette Park around 4:45 p.m. with her brother and a coworker.  People were talking and chanting, and the atmosphere was passionate but peaceful.  Ms. Field did not see protesters throw a single thing at the police.  Around 6:00 p.m., Ms. Field noticed the police and military presence increasing significantly and moving closer towards the barricades.  Some of the officers were equipped with ammunition belts or spray canisters.  Several older white men in suits walked between the rows of police and military.  Protesters in the crowd tried to guess who they were, and Ms. Field thought that one of them resembled Attorney General Barr.  An officer made a muffled announcement over a megaphone.  Ms. Field thinks he told protesters to vacate the premises, but she could not really hear him, and it was well before the 7:00 p.m. curfew.

83.     Ms. Field and her brother were at that time standing in the second row of protesters behind the barricades.  But when she saw the officers suddenly begin to move forward, Ms. Field, her brother, and other white protesters moved to the front row to stand in between black protesters and the police and military.  Shortly after 6:30 p.m., Ms. Field heard loud noises and saw police or military officers on horseback and smoke coming up H Street from east to west.  Other officers were approaching the barricades and blowing whistles and spraying pepper spray or tear gas.  The crowd, including Ms. Field, began to move back.

84.     As Ms. Field walked away from the barricades, she felt something hit the back of her thigh, which stung and left a bruise.  Ms. Field's brother told her to keep moving, and she did.  A couple minutes later, the police stopped advancing towards the protesters, and some protesters began to move back towards the police.  Ms. Field saw a black man who had gone back towards

the police, and she went and stood between him and the police.  The police then came into the crowd and began hitting people with night sticks.  The police focused on one black protester, who was standing near the barricades, and beat him particularly hard until other protesters pulled him away.

85.     As Ms. Field continued to walk away from the police and military's attack, she came across a young black woman who had been sprayed in the eyes with pepper spray or tear gas.  Ms. Field and the young woman took shelter behind an electrical box, and Ms. Field flushed the young woman's eyes out with a water bottle Ms. Field had brought to the protest.  Other people came and helped flush the young woman's eyes out as well.

86.     Ms. Field and her brother then rejoined the crowd, reunited with Ms. Field's coworker, and left the protest.  Ms. Field's coworker had been badly sprayed with pepper spray or tear gas and had to have her eyes flushed out at the protest.  They all continued to cough on the way home, and Ms. Field and her brother continued to cough after they got back to her apartment.

87.     Ms. Field is deeply disturbed and shaken by the police's and military's unprovoked attack on her and other protesters.  She feels like she is still processing the psychological and emotional impact of the events that night.  Nevertheless, Ms. Field plans to continue to protest and make her voice heard.  Ms. Field participated in Black Lives Matter demonstrations again on Saturday, June 6.  She and friends walked along Independence Avenue to Freedom Plaza.  She has continued to protest in the weeks since June 1, yet she fears that law enforcement may return to attack her and other peaceful protesters as law enforcement did on June 1 and have at peaceful protests throughout the country.

### *The Trump Administration's Cover-Up and Shifting Justifications Begin.*

88.     Defendants' explanations for their violence demonstrate that the attack cannot be justified under any constitutional scrutiny—even rational basis review.  Indeed, Defendants' own justifications started shifting almost immediately and are wildly inconsistent:

89.     ***The Curfew.***  The White House deputy press secretary initially put out a statement just hours after law enforcement attacked the protesters, explaining that law enforcement had done so because "[t]he perimeter was expanded to help enforce the 7 p.m. curfew."  Yet this explanation was almost immediately contradicted by the Mayor of Washington, D.C., who had ordered the curfew.  Mayor Bowser in fact condemned the attack on protesters, tweeting:  "***A full 25 minutes before the curfew & w/o provocation***, federal police used munitions on peaceful protesters in front of the White House, an act that will make the job of @DCPoliceDept officers more difficult. Shameful!"

90.     ***False Allegations of Violence.***  The next day, the United States Park Police put out a statement attributed to Defendant Monahan, Park Police acting chief, instead explaining that law enforcement acted "[t]o curtail the violence that was underway," claiming that by "approximately 6:33 pm [on June 1], violent protesters on H Street NW began throwing projectiles including bricks, frozen water bottles and caustic liquids."[7]  In a June 7, 2020 interview, Attorney General

---

[7]  According to the head of the Federal Public Defender's office for the Eastern District of Virginia, Acting Chief Gregory T. Monahan of the Park Police "had, by far, more cases thrown out because of police misconduct than any other officer [he had] ever dealt with."  Matthew Goldstein & Katie Benner, *Park Police Head Had Been Accused of Illegal Searches and Unreliable Testimony*, N.Y. TIMES (June 18, 2020), https://nytimes.com/2020/06/18/us/politics/park-police-gregory-monahan.html.  Among these cases is one where Monahan performed a cavity search on a black motorist in full view of a busy street.  *Id.*  In fact, Monahan has been investigated at least four additional times for conducting unlawful cavity searches.  *Id.*  Monahan also has such a long-standing reputation for lying under oath, in fact, that the same federal judge twice discounted Monahan's testimony against a defendant's.  In one case, Judge Gerald B. Lee specifically stated in an opinion that he found Monahan's statements "lack[ed] credibility."  *United States v. Ford*, 232 F.Supp. 2d 625, 629 (E.D. Va. 2002).  In a subsequent decision, Judge Lee referred to Monahan's "previous questionable veracity" in deciding to once again disregard Monahan's testimony.  Goldstein, *supra*.

Barr similarly insisted that "projectiles were being hurled at the police" by "a very rowdy and non-compliant crowd."  In a June 8, 2020 press conference, the White House press secretary reiterated these claims and referred to the protesters as "rioters."  This justification was blatantly false. Protesters present at Lafayette Park, including Plaintiffs, saw no such projectiles being thrown, an observation consistently corroborated by numerous media accounts, police radios, and clear video footage.  Moreover, public reports suggest that none of the protesters who were violently dispersed was arrested.[8]  Notably, on June 1, not a single law enforcement officer at or near Lafayette Park was reported to have been injured by a protester until *after* officers began forcibly clearing the Square.

91.     ***The Security Perimeter.***  Later on June 2, 2020, anonymous administration officials informed reporters that Defendant Barr had resolved either the day before or the morning of June 1, 2020 to extend the security perimeter around the White House, and was surprised when he arrived at Lafayette Park at approximately 6:08 p.m. on June 1 to see that law enforcement had failed to do so.  Indeed, in a June 7, 2020 interview, Barr stated, "This was not an operation to respond to that particular crowd.  It was an operation to move the perimeter one block."[9]  And on July 29, 2020, Barr testified under oath that the decision to extend the security perimeter "was something conceived of long before and didn't turn on the nature of the crowd."  Defendants, however, have never explained why the security perimeter needed to be expanded at the moment

---

[8]   *See, e.g.*, *Statement from United States Park Police acting Chief Gregory T. Monahan about the actions taken over the weekend to protect life and property,* NAT'L PARK SERVICE (June 4, 2020), https://www.nps.gov/subjects/uspp/6_2_20_statement_from_acting_chief_monahan.htm#:~:text=Throughout%20the%20demonstrations%2C%20the%20USPP,we%20are%20entrusted%20to%20protect.

[9]   *Transcript: Attorney General William Barr on "Face the Nation," June 7, 2020*, CBS NEWS (June 7, 2020), https://www.cbsnews.com/news/bill-barr-george-floyd-protests-blm-face-the-nation-transcript.

it was and in the violent manner undertaken.[10]  In fact, General Joseph L. Lengyel, Chief of the National Guard Bureau and a member of the Joint Chiefs of Staff, reported that while there were general discussions about expanding the security perimeter, he did not recall any discussion that the police would set up that perimeter through use of force or by a particular time.  As Former U.S. Capitol Police Chief Terrance Gainer observed: "There was no reason to use force and fight. If they wanted to clear the park, they could have done it in a very orderly way, giving people notice."

92.     More than a half-dozen law enforcement officials have contradicted Barr and the Trump administration's account of the operation to clear Lafayette Park.  Among them is D.C. Police Chief Peter Newsham, who said that the "perimeter" had not actually been extended until long after the protesters were forcibly removed "overnight."  Newsham reported that his agency learned through police communications that force was going to be used moments after he was told that President Trump intended to walk to the church: "We heard that there was going to be an unscheduled presidential movement. Just a few minutes later, our teams on the ground learned [chemical] munitions were going to be used. The munitions were deployed minutes later."  General Joseph L. Lengyel also reported that: "I never heard any plan, ever, that police of National Guard were going to push people out of Lafayette Square."

93.     In a July 28, 2020 hearing before the House Committee on Natural Resources, Defendant Monahan stated that the purpose of driving protesters out of Lafayette Park was to promptly build a perimeter fence around it.  But the material to erect the fence was not even brought

---

[10]   Although both White House and Justice Department officials had previously confirmed that Barr personally told law enforcement personnel at Lafayette Park that "we need[] to get going with moving that perimeter" and to "[g]et it done," after Barr was sued personally for damages arising out of this event by other plaintiffs, Barr subsequently claimed that law enforcement was already in the process of extending the security perimeter when he arrived at the park; that "I didn't just say to them, 'Go,'" although "my attitude was get it done"; and that the order for law enforcement to move in and clear the protesters was given by a Park Police "tactical commander." Notwithstanding Barr's comments, on June 8, 2020, the White House reiterated that "it was AG Barr who made the decision to move the perimeter."

to the Square until approximately 9:00 p.m., well over two and a half hours *after* officers attacked peaceful protesters.

94.     ***Protecting St. John's Episcopal Church.***   On June 8, 2020, the White House Press Secretary claimed that **"**the burning at St. John's [on May 31] is what prompted the decision to move the perimeter."   Yet the expanded security perimeter following June 1, 2020 did not encompass St. John's—a 10-foot tall fence that was erected on the south side of H Street, N.W., the opposite side of the street from St. John's.

95.     ***The President's Photo Op.***   Defendants have waffled as to whether the protesters were attacked simply to clear Lafayette Park for President's photo op.  On June 4, 2020, Defendant Barr denied there was any correlation between the decision to clear Lafayette Park—which occurred at approximately 6:30 p.m.—and the President's walk through the park to visit St. John's, which occurred at approximately 7:00 p.m., although he acknowledged that he knew of the President's plan to visit St. John's prior to giving the directive to law enforcement that evening. But the Attorney General also stated "I think the president is the head of the executive branch and the chief executive of the nation and should be able to walk outside the White House and walk across the street to the church of presidents . . . .  I think it was entirely appropriate for him to do," suggesting clearing the park *was* designed to facilitate the photo op.

96.     ***Political Propaganda.***   The purpose of the violent dispersal of peaceful protesters in Lafayette Park was made clear by June 2, 2020, when the White House published a 29-second video depicting President Trump walking across the street, through the now-cleared park, so he could stand in front of St. John's Episcopal Church in order to pose for pictures while holding aloft a bible.  The White House press secretary would later compare President Trump's walk across the street following the violent crackdown to Winston Churchill inspecting bombing damage during

World War II and President George W. Bush throwing out the first pitch at a Major League Baseball game after 9/11.

### *Defendants Mislead the Public About the Scope of the Violence Undertaken*

97.     In addition to attempting to obscure the improper and unlawful motives for their vicious attack on protesters, Defendants also sought to deny and downplay the violent means of their attack.

98.     For example, the United States Park Police statement denied using "tear gas" to disburse protesters, but acknowledged using pepper balls and smoke canisters—a formalistic and meaningless distinction, particularly given that these and related compounds plainly constitute tear gas pursuant to the federal Centers for Disease Control and Prevention's categorizations.  Indeed, the *Washington Post* and a local news team even reported found spent "CS canisters"[11] on the scene, evidencing that "tear gas" was used even under the government's own crimped definition of the phrase.  By June 4, 2020, the White House went further, denying that either tear gas or rubber bullets were used, and claiming instead—ignoring all video evidence to the contrary—that "bricks" and "frozen water bottles" were being thrown at law enforcement, and that law enforcement thus "had no other choice than to act."  Incredibly, Defendants stated that law enforcement had defended themselves "peaceably" during the attack on the peaceful protesters in Lafayette Park.  Attorney General Barr himself insisted on June 7, 2020 that "law enforcement officials with shields warn[ed] and mov[ed] a line slowly" and "mounted officers mov[ed] slowly, directing people to move," contrary to live television broadcasts depicting law enforcement charging at the protesters and the ensuing chaos.

---

[11]     *See* Carol D. Lenning, *Park Police spokesman acknowledges chemical agents used on Lafayette Square protesters are similar to tear gas*, WASH. POST (June 5, 2020), https://www.washingtonpost.com/politics/park-police-spokesman-acknowledges-chemical-agents-used-on-lafayette-square-protesters-are-similar-to-tear-gas/2020/06/05/971a8d78-a75a-11ea-b473-04905b1af82b_story.html.

99.     And in a June 5, 2020 interview, a United States Park Police spokesperson admitted that "it was a 'mistake' to insist in a statement on Tuesday that the agency didn't use tear gas the day before in a Washington, DC, park to disperse a crowd ahead of President Donald Trump's photo op, explicitly noting that pepper balls shot by officials irritate the eyes and cause tears."  Yet just hours later, the United States Park Police switched course yet again, issuing a statement from Defendant Monahan "reiterating" that "United States Park Police officers and other assisting law enforcement partners did not use tear gas or OC Skat Shells to close the area at Lafayette Park in response to violent protesters."  On June 7, 2020, Barr continued to deny that any tear gas or chemical irritants had been used in Lafayette Park on June 1, even as he acknowledged the use of "pepper balls," because "[p]epper spray is not a chemical irritant.  It's not chemical."

### Defendants Close Lafayette Park—A Traditional Public Forum.

100.     By the morning of June 2, 2020, the United States Secret Service announced that all access to Lafayette Park would be blocked indefinitely "to ensure public safety," erecting a 10-foot-high fence around a square that has long served as a key gathering place for peaceful assembly in the nation's capital.  They cited no ongoing threat to public safety, nor was there been any.  Indeed, arrests in Washington, D.C. arising from the protests were minimal on June 2 (29 arrests), June 3 (0 arrests), June 4 (0 arrests), and June 5-7 (1 arrest each day).[12]  But the fence blocked access to Lafayette Park entirely, and prevented anyone from assembling there to exercise their free speech rights, in "possibly the most conspicuous public forum in the Nation" directly in front of the White House.  By June 4, 2020, the erection of additional security barriers

---

[12] *May-June 2020 Unrest-Related Arrests and Persons of Interest*, METROPOLITAN POLICE DEPT. (June 11, 2020), https://mpdc.dc.gov/page/may-june-2020-unrest-related-arrests-and-persons-interest.

around the White House and surrounding area had been "transformed into a veritable fortress" "resembl[ing] the monarchical palaces or authoritarian compounds of regimes in faraway lands"—"the physical manifestation of President Trump's vision of law-and-order 'domination' over the millions of Americans who have taken to the streets to protest racial injustice."[13]

101.    A few days later, after congressional leaders sent a letter to the White House demanding that the fences come down, news reports suggested that the fencing would come down on June 10, 2020.  On June 9, 2020, the United States Secret Service backtracked, advising that the fences would *not* be coming down and Lafayette Park would *not* reopen to the public in the near future.  Some fencing was removed on June 11, but other sections of fence remained after, reminding protesters that Defendants may attempt to seal off the Park at any time.

### *Americans Across the Political Spectrum Are Outraged Over the Attack of Unarmed Peaceful Protesters.*

102.    In response to this wanton violence against unarmed, peaceful protesters, Americans—already outraged over the continual and systematic abuse endured by communities of color at the hands of government—have grown even more incensed.

103.    Church leaders at St. John's Episcopal Church are infuriated.  Reverend Robert Fisher said he was never informed that President Trump planned to visit the church, describing the event as "surreal" and like "some alternative universe."  And the Right Reverend Mariann Budde stated "I am outraged . . . .  I am the bishop of the Episcopal Diocese of Washington and was not given even a courtesy call that they would be clearing with tear gas so they could use one of our churches as a prop, holding a Bible, one that declares that God is love and when everything he has

---

[13]  Philip Rucker et al., *With White House Effectively a Fortress, Some See Trump's Strength — but Others See Weakness*, WASH. POST (June 4, 2020), https://www.washingtonpost.com/politics/with-his-white-house-effectively-a-fortress-trump-sees-strength--but-others-see-weakness/2020/06/04/3c70fa26-a672-11ea-b619-3f9133bbb482_story.html.

said and done is to inflame violence."  Reverend Budde testified before the House Committee on Natural Resources that she was "horrified" to see the government carrying out the threats of force President Trump made in the Rose Garden by "tear gassing Americans engaged in peaceful protests."  She testified that President Trump's actions were "a misappropriation of scripture, and a usurpation of our sacred space."  And a former rector at St. John's Episcopal Church described her dismay at being "driven off of the patio at St. John's – a place of peace and respite and medical care throughout the day – so that man could have a photo opportunity in front of the church!!! People were hurt so that he could pose in front of the church with a bible!"

104.    Republican Senators also rebuked the attack on peacefully protesting American citizens and questioned the constitutionality of the order.  Senator Ben Sasse of Nebraska said "there is a fundamental – a Constitutional – right to protest, and I'm against clearing out a peaceful protest for a photo op."  Senator Tim Scott of South Carolina also criticized the President's actions: "[I]f your question is, should you use tear gas to clear a path so the president can go have a photo-op, the answer is no."  Senator Susan Collins of Maine stated that it was "painful to watch peaceful protesters be subjected to tear gas in order for the president to go across the street to a church that I believe he's attended only once."  Senator Thom Tillis denounced the Trump administration's treatment of protesters.[14]  And Senator Lindsey Graham openly supported Gen. Milley's apology for his involvement in President Trump's photo op at St. John's.[15]

---

[14]  *Sen. Tillis says using military to push protesters out of Lafayette Square was inappropriate*, WASH. POST (June 16, 2020), https://www.washingtonpost.com/video/washington-post-live/wplive/sen-tillis-says-using-military-to-push-protesters-out-of-lafayette-square-was-inappropriate/2020/06/16/e821f7fc-c142-41a5-addc-96f1f5abc962_video.html?.

[15]  Caroline Kelly, *Lindsey Graham backs top general's apology for appearing with Trump after force used on protesters*, CNN (June 11, 2020), https://www.cnn.com/2020/06/11/politics/lindsey-graham-general-apologize-trump-protests/index.html.

105.    Even respected members of the military and former members of the Trump Administration spoke out against the actions taken in Lafayette Park.  Former Secretary of Defense James Mattis excoriated the decision to use tear gas on peaceful protesters stating: "When I joined the military, some 50 years ago, I swore an oath to support and defend the Constitution.  Never did I dream that troops taking that same oath would be ordered under any circumstance to violate the Constitutional rights of their fellow citizens—much less to provide a bizarre photo op for the elected commander-in-chief, with military leadership standing alongside."  In a June 5, 2020 interview, General John Kelly, former White House Chief of Staff for President Trump and former Secretary of Homeland Security, stated that he "agree[d]" with General Mattis's comments. Former Under Secretary of Defense James N. Miller resigned from the Defense Science Board and accused Secretary of Defense Esper of violating his oath of office because under his auspices "[l]aw-abiding protesters just outside the White House were dispersed using tear gas and rubber bullets – not for the sake of safety, but to clear a path for a presidential photo op."  Admiral Mike Mullen, former Chairman of the Joint Chiefs of Staff, wrote, "It sickened me yesterday to see security personnel—including members of the National Guard—forcibly and violently clear a path through Lafayette Park to accommodate the president's visit outside St. John's Church. . . . Whatever Trump's goal in conducting his visit, he laid bare his disdain for the rights of peaceful protest in this country, gave succor to the leaders of other countries who take comfort in our domestic strife, and risked further politicizing the men and women of our armed forces."

106.    Eighty-nine former Department of Defense officials, including four former Secretaries of Defense of both parties, published an open letter in the *Washington Post* decrying President Trump's use of "flash-bang grenades, pepper spray and . . . rubber bullets to drive lawful protesters, as well as members of the media and clergy, away from the historic St. John's Episcopal

Church[,] [a]ll so he could hold a politically motivated photo op" as a "betray[al]" of his oath "to support and defend the Constitution of the United States."  And General Mark Milley, the Chairman of the Joint Chiefs of Staff, has now publicly apologized for his role in the Lafayette Park incident: "I should not have been there.  My presence in that moment and in that environment created a perception of the military involved in domestic politics.  As a commissioned uniformed officer, it was a mistake that I have learned from, and I sincerely hope we all can learn from it."

107.    *Politico* subsequently published an article with interviews of National Guardsmen involved in the attack.[16]  One noted, "As a military officer, what I saw was more or less really f--ed up. . . .  The crowd was loud but peaceful, and at no point did I feel in danger, and I was standing right there in the front of the line."  The Guardsman concluded: "I believe I saw civil rights being violated in order for a photo op . . . .  I'm here to support and defend the Constitution of the United States and what I saw just goes against my oath and to see everyone try to cover up what really happened.  What I saw was just absolutely wrong."  Similarly, more than 1,250 Justice Department alumni signed an open letter calling on the department's inspector general to open an investigation into Attorney General Barr's actions on June 1, noting that "it is unclear under what purported authority" he "issued orders to officers of a variety of federal agencies, including United States Secret Service, United States Park Police, District of Columbia National Guard, and United States Military Police" and that "[b]ased on what we now know, these actions violated both the First Amendment of the United States Constitution, which protects freedom of speech and the press, and the right to assemble; and the Fourth Amendment, which prohibits unreasonable seizures, to include objectively unreasonable uses of force by law enforcement officers.  None of us would

---

[16]    Daniel Lippman, *'What I saw was just absolutely wrong': National Guardsmen struggle with their role in controlling protests*, POLITICO (June 10, 2020), https://www.politico.com/news/2020/06/09/national-guard-protests-309932.

ever have considered directing or engaging in such actions to be consistent with our oaths to support and defend the Constitution."[17]

108.    Facing this wave of criticism, Defendant Mark Esper, the Secretary of Defense and one of the attendees of President Trump's photo op, attempted to distance himself from the administration's rhetoric and President Trump's threat to deploy military force to enforce order, stating that "[w]e are not in one of those situations" where such force would be appropriate, and stating, "I do not support invoking the Insurrection Act."

109.    In addition, Arlington County police officers who had been deployed to support Park Police at Lafayette Park left after Arlington County officials realized they had been co-opted to participate in a "presidential publicity stunt."

110.    However, what still failed to come to pass is any acknowledgment by the Defendants that their actions were inappropriate, unlawful, and dangerous.  Furthermore, there has been no indication that these violent actions will not be undertaken again.  Indeed, on June 8, 2020, the White House Press Secretary reiterated that the President is not "sorry" about the events of June 1 and stated that critics of what happened in Lafayette Park "should go back and read the Constitution" and "I'd point [them] to the First Amendment, where it says you have the right to, quote, 'peaceably assemble.'"

111.    In the weeks following the June 1 attack on peaceful protesters, the President has only continued his violent rhetoric.  On Juneteenth 2020, the holiday commemorating the end of slavery in the United States, President Trump tweeted a warning to anyone who planned to protest at a re-election campaign rally he was about to hold in Tulsa, Oklahoma:  "***Any protesters***,

---

[17]  Matt Zapotosky, *More than 1,250 former Justice Dept. workers call for internal watchdog to probe Barr role in clearing demonstrators from Lafayette Square*, WASH. POST (June 10, 2020), https://www.washingtonpost.com/national-security/more-than-1250-former-justice-dept-workers-call-for-internal-watchdog-to-probe-barr-role-in-clearing-demonstrators-from-lafayette-square/2020/06/10/608827fe-aa73-11ea-9063-e69bd6520940_story.html.

anarchists, agitators, looters or lowlifes" who are going to Oklahoma please understand, you will not be treated like you have been in New York, Seattle, or Minneapolis. It will be a much different scene!"  Days later, on June 23, 2020, President Trump tweeted that protesters in Washington, D.C. who attempted to set up an autonomous zone in the nation's capital would be "met with serious force!".  Twitter flagged President Trump's tweet with a public interest notice explaining that the Tweet "violat[ed] Twitter's policy against abusive behavior, specifically the presence of a threat of harm against an identifiable group."

### Congress and Federal Agencies Launch Investigation of Excessive Use of Force against Protesters at Lafayette Park on June 1

112.    Following the events on June 1, 2020, the House Committee on Natural Resources requested that the Interior Department Office of the Inspector General launch an investigation into United States Park Police's actions in Lafayette Park that day.  On June 18, 2020, Interior Department Inspector General Mark Greenblatt confirmed that his office had "already begun collecting and reviewing information concerning the Park Police's activities," and "will make an initial determination of which agency had command and control of the law enforcement operation and conduct a review of Park Police actions accordingly."

113.    Since then, the House Committee on Natural Resources has held two oversight hearings, on June 29 and July 28, 2020, to examine the use of force against peaceful protesters at Lafayette Park on June 1, 2020.  The House Committee on Natural Resources  interviewed various witnesses including a civil rights activist, journalist, a major in the D.C. National Guard, and Acting Chief of the United States Park Police Gregory Monahan.  The House Judiciary Committee, in a separate hearing on July 28, 2020, also interviewed Attorney General Barr on his role in dispersing protesters in Lafayette Park on June 1, 2020.  Federal authorities continue to investigate

the facts and circumstances surrounding the Trump Administration's decision to use force against

protesters in Lafayette Park.

114.     During these congressional hearings, a whistleblower with the National Guard

confirmed the depravity of Defendants' conduct, testifying under oath:

> Having served in a combat zone, and understanding how to assess
> threat environments, at no time did I feel threatened by the
> protesters or assess them to be violent. In addition, considering the
> principles of proportionality of force and the fundamental strategy
> of graduated responses specific to civil disturbance operations, it
> was my observation that the use of force against demonstrators in
> the clearing operation was an unnecessary escalation of the use of
> force. From my observation, those demonstrators – our fellow
> American citizens -- were engaged in the peaceful expression of
> their First Amendment rights. Yet they were subjected to an
> unprovoked escalation and excessive use of force.
>
> As the late Representative John Lewis said, "When you see
> something that is not right, not just, not fair, you have a moral
> obligation to say something, to do something."
>
> The oath I swore as a military officer, to support and defend the
> Constitution of the United States, is a bedrock guiding principle
> and, for me, constitutes an individual moral commitment and
> ethical instruction. It is the foundation of the trust safely placed in
> the Armed Forces by the American people. And it compels me to
> say something – and do something – about what I witnessed on
> June 1 at Lafayette Square.[18]

---

[18]  *Unanswered Questions About the U.S. Park Police's June 1 Attack on Peaceful Protestors at Lafayette Square:*
*Hearing Before the H. Committee on Natural Resources*, 116th Cong. (2020) (statement of Adam DeMarco),
https://naturalresources.house.gov/imo/media/doc/Mr.%20Adam%20DeMarco%20-%20Written%20Testimony
_.pdf.

## FIRST CAUSE OF ACTION
### Violation of the First Amendment

115.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

116.    Defendants' decision to forcibly disperse Plaintiffs by using weapons, including, but not limited to, tear gas, flash-bang grenades, smoke bombs, and rubber bullets, violates the First Amendment in at least four ways: (i) as unconstitutional retaliation for expressive conduct protected under the First Amendment; (ii) as a violation of right to peaceably assemble; (iii) as an unconstitutional restriction to a traditional public forum; and (iv) as unconstitutional viewpoint discrimination.

117.    Plaintiffs' rights to assemble, protest, and demonstrate peaceably were all protected activities under the First Amendment of the United States Constitution.  As the Department of Justice itself stated mere weeks ago, "First Amendment protection is at its apex when citizens seek to engage in core political speech in a traditional public forum."

118.    Defendants deprived Plaintiffs of their rights to assemble, protest, and demonstrate peaceably by forcibly dispersing Plaintiffs' peaceful protest by using weapons, including, but not limited to, tear gas, flash-bang grenades, smoke bombs, and rubber bullets.

119.    Defendants would not have attacked Plaintiffs but for their speech's content and their viewpoint, as evidenced by the fundamentally different approach the administration advances towards far right fringe groups, such as the "very fine" neo-Nazis who rallied in Charlottesville, Virginia, or the armed protesters who stormed the state capitol in Lansing, Michigan, as opposed to the peaceful protesters seeking racial justice in Lafayette Park.  Defendants' subsequent decision to erect a fence around Lafayette Park further infringed upon Plaintiffs' rights to assemble, protest, and demonstrate peaceably by blocking all available access points to the park.  Defendants'

conduct attempted to silence Plaintiffs' speech, depriving Plaintiffs of their right to command the attention of the President and the nation by assembling in sight of the White House to express their dissent.

120.    Defendants' conflicting explanations for impeding Plaintiffs' First Amendment rights are pretextual, disproved by the numerous videos of the June 1, 2020 event, and cannot justify their forcible dispersion of Plaintiffs' peaceful protest with the use of weapons, including, but not limited to, rubber bullets, tear gas, flash-bang grenades, smoke bombs, and rubber bullets. The videos of the June 1 event, which show that officers began using munitions on peaceful protesters approximately 30 minutes before the District of Columbia's curfew was set to take effect, confirms that the Defendants' actions were not aimed at enforcing the curfew, as the White House alleged, thus refuting the factual bases on which Defendants' decision was made. Consequently, the only reasonable inference from Defendants' conduct is that they forcibly dispersed protesters as a form of content- and viewpoint-based discrimination and in retaliation for Plaintiffs' exercise of protected First Amendment activity.

121.    None of the shifting justifications Defendants have offered to justify their violence satisfies the First Amendment.  Defendants' shifting, pretextual bases could not have authorized violence against unarmed protesters.

122.    As a result of Defendants' actions, Plaintiffs have suffered and will continue to suffer irreparable harm.

## SECOND CAUSE OF ACTION
### Violation of the Fourth Amendment

123.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

124.    Plaintiffs were seized by Defendants when Defendants' officers intentionally, through the use of force and threat of arrest, and by using weapons, including, but not limited to, tear gas, flash-bang grenades, smoke bombs, and rubber bullets, terminated their freedom of movement.

125.    Defendants committed these acts without forewarning and, as a result, Defendants' acts were objectively unreasonable and constituted unlawful seizure and excessive force.

126.    Plaintiffs did not commit a crime.

127.    Plaintiffs did not pose a threat to Defendants or any of their officers or agents or any other person.

128.    Plaintiffs' Fourth Amendment rights were violated when they were deliberately targeted and shot with tear gas, flash-bang grenades, smoke bombs, and rubber bullets, during the course of their lawful protest.

129.    Plaintiffs fear further retaliation in the future in violation of the Fourth Amendment if they continue to observe, record, or participate in constitutionally protected activity.

## THIRD CAUSE OF ACTION
### Violation of the Fifth Amendment

130.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

131.    Defendants' decision to forcibly disperse Plaintiffs by using weapons, including, but not limited to, tear gas, flash-bang grenades, smoke bombs, and rubber bullets, violates the Fifth Amendment right to due process.

132.    Plaintiffs have protected First Amendment liberty interests in the right to assemble, protest, and demonstrate peaceably.

133.    Plaintiffs have a right to not be subject to excessive force in the context of engaging in this expressive First Amendment activity.

134.    By violently attacking unarmed protesters engaged in expressive conduct, Defendants have engaged in conduct that was "so egregious, so outrageous that it may fairly be said to shock the contemporary conscience," *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998), and therefore constitutes excessive force in violation of the Due Process Clause of the Fifth Amendment.

135.    As a result of Defendants' actions, Plaintiffs have suffered and continue to suffer irreparable harm.

## FOURTH CAUSE OF ACTION
### Damages Pursuant to *Bivens*
### (Against Defendants Barr, Monahan, Fennelly, Adamchik, Seberling, and John and Jane Does 1-50 in Their Individual Capacities)

136.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

137.    Plaintiffs have constitutionally protected rights under the First, Fourth, and Fifth Amendments.  Defendants infringed upon those rights by forcibly dispersing Plaintiffs' peaceful protest by using weapons, including, but not limited to, tear gas, flash-bang grenades, smoke bombs, and rubber bullets; by attempting to suppress and chill Plaintiffs' speech; and by engaging in excessive force as a means to deprive Plaintiffs of their First Amendment liberty interests.

138.    Defendants are federal actors who each acted under color of law in depriving Plaintiffs of their rights.

46

139.    Defendants were personally involved in the deprivation of Plaintiffs' constitutional rights and remain involved in the continued constitutional violations.  Defendants, including Defendant Barr, personally ordered law enforcement personnel to extend the security perimeter and clear the streets around Lafayette Park, personally supervised the execution of that order, and/or personally carried it out.

140.    Defendants are not immune from liability to remedy their patently unconstitutional conduct—conduct prohibited by clearly established governing law.

141.    Plaintiffs have suffered and continue to suffer damages in an amount to be determined at trial.

142.    Plaintiffs are therefore entitled to monetary damages pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  Defendants Barr, Monahan, Fennelly, Adamchik, Seberling, and John and Jane Does 1-50 are jointly and severally liable to Plaintiffs.

## FIFTH CAUSE OF ACTION
### Ultra Vires Conduct in Violation of the Posse Comitatus Act

143.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

144.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful presidential action that is *ultra vires*.

145.    The Constitution grants Congress the power "[t]o provide for calling forth the militia to execute the laws of the union."  U.S. CONST. ART. I, § 8, cl. 15.

146.    The Posse Comitatus Act (the "PCA"), 18 U.S.C. § 1385, provides that "[w]hoever, except in cases and under circumstances expressly authorized by the Constitution or Act

of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both."

147.    The "Army" consists of "the Regular Army, the Army National Guard of the United States, the Army National Guard while in the service of the United States and the Army Reserve." 10 U.S.C. § 7062(c)(1).

148.    The PCA "'eliminate[s] the direct active use of Federal troops by civil law authorities,' and 'prohibits Army and Air Force military personnel from participating in civilian law enforcement activities.'"   *United States v. Dreyer*, 804 F.3d 1266, 1272 (9th Cir. 2015) (en banc) (first quoting *United States v. Banks*, 539 F.2d 14, 16 (9th Cir. 1976); then quoting *United States v. Chon*, 210 F.3d 990, 993 (9th Cir. 2000)).

149.    18 U.S.C. § 1385 does not provide authority to order members of the "Army" to conduct law enforcement operations such as clearing a crowd of peaceful protesters exercising their First Amendment rights.

150.    On information and belief, military police and National Guard members in service of the United States were among the personnel who attacked the protesters on June 1, 2020, and cleared Lafayette Park.

151.    Plaintiffs seek damages from the unlawful deployment of troops to Lafayette Park as a posse comitatus, a declaration that such deployment was unlawful, and injunctive relief prohibiting such further unlawful deployments.

**SIXTH CAUSE OF ACTION**
**Injunctive Relief and Damages Pursuant to 42 U.S.C. § 1983**
**(Against Defendants Allen, Alioto, Black, Buchanan, Carroll, Hargrove, Meyer, Murphy,**
**Newsham, Payne, Taylor, Thau, Vincent, Willis, John and Jane Poes 1-50, and John and**
**Jane Roes 1-50)**

152.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

153.    Plaintiffs have constitutionally protected rights under the First, Fourth, and Fifth Amendments.  Defendants Allen, Black, Buchanan, Hargrove, Meyer, Murphy, Payne, Taylor, Thau, Willis, John and Jane Poes 1-50, and John and Jane Roes 1-50 deliberately deprived Plaintiffs of those rights by forcibly dispersing Plaintiffs' peaceful protest by using weapons, including, but not limited to, tear gas, flash-bang grenades, smoke bombs, and rubber bullets; by attempting to suppress and chill Plaintiffs' speech; and by engaging in excessive force as a means to deprive Plaintiffs of their First Amendment liberty interests.  Defendants Carroll and Alioto directed and oversaw such actions by the Metropolitan Police Department Officers, and Defendant Vincent coordinated the actions of the Arlington Police Department Officers.  In doing so, Defendants Allen, Alioto, Black, Buchanan, Carroll, Hargrove, Meyer, Murphy, Payne, Taylor, Thau, Vincent, Willis, John and Jane Poes 1-50, and John and Jane Roes 1-50 acted with reckless or callous indifference to the Plaintiffs' constitutionally protected rights.

154.    The actions taken by Defendants Buchanan, Hargrove, Meyer, Murphy, Payne, Taylor, Thau, Willis, and John and Jane Roes 1-50 were a result of the District of Columbia deliberately indifferent failure to train and supervise John and Jane Roes 1-50 on the appropriate use of force, despite the fact that the number of times that Metropolitan Police Department officers

have used force has steadily increased since 2013, which warranted training.[19]   Several of these prior incidents involved excessive use of force against protesters.  For example, during the 2017 inauguration, police pinned hundreds of protesters into city blocks, used frequent flash-bang grenades, and heavily deployed tear gas.[20]   Defendant Newsham is the Chief of the Metropolitan Police Department.

155.     Defendants are state actors who each acted under color of law in depriving Plaintiffs of their rights.

156.     As a result of Defendants' actions, Plaintiffs have suffered and continue to suffer irreparable harm and damages in an amount to be determined at trial.

157.     Plaintiffs are therefore entitled to injunctive relief and monetary and punitive damages against Defendants pursuant to 42 U.S.C. § 1983.

158.     Defendants are jointly and severally liable to Plaintiffs.

---

[19]   Peter Hermann, *Study finds D.C. police using more force*, WASH. POST (Jan. 23, 2018), https://www.washington post.com/local/public-safety/report-finds-dc-police-using-more-force/2018/01/23/a858451e-0066-11e8-8acf-ad2991367d9d_story.html.

[20]   Kriston Capps, *Protesters Descend on D.C. for Day One of the Trump Era*, BLOOMBERG (Jan. 20, 2017), https://www.bloomberg.com/news/articles/2017-01-20/protesters-descend-on-d-c-for-trump-s-inauguration.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court order each of the following forms of relief:

a.      Injunctive relief so that Plaintiffs may continue to exercise their right to assemble, protest, and demonstrate peaceably without fearing retribution, including preliminary injunctive relief and/or a temporary restraining order requiring Defendants to restore access to Lafayette Park's traditional public forum and refrain from using excessive force on peaceful protesters;

b.      A declaration that the officers' forcible dispersion of peaceful protesters by using weapons, including, but not limited to, tear gas, flash-bang grenades, smoke bombs, and rubber bullets, was and is unconstitutional and unlawful, in violation of the First Amendment, Fourth Amendment, the Due Process Clause of the Fifth Amendment, and the Posse Comitatus Act;

c.      Damages in an amount to be proved at trial, including, but not limited to, punitive damages; and

d.      An order granting Plaintiffs costs, fees, and disbursements incurred in connection with these proceedings and such further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a jury trial.


Dated:    September 1, 2020                    Respectfully submitted,

                                               /s Greta B. Williams
                                               Greta B. Williams (D.C. Bar No. 1006968)
                                               Naima L. Farrell (D.C. Bar No. 1023230)
                                                   (*admission pending*)
                                               Brittany Raia (D.C. Bar No. 1044115)
                                                   (*pro hac vice forthcoming*)
                                               Matthew Guice Aiken (D.C. Bar No. 1616755)
                                               **GIBSON, DUNN & CRUTCHER LLP**
                                               1050 Connecticut Avenue, N.W.
                                               Washington, D.C. 20036-5306
                                               Tel:  202.955.8500
                                               GBWilliams@gibsondunn.com
                                               NFarrell@gibsondunn.com
                                               BRaia@gibsondunn.com
                                               MAiken@gibsondunn.com


                                               Randy M. Mastro (*pro hac vice*)
                                               Orin Snyder (*pro hac vice*)
                                               Mylan L. Denerstein (*pro hac vice*)
                                               Anne Champion (*pro hac vice*)
                                               Katherine Marquart (*pro hac vice*)
                                               Lee R. Crain (*pro hac vice*)
                                               Amanda L. LeSavage (*pro hac vice*)
                                               **GIBSON, DUNN & CRUTCHER LLP**
                                               200 Park Avenue
                                               New York, New York 10166-0193
                                               Tel:  212.351.4000
                                               RMastro@gibsondunn.com
                                               OSnyder@gibsondunn.com
                                               MDenerstein@gibsondunn.com
                                               AChampion@gibsondunn.com
                                               KMarquart@gibsondunn.com
                                               LCrain@gibsondunn.com
                                               ALeSavage@gibsondunn.com


                                               *Counsel for Plaintiffs Radiya Buchanan,*
                                               *Ann Dagrin, and Lindsay Field*