## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| RADIYA BUCHANAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:20cv1542-DLF |
| | ) | |
| DONALD J. TRUMP, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS WILLIAM BARR AND GREGORY MONAHAN'S
## MOTION TO DISMISS ALL INDIVIDUAL-CAPACITY CLAIMS

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants William Barr and Gregory Monahan, as sued in their individual capacities ("individual defendants"), respectfully move this court to dismiss the claims asserted against them in Plaintiffs Radiya Buchanan, Ann Dagrin, and Lindsay Field's First Amended Complaint.[1] These claims should be dismissed because plaintiffs have failed to state a claim upon which relief may be granted. Specifically, the Supreme Court has never authorized a *Bivens* claim in the context presented here and a host of special factors counsel against implying the constitutional damages remedy that plaintiffs seek. To the extent plaintiffs seek to sue defendants in their individual capacities under the Posse Comitatus Act, 18 U.S.C. § 1385, no private right of action is available. The individual defendants are also entitled to qualified immunity on any constitutional or statutory claim.

---

[1] This Motion, and its accompanying Memorandum, is submitted solely on behalf of Defendants Barr and Monahan in their individual capacities. The official-capacity defendants will separately respond to the claims asserted against them. *See* ECF No. 24. Through an amended complaint, ECF No. 29, plaintiffs have named additional individual-capacity federal defendants, who have not been served and are not represented herein.

The grounds for this motion are set forth in the accompanying memorandum of points and authorities. A proposed order is attached.

Dated: October 1, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

DOUGLAS G. SMITH
Deputy Assistant Attorney General

C. SALVATORE D'ALESSIO, JR.
Acting Director, Torts Branch

/s/ James G. Bartolotto
JAMES G. BARTOLOTTO, DC Bar 441314
Senior Trial Counsel, Torts Branch, Civil Division
United States Department of Justice
175 N Street, NE
Washington, DC 20002
Tel: (202) 616-4174; F: (202) 616-4314
Email: James.Bartolotto@usdoj.gov

/s/ Sarah E. Whitman
SARAH E. WHITMAN
MA Bar 657726, under LCvR 83.2
Senior Trial Attorney, Torts Branch, Civil Division
United States Department of Justice
175 N Street, NE
Washington, DC 20002
Tel: (202) 616-0089; F: (202) 616-4314
Email: Sarah.Whitman@usdoj.gov

*Counsel for Defendants William Barr and Gregory Monahan, in their individual capacities*

2

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| RADIYA BUCHANAN, et al.,            ) | |
| )  | |
| Plaintiffs,            ) | |
| )  | |
| v.            ) | Case No. 1:20-cv-1542-DLF |
| )  | |
| DONALD J. TRUMP, et al.,            ) | |
| )  | |
| Defendants.            ) | |
| )  | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS WILLIAM BARR AND GREGORY MONAHAN'S MOTION TO DISMISS ALL INDIVIDUAL-CAPACITY CLAIMS

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

DOUGLAS G. SMITH
Deputy Assistant Attorney General

C. SALVATORE D'ALESSIO, JR.
Acting Director, Torts Branch

*/s/ James G. Bartolotto*
JAMES G. BARTOLOTTO, DC Bar 441314
Senior Trial Counsel, Torts Branch, Civil Division
United States Department of Justice
175 N Street, NE
Washington, DC 20002
Tel: (202) 616-4174; F: (202) 616-4314
Email: James.Bartolotto@usdoj.gov

*/s/ Sarah E. Whitman*
SARAH E. WHITMAN, MA Bar 657726, LCvR 83.2
Senior Trial Attorney, Torts Branch, Civil Division
United States Department of Justice
175 N Street, NE
Washington, DC 20002
Tel: (202) 616-0089; F: (202) 616-4314
Email: Sarah.Whitman@usdoj.gov
*Counsel for Defendants William Barr and Gregory Monahan, in their individual capacities*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION ........................................................................................................................... 1

BACKGROUND .............................................................................................................................. 2

LEGAL STANDARD...................................................................................................................... 5

ARGUMENT ................................................................................................................................... 5

I.   This Court Should Not Recognize a *Bivens* Remedy. ........................................................... 6

    A.   The Supreme Court Has Consistently Rejected New Implied Damages Remedies. ....... 6

    B.   This Case Presents a New Context. ................................................................................. 9

    C.   Plaintiffs' Claims Directly Implicate Numerous Special Factors That Counsel
        Against Authorizing a *Bivens* Remedy. .......................................................................... 11

        1.   Plaintiffs' Claims Raise Core Separation-of-Powers Concerns. ........................ 12

        2.   Creating a Damages Remedy Would Be Inconsistent With Congress's
            Activity in the Field. ........................................................................................... 16

        3.   Alternative, Existing Processes Preclude Plaintiffs' Claims. ............................. 22

        4.   Weighty Administrability Concerns Counsel Against Implying a *Bivens*
            Remedy. ............................................................................................................... 25

II.   The Posse Comitatus Act Creates No Private Right of Action. ............................................. 31

III.   Qualified Immunity Bars Plaintiffs' Individual-Capacity Claims Against Attorney General
    Barr and Chief Monahan. ...................................................................................................... 32

    A.   The Framework for the Qualified Immunity Defense. ................................................... 32

    B.   Plaintiffs Fail to Allege the Personal Participation of Barr and Monahan in the
        Violation of Any Constitutional or Statutory Right. ...................................................... 33

    C.   Plaintiffs Fail to Allege a Violation of a Clearly Established Constitutional Right. ..... 35

        1.   Plaintiffs Fail to Allege a Violation of a Clearly Established First
            Amendment Right. .............................................................................................. 35

        2.   Plaintiffs Fail to Allege a Violation of a Clearly Established Fourth
            Amendment Right. .............................................................................................. 40

        3.   Plaintiffs Fail to Allege a Violation of a Clearly Established Fifth
            Amendment Right. .............................................................................................. 42

IV.   Plaintiffs Cannot Obtain Equitable Relief From Defendants in Their Individual
    Capacities (Causes of Action 1-3, 5). .................................................................................. 43

CONCLUSION.............................................................................................................................. 45

## TABLE OF AUTHORITIES

<u>Cases</u>

*A.N.S.W.E.R. Coal. v. Basham*,
    845 F.3d 1199 (D.C. Cir. 2017) ..................................................................................... 37, 38

*A Quaker Action Group v. Morton*,
    516 F.2d 717 (D.C. Cir. 1975) ............................................................................... 14, 28, 37

*Abdelfattah v. U.S. Dep't Homeland Sec.*,
    787 F.3d 524 (D.C. Cir. 2015) ............................................................................................ 42

*Albright v. Oliver*,
    510 U.S. 266 (1994) ............................................................................................................ 42

\*  *Ashcroft v. al-Kidd*,
    563 U.S. 731 (2011) ..................................................................................................... 33, 37

\*  *Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................... 5, 33, 34

*Barham v. Ramsey*,
    434 F.3d 565 (D.C. Cir. 2006) ............................................................................................ 41

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .............................................................................................................. 5

*Bernini v. City of St. Paul*,
    665 F.3d 997 (8th Cir. 2012) .............................................................................................. 40

*Bistrian v. Levi*,
    912 F.3d 79 (3d Cir. 2018) .................................................................................................. 30

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*,
    403 U.S. 388 (1971) .......................................................................................................... 1, 6

*Brower v. Cnty. of Inyo*,
    489 U.S. 593 (1989) ............................................................................................................ 40

*Bush v. Lucas*,
    462 U.S. 367 (1983) .............................................................................................................. 9

*California v. Hodari D.*,
    499 U.S. 621 (1991) ............................................................................................................ 40

*Camreta v. Greene*,
    563 U.S. 692 (2011) ............................................................................................................ 32

*Carlson v. Green*,
    446 U.S. 14 (1980) ........................................................................................................... 7, 24

*Carr v. Dist. of Columbia*,
    587 F.3d 401 (D.C. Cir. 2009) ............................................................................................ 40

*Chappell v. Wallace*,
    462 U.S. 296 (1983) ............................................................................................. 12, 16, 22

*Christopher v. Harbury,*
   536 U.S. 403 (2002) ................................................................................................ 12

*Clark v. Cmty. for Creative Non-Violence,*
   468 U.S. 288 (1984) ......................................................................................... 28, 38

*Corr. Servs. Corp. v. Malesko,*
   534 U.S. 61 (2001) ..................................................................................... 22, 23, 24

*Corsi v. Mueller,*
   422 F. Supp. 3d 51 (D.D.C. 2019) ...................................................................... 43

*County of Sacramento v. Lewis,*
   523 U.S. 833 (1998) ......................................................................................... 42, 43

*Crawford-El v. Britton,*
   523 U.S. 574 (1998) ............................................................................................. 30

*Davis v. Billington,*
   681 F.3d 377 (D.C. Cir. 2012) ........................................................................ 2, 16

*Davis v. Passman,*
   442 U.S. 228 (1979) ............................................................................................... 7

*De La Paz v. Coy,*
   786 F.3d 367 (5th Cir. 2015) .............................................................................. 21

*DeBrew v. Atwood,*
   792 F.3d 118 (D.C. Cir. 2015) ........................................................................... 34

*Dep't of Navy v. Egan,*
   484 U.S. 518 (1988) ............................................................................................. 12

*Detroit Int'l Bridge Co. v. Canada,*
   133 F. Supp. 3d 70 (D.D.C. 2015) ................................................................... 3, 4

*District of Columbia v. Wesby,*
   138 S. Ct. 577 (2018) ..................................................................................... 32, 36

*Doe v. Meron,*
   929 F.3d 153 (4th Cir. 2019) .............................................................................. 24

*Doe v. Rumsfeld,*
   683 F.3d 390 (D.C. Cir. 2012) .................................................................. 7, 10, 21

*Dugan v. Rank,*
   372 U.S. 609 (1963) ............................................................................................. 44

*Dukore v. District of Columbia,*
   799 F.3d 1137 (D.C. Cir. 2015) ......................................................................... 33

*Elkins v. District of Columbia,*
   690 F.3d 554 (D.C. Cir. 2012) ........................................................................... 43

*Farah v. Esquire Magazine,*
   736 F.3d 528 (D.C. Cir. 2013) ............................................................................. 3

*Feit v. Ward,*
    886 F.2d 848 (7th Cir. 1989) ............................................................................... 45

*Frank v. Relin,*
    1 F.3d 1317 (2d Cir. 1993)................................................................................... 45

*GasPlus, LLC v. U.S. Dep't of Interior,*
    593 F. Supp. 2d 80 (D.D.C. 2009) ........................................................................ 5

*Gerlich v. U.S. Dep't of Justice,*
    659 F. Supp. 2d 1 (D.D.C. 2009) ....................................................................... 44

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982)........................................................................................... 32

*Hartman v. Moore,*
    547 U.S. 250 (2006)........................................................................................... 38

*Hatfill v. Gonzales,*
    519 F. Supp. 2d 13 (D.D.C. 2007) ..................................................................... 44

*Hernandez v. Mesa,*
    137 S. Ct. 2003 (2017)................................................................................... 6, 32

\*   *Hernandez v. Mesa,*
    140 S. Ct. 735 (2020) ................................................................................. passim

*Hernandez v. Mesa,*
    885 F.3d 811 (5th Cir. 2018) ............................................................................. 11

*Hill v. Colorado,*
    530 U.S. 703 (2000)..................................................................................... 36, 38

*Hufford v. McEnaney,*
    249 F.3d 1142 (9th Cir. 2001) ........................................................................... 43

*In re Sealed Case,*
    148 F.3d 1073 (D.C. Cir. 1998) ......................................................................... 39

*Int'l Action Ctr. v. United States,*
    365 F.3d 20 (D.C. Cir. 2004) ............................................................................. 41

*Jangjoo v. Sieg,*
    319 F. Supp. 3d 207 (D.D.C. 2018) ................................................................... 23

*K.O. v. U.S. Imm. & Cust. Enf't,*
    - F. Supp. 3d -, No. 20-309, 2020 WL 3429697 (D.D.C. June 23, 2020)................ 26

*Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.,*
    909 F.3d 446 (D.C. Cir. 2018) ............................................................................. 3

*Kentucky v. Graham,*
    473 U.S. 159 (1985)........................................................................................... 44

*Kervin v. City of New Orleans,*
    No. 06-3231, 2006 WL 2849861 (E.D. La. Sept. 28, 2006).................................. 31

*Kirby v. City of Elizabeth*,
    388 F.3d 440 (4th Cir. 2004) .......................................................................... 44

*Kiser v. Kamdar*,
    831 F.3d 784 (6th Cir. 2016) .......................................................................... 43

*Klay v. Panetta*,
    758 F.3d 369 (D.C. Cir. 2014) .................................................................... 7, 16

*Kreines v. United States*,
    33 F.3d 1105 (9th Cir. 1994) ............................................................................ 5

*Lash v. Lemke*,
    786 F.3d 1 (D.C. Cir. 2015) ........................................................................... 39

*Lebron v. Rumsfeld*,
    670 F.3d 540 (4th Cir. 2012) .................................................................. passim

*Lee v. USAID*,
    859 F.3d 74 (D.C. Cir. 2017) ......................................................................... 31

*Leyland v. Edwards*,
    797 F. Supp. 2d 7 (D.D.C. 2011) ................................................................... 43

*Libby v. Marshall*,
    833 F.2d 402 (1st Cir. 1987) .......................................................................... 44

*Liff v. Office of Inspector Gen. for U.S. Dep't of Labor*,
    881 F.3d 912 (D.C. Cir. 2018) ................................................................. 16, 25

*LKQ Corp. v. United States*,
    No. 18-CV-1562, 2019 WL 3304708 (D.D.C. July 23, 2019) .................................. 9

\* *Loumiet v. United States*,
    948 F.3d 376 (D.C. Cir. 2020) ................................................... 7, 9, 28, 30

*Lyall v. City of Los Angeles*,
    807 F.3d 1178 (9th Cir. 2015) ........................................................................ 40

*Mahoney v. U.S. Marshals Serv.*,
    454 F. Supp. 2d 21 (D.D.C. 2006) ............................................................ 14, 36

*Malley v. Briggs*,
    475 U.S. 335 (1986) ........................................................................................ 32

*Marcavage v. City of New York*,
    689 F.3d 98 (2d Cir. 2012) ............................................................................. 37

*McCabe v. Parker*,
    608 F.3d 1068 (8th Cir. 2010) .................................................................. 14, 38

*McNair v. Coffey*,
    279 F.3d 463 (7th Cir. 2002) .......................................................................... 42

*Mejia-Mejia v. U.S. Imm. & Cust. Enf't*,
    No. 18-1445, 2019 WL 4707150 (D.D.C. Sept. 26, 2019) ................... 10, 23, 27, 29

*Menotti v. City of Seattle,*
   409 F.3d 1113 (9th Cir. 2005) ......................................................................... 14, 37

*Meshal v. Higgenbotham,*
   804 F.3d 417 (D.C. Cir. 2015) ............................................................ 11, 12, 15, 25

*Miller v. U.S. Dep't Agric.,*
   143 F.3d 1413 (11th Cir. 1998) .............................................................................. 23

*Minneci v. Pollard,*
   565 U.S. 118 (2012) ................................................................................................ 24

*Nieves v. Bartlett,*
   139 S. Ct. 1715 (2019) ..................................................................................... 30, 38

*Oliva v. Nivar,*
   - F.3d -, 2020 WL 5227472 (5th Cir. Sep. 2, 2020) .............................................. 24

*Oliveras v. Basile,*
   440 F. Supp. 3d 365 (S.D.N.Y. 2020) .................................................................... 24

*Pearson v. Callahan,*
   555 U.S. 223 (2009) ................................................................................................ 32

*Quaker Action Group v. Hickel,*
   421 F.2d 1111 (D.C. Cir. 1969) ............................................................................. 13

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015) ................................................................................................ 36

*Reichle v. Howards,*
   566 U.S. 658 (2012) .................................................................................................. 9

*Robinson v. Overseas Military Sales Corp.,*
   21 F.3d 502 (2d Cir. 1994) ..................................................................................... 31

*Roy v. United States,*
   416 F.2d 874 (9th Cir. 1969) ................................................................................. 13

*Sai v. Trump,*
   325 F. Supp. 3d 68 (D.D.C. 2018) ......................................................................... 31

*Smart v. Holder,*
   No. 09-101, 2009 WL 2498213 (W.D. Tex. Aug. 12, 2009) .................................. 31

*Smith v. United States,*
   293 F.3d 984 (7th Cir. 2002) ................................................................................. 31

*Stigile v. Clinton,*
   110 F.3d 801 (D.C. Cir. 1997) ................................................................... 13, 27, 37

*Storms v. Shinseki,*
   319 F. Supp. 3d 348 (D.D.C. 2018) ....................................................................... 30

*Terry v. Ohio,*
   392 U.S. 1 (1968) .................................................................................................... 40

*Tracy v. Neuberger*,
   840 F. Supp. 2d 1183 (D. Minn. 2012) ................................................................ 42

*Trudeau v. Fed. Trade Comm'n*,
   456 F.3d 178 (D.C. Cir. 2006) ............................................................................... 5

*United States v. Caputo*,
   201 F. Supp. 3d 65 (D.D.C. 2016) ....................................................................... 37

*United States v. Musser*,
   873 F.2d 1513 (D.C. Cir. 1989) ........................................................................... 37

*United States v. Stanley*,
   483 U.S. 669 (1987) .............................................................................................. 22

*Vance v. Rumsfeld*,
   701 F.3d 193 (7th Cir. 2012) .......................................................................... 24, 27

*Vanderklok v. United States*,
   868 F.3d 189 (3d Cir. 2017) ........................................................................... 12, 24

*Vega v. United States*,
   881 F.3d 1146 (9th Cir. 2018) ........................................................................ 22, 23

*W. Radio Servs. Co. v. U.S. Forest Serv.*,
   578 F.3d 1116 (9th Cir. 2009) ............................................................................. 23

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ........................................................................................ 36, 37

*Watts v. United States*,
   394 U.S. 705 (1969) ........................................................................................ 13, 37

*White House Vigil for ERA Comm. v. Clark*,
   746 F.2d 1518 (D.C. Cir. 1984) ............................................................... 13, 14, 15, 37

*White House Vigil for ERA Comm. v. Watt*,
   717 F.2d 568 (D.C. Cir. 1983) ............................................................................. 27

*Wilkie v. Robbins*,
   551 U.S. 537 (2007) ............................................................................ 22, 23, 24, 30

*Wilson v. Libby*,
   535 F.3d 697 (D.C. Cir. 2008) ............................................................................. 25

*Wolfe v. Strankman*,
   392 F.3d 358 (9th Cir. 2004) ............................................................................... 45

\*  *Wood v. Moss*,
   572 U.S. 744 (2014) ...................................................................................... passim

\*  *Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017) .................................................................................. passim

**Statutes, Session Laws, & Regulations**

3 U.S.C. §§ 201-9 ........................................................................................................ 17

5 U.S.C. App. 3 ........................................................................................................... 20

5 U.S.C. §§ 701, *et seq.* ............................................................................................ 23

6 U.S.C. § 111 ............................................................................................................. 20

6 U.S.C. § 381 ............................................................................................................. 19

10 U.S.C. § 2733 ......................................................................................................... 24

18 U.S.C. § 871 ........................................................................................................... 17

18 U.S.C. § 879 ........................................................................................................... 18

18 U.S.C. § 1385 .......................................................................................... 1, 4, 31, 35

18 U.S.C. § 1751 ................................................................................................... 18, 19

18 U.S.C. § 1752 ......................................................................................................... 18

18 U.S.C. § 3056A ................................................................................................. 15, 17

18 U.S.C. § 3056 ................................................................................................... 15, 19

28 U.S.C. § 503 ........................................................................................................... 15

28 U.S.C. § 509 ........................................................................................................... 15

28 U.S.C. § 1346 ......................................................................................................... 23

28 U.S.C. § 2671-80 ................................................................................................... 23

32 U.S.C. § 715 ........................................................................................................... 24

42 U.S.C. § 1983 ......................................................................................................... 24

54 U.S.C. § 102701 ..................................................................................................... 15

41 Fed. Reg. 44876 (1976) ......................................................................................... 15

Pub. L. 67-300, 42 Stat. 841 (1922) ........................................................................... 17

Pub. L. 71-221, 46 Stat. 328 (1930) ........................................................................... 17

Pub. L. 82-79, 65 Stat. 121 (1951) ............................................................................. 17

Pub. L. 82-79, 65 Stat. 122 (1951) ............................................................................. 17

Pub. L. 87-829, 76 Stat. 956 (1962) ........................................................................... 17

Pub. L. 89-186, 79 Stat. 791 (1965) ........................................................................... 17

Pub. L. 90-331, 82 Stat. 170 (1968) ........................................................................... 15

Pub. L. 91-217, 84 Stat. 74 (1970) ............................................................................. 17

Pub. L. 91-644, 84 Stat. 1880 (1971) ......................................................................... 17

Pub. L. 91-644, 84 Stat. 1892 (1971) ......................................................................... 17

Pub. L. 94-524, 90 Stat. 2475 (1976) ......................................................................... 17

Pub. L. 95-452, 92 Stat. 1101 (1978) ......................................................................... 20

Pub. L. 97-308, 96 Stat. 1451 (1982) ......................................................................... 17

Pub. L. 98-587, 98 Stat. 3110 (1984) ......................................................................... 17

Pub. L. 106-544, 114 Stat. 2715 (2000) ..................................................................... 17

Pub. L. 107-56, 115 Stat. 272 (2001) ................................................................... 19, 20

Pub. L. 107-117, 115 Stat. 2334 (2002) ..................................................................... 18

Pub. L. 109-177, 120 Stat. 192 (2006) ....................................................................... 19

Pub. L. 109-177, 120 Stat. 253 (2006) ....................................................................... 19

Pub. L. 109-177, 120 Stat. 256 (2006) ....................................................................... 19

Pub. L. 110-53, 121 Stat. 544 (2007) ......................................................................... 19

Pub. L. 112-98, 126 Stat. 263 (2012) ......................................................................... 17

Pub. L. 112-257, 126 Stat. 2413 (2013) ................................................................ 17, 19

**Federal Rules**

Federal Rule of Civil Procedure 12(b)(6) ....................................................................... 5

**Other Authorities**

Washington, D.C. Mayor's Order 2020-069 ................................................................. 3

*America's Main Street: The Future of Pennsylvania Avenue: Hearing Before the Subcomm. on Dist. of Columbia of the H. Comm. on Gov't Reform*, 107th Cong. (2001) ........................... 18
*Information Hearing on the Closing of Pennsylvania Avenue*: *Hearing Before the Subcomm. on Dist. of Columbia of the H. Comm. on Gov't Reform and Oversight,* 104th Cong. (1995) .... 18
*The U.S. Secret Service and Presidential Protection: An Examination of a System Failure*: *Hearing Before the H. Comm. on Homeland Sec.*, 111th Cong. (2009).................................. 19
*White House Perimeter Breach: New Concerns About the Secret Service: Hearing Before the H. Comm. on Oversight and Gov't Reform*, 113th Cong. (2014).................................................. 19

*Final Report: Summary of Findings and Recommendations*, H. Select Comm. on Assassinations H. R. REP. No. 95-1828 (1979) ................................................................................... 18
H. R. REP. No. 97-725 (1982) ........................................................................................ 18
S. REP. No. 107-109 (2002) ............................................................................................ 18
Homeland Security Presidential Directive 7: *Critical Infrastructure Identification, Prioritization, and Protection* (2003) ............................................................................. 19

Report of the President's Commission on the Assassination of President Kennedy ("Warren Commission Report") (1964)......................................................................... 17

SHAWN REESE, CONG. RSCH. SERV., RL34603, THE U.S. SECRET SERVICE: HISTORY AND MISSIONS (2014) ................................................................................................................. 17

THE WHITE HOUSE HISTORICAL ASS'N, *History of the White House Fence*, https://www.whitehousehistory.org/press-room/press-timelines/history-of-the-white-house-fence .............................................................................................................................. 19

## INTRODUCTION

This lawsuit invites the court to craft an extra-statutory damages remedy against the Attorney General of the United States and the Acting Chief of the United States Park Police. Neither Supreme Court nor D.C. Circuit precedent supports judicial-implication of a damages remedy here. For a host of reasons, plaintiffs' claims should be dismissed.

Following the death of George Floyd at the hands of a Minneapolis police officer, large demonstrations broke out across the country. Many of the protests were peaceful, but localities experienced violence and property destruction. Washington, D.C. was not spared; the Mayor of D.C. declared a public emergency and imposed a citywide curfew in light of the rioting and damage. On June 1, 2020, plaintiffs joined a large crowd gathering across from the White House at Lafayette Park to protest racial injustice.

Plaintiffs bring this civil lawsuit asserting that federal officers used unreasonable force to disperse protesters from Lafayette Park and to expand the perimeter around the White House after D.C. experienced several nights of rioting and damage. Invoking *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), plaintiffs seek to recover money damages from the personal assets of Attorney General William Barr and the Acting Chief of the U.S. Park Police, Gregory Monahan ("individual defendants") under the First, Fourth, and Fifth Amendments for their alleged roles in clearing Lafayette Park, which plaintiffs assert was "prompted" by the President's "desire to walk through the park a few minutes later…" First Am. Compl., ECF No. 29 ("FAC") ¶ 1. Plaintiffs also include a claim against unspecified defendants under the Posse Comitatus Act, 18 U.S.C. § 1385.

None of the claims brought against these individual defendants can proceed. Foremost, the Supreme Court has never authorized a *Bivens* claim in the context presented here and

numerous special factors dictate that the court refrain from fashioning a new, standalone damages remedy directly under the Constitution. Second, the Posse Comitatus Act contains no private right of action and it is not even clear from the complaint that plaintiffs allege either of the individual defendants violated it. Third, the individual defendants are entitled to qualified immunity because plaintiffs fail to allege that they personally violated a clearly established constitutional or statutory right. Finally, the equitable relief plaintiffs seek cannot be obtained from defendants in their individual capacities.

## BACKGROUND[1]

Large protests against police brutality ignited in Minneapolis following the killing of George Floyd by one of the city's police officers. FAC ¶¶ 44-46. Protests spread to communities across the country. Although many of the demonstrations were peaceful, some localities "experienced rioting, looting, and property damage." *Id*. Large protests in Washington, D.C. began on May 29, 2020, and continued to grow over the ensuing days. *Id*. ¶ 50. The city experienced several nights of looting and vandalism, including the setting of a fire on the night of May 31, 2020, at the historic St. John's Episcopal Church located across Lafayette Park from the White House. *Id*.

The Mayor of D.C. imposed a citywide curfew beginning at 7:00pm on June 1, 2020. *Id*. The Mayor mandated the curfew and declared a public emergency to "protect the safety of persons and property in the District" following several nights during which "numerous businesses, vehicles, and government buildings ha[d] been vandalized, burned, or looted."

---

[1] The facts in this section are taken from the complaint and are assumed to be true for the purposes of this motion only. *See Davis v. Billington*, 681 F.3d 377, 379 (D.C. Cir. 2012).

Mayor's Order 2020-069, § I ¶¶ 3, 6, https://mayor.dc.gov/release/mayor-bowser-orders-curfew.[2]
The Order noted that looting and vandalism, in addition to "rioting in the downtown area,"
caused "extensive damage" and adversely affected government operations. *Id.* ¶ 4.

On June 1, 2020, large protests in D.C. continued, with numerous protesters gathering in
Lafayette Park, "situated at the White House's doorstep." FAC ¶¶ 2-3, 52. Plaintiffs are three
residents of Washington, D.C., who participated in the protest in Lafayette Park that day. *Id.* ¶¶
12-14. While plaintiffs describe the gathering in Lafayette Park as "a large crowd of peaceful
demonstrators," *id.* ¶ 53, they acknowledge that instances of looting and vandalism occurred in
D.C., including the night before. *Id.* ¶ 50. They do not claim that any security procedures were in
place to search or otherwise screen the growing crowd.

Just after 6:00pm, the White House communications office notified reporters that the
President would be adding a news briefing in the Rose Garden to his calendar. Shortly thereafter,
Attorney General Barr arrived at Lafayette Park behind the law enforcement barricade. *Id.* ¶ 54.
Plaintiffs allege the Attorney General ordered law enforcement personnel to extend the security
perimeter around the White House and to clear the streets around Lafayette Park. This included
directing them to clear protesters from the park. *Id.* ¶¶ 4, 55. The D.C. National Guard, U.S. Park
Police, U.S. Secret Service, Bureau of Prisons, and U.S. military were present. *Id.* ¶ 55.

At approximately 6:30pm, an officer issued warnings over a megaphone. *Id.* ¶ 56.
Plaintiff Field noticed the police and military presence increasing significantly and moving
towards the barricades. *Id.* ¶ 82. She heard an officer make a muffled announcement over a

---

[2] In deciding a motion to dismiss, the court may consider the Mayor's Order because it is
incorporated by reference, *see* FAC ¶ 50, and because it is a public government record subject to
judicial notice. *See Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013); *Kaspersky
Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018); *Detroit Int'l
Bridge Co. v. Canada*, 133 F. Supp. 3d 70, 84-85 (D.D.C. 2015).

megaphone and thinks he told protesters to vacate the premises. *Id*. Shortly after 6:30pm, Field saw officers approaching the barricades, blowing whistles, and spraying pepper spray. *Id*. ¶ 83. While walking away, she alleges she felt something hit the back of her thigh, which stung and left a bruise. *Id*. ¶ 84. Plaintiff Buchanan heard officers on horses yell, "move!" and law enforcement began to shoot canisters of tear gas into the crowd. *Id*. ¶ 70. She and Plaintiff Dagrin allege officers began throwing flash-bang grenades and spraying more tear gas. *Id*. ¶ 71. Plaintiffs claim the President "ordered law enforcement officers to take the actions" described in the complaint "in order to forcibly drive protesters from Lafayette Park." *Id*. ¶ 59.

At 6:43pm on June 1, 2020, the President delivered remarks in the Rose Garden. *Id*. ¶ 60. He said he planned to pay his respects to a "very special place," referring to St. John's Church, which had suffered fire damage the night before. *Id*. ¶¶ 61-62. Just after 7:00pm, the President, accompanied by security personnel and Attorney General Barr, walked through the now-cleared Lafayette Park to the church. *Id*. ¶ 63. The President remained at the church for approximately five minutes. *Id*. Thereafter, the federal government fenced in Lafayette Park. *Id*. ¶¶ 11, 100.

Plaintiffs filed this civil suit on June 11, 2020. ECF No. 1. They sue the President and others in their official capacities. They sue in both their official and individual capacities Attorney General Barr and Acting Chief Monahan. Plaintiffs assert claims under the First, Fourth, and Fifth Amendments, describing actions of "Defendants" without specifying the relief sought. FAC ¶¶ 115-135 (First, Second, and Third Causes of Action). In their Fourth Cause of Action, they seek "Damages Pursuant to *Bivens*" against Defendants Barr, Monahan, and others "in Their Individual Capacities" for alleged First, Fourth, and Fifth Amendment violations. *Id*. ¶¶ 136-142. Plaintiffs also seek damages and equitable relief from unspecified defendants in unspecified capacities for violations of the Posse Comitatus Act, 18 U.S.C. § 1385. *Id*. ¶¶ 143-

151 (Fifth Cause of Action). The remaining causes of action are against non-federal personnel. In their Prayer for Relief, plaintiffs request damages, equitable relief,[3] and attorneys' fees.[4]

## LEGAL STANDARD

Dismissal is required under Federal Rule of Civil Procedure 12(b)(6) when a plaintiff fails to plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and quotation marks omitted). Although the court assumes the truth of well-pleaded factual allegations in ruling on a motion to dismiss, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id*. A court need not "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quotation marks omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability," it has failed to state a claim. *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

## ARGUMENT

All claims against the individual defendants should be dismissed because (1) special factors counsel against implying a damages remedy for alleged constitutional violations in this new context; (2) the Posse Comitatus Act creates no private right of action for money damages;

---

[3] Plaintiffs specify that they seek damages pursuant to *Bivens* against defendants in their individual capacities in Count Four, but do not specify who they are suing or what relief they are seeking in Counts One through Three (or who they are suing in Count Five). While we assume that plaintiffs' requests for injunctive and declaratory relief are against the defendants in their official capacities only, as discussed below, plaintiffs cannot obtain such relief from defendants in their individual capacities. *See* § IV, *infra*.

[4] Attorneys' fees are not recoverable in *Bivens* suits. *Kreines v. United States*, 33 F.3d 1105, 1109 (9th Cir. 1994); *GasPlus, LLC v. U.S. Dep't of Interior*, 593 F. Supp. 2d 80, 84, 88-89 (D.D.C. 2009).

(3) the individual defendants are entitled to qualified immunity because plaintiffs have failed to

sufficiently allege they personally violated a clearly established constitutional or statutory right;

and (4) to the extent plaintiffs seek equitable relief from the individual defendants (although it is

not clear that they do), they cannot obtain such relief from them personally.

## I.    This Court Should Not Recognize a *Bivens* Remedy.

In their Fourth Cause of Action, plaintiffs seek damages directly under the Constitution

from the Attorney General and the Acting Chief of the Park Police for alleged violations of the

First, Fourth, and Fifth Amendments. *See* FAC ¶ 142 (relying upon *Bivens*, 403 U.S. 388). This

court should decline plaintiffs' invitation to create an implied damages remedy because a host of

factors counsel against doing so in this novel context.

### A.  The Supreme Court Has Consistently Rejected New Implied Damages Remedies.

Before the merits of constitutional claims against federal officials sued in their individual

capacities can be considered, the antecedent inquiry is whether an implied damages remedy is

available at all. *See Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017) (per curiam). Recent

Supreme Court precedent makes clear that no such remedy should be implied here.

In *Bivens*, the Supreme Court "broke new ground by holding that a person claiming to be

the victim of an unlawful arrest and search could bring a Fourth Amendment claim for damages

against the responsible agents even though no federal statute authorized such a claim."

*Hernandez v. Mesa*, 140 S. Ct. 735, 741 (2020). The Court took the unprecedented step of

devising an implied cause of action for damages only after finding that there were "no special

factors counseling hesitation [in creating such a remedy] in the absence of affirmative action by

Congress." *Bivens,* 403 U.S. at 396.

As the Supreme Court more recently explained, during the "*ancien regime*" when *Bivens*

6

was decided in 1971, the Court applied a different legal "interpretive framework." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017). In the decade after *Bivens*, and under the then-prevailing framework, the Court expanded *Bivens* in two other cases. *Davis v. Passman,* 442 U.S. 228, 230 (1979) (implying remedy under the Fifth Amendment for congressional aide alleging sex discrimination); *Carlson v. Green,* 446 U.S. 14, 18 (1980) (implying remedy under the Eighth Amendment against prison officials for failure to treat an inmate, resulting in death).

In the ensuing four decades since *Carlson* was decided, however, the Supreme Court "has carefully circumscribed *Bivens* and 'consistently refused to extend *Bivens* to any new context or new category of defendants.'" *Loumiet v. United States*, 948 F.3d 376, 380 (D.C. Cir. 2020) (quoting *Abbasi*, 137 S. Ct. at 1857); *Klay v. Panetta*, 758 F.3d 369, 372 (D.C. Cir. 2014) ("Only twice has the Supreme Court approved of the application of *Bivens's* reasoning to new classes of cases, and never in the past thirty years."); *Doe v. Rumsfeld*, 683 F.3d 390, 394 (D.C. Cir. 2012) (advising that "[t]he implication of a *Bivens* action … is not something to be undertaken lightly" given that the Supreme Court "consistently has considered and rejected *Bivens* remedies in all other contexts.").

In the past three years alone, the Supreme Court has declared—and then repeated—that expansion of *Bivens* is "a disfavored judicial activity," cautioning against creating additional implied damages remedies. *Hernandez*, 140 S. Ct. at 742; *Abbasi*, 137 S. Ct. at 1857. The Court explained that the arguments underpinning *Bivens* "los[t] their force." *Abbasi*, 137 S. Ct. at 1855. In fact, the Court observed that had the trio of *Bivens* cases been decided today "it is doubtful we would have reached the same result." *Hernandez*, 140 S. Ct. at 742-43. That is because "it is a significant step under separation-of-powers principles for a court to determine that it has the authority, under the judicial power, to create and enforce a cause of action for damages against

federal officials in order to remedy a constitutional violation." *Abbasi*, 137 S. Ct. at 1856. Instead, Congress "is best positioned to evaluate 'whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government' based on constitutional torts." *Hernandez*, 140 S. Ct. at 742 (quoting *Abbasi*, 137 S. Ct. at 1856).

Pursuant to the Supreme Court's instruction, a court evaluating a *Bivens* claim today first must determine whether the claim "arises in a new context or involves a new category of defendants." *Hernandez*, 140 S. Ct. at 743 (quotation marks omitted). The "proper test" for determining whether a proposed implied right of action involves a new context is whether the case "is different in a meaningful way" from *Davis*, *Carlson*, or *Bivens*. *Abbasi*, 137 S. Ct. at 1855, 1859. The Court offered several examples of how a given case might differ in a meaningful way including: the constitutional right at issue; the rank of the officers involved; the extent of judicial guidance as to how an officer should respond; the generality or specificity of the official action; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of special factors that previous *Bivens* cases did not consider. *Id*. at 1860. The Court left no doubt that even small differences constitute a new context, observing that "a modest extension is still an extension." *Id.* at 1864.

If a case presents a new *Bivens* context, then "a special factors analysis [is] required" before a court may allow a proposed damages suit "to proceed." *Id*. at 1860. This involves asking whether there are any special factors that counsel hesitation about extending *Bivens*. *Hernandez*, 140 S. Ct. at 743. At bottom, the inquiry focuses not on the merits of the remedy sought, but "'who should decide' whether to provide for a damages remedy, Congress or the courts?"

*Abbasi*, 137 S. Ct. at 1857 (quoting *Bush v. Lucas*, 462 U.S. 367, 380 (1983)). "The answer most often will be Congress." *Id*. This case undoubtedly presents a new context, and multiple factors and processes counsel authoritatively against the court fashioning a new damages remedy for plaintiffs here.

**B.  This Case Presents a New Context.**

Plaintiffs' novel claims would stretch *Bivens* well beyond its existing confines. The claims for which plaintiffs ask this court to devise a damages remedy fall into many of the categories that *Abbasi* used to illustrate when a context is new. First, plaintiffs ask this court to craft a damages remedy under the First Amendment, but the Supreme Court has never authorized an implied damages remedy under any of its clauses. *Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims"). Recognizing that the new-context analysis must consider only "Supreme Court decisions approving *Bivens* actions," the D.C. Circuit recently confirmed that a First Amendment claim presents a new context. *Loumiet*, 948 F.3d at 382 (explaining that although prior Circuit cases allowed First Amendment claims, "those cases have been overtaken by *Abbasi's* holding").

Second, while plaintiffs also bring Fourth and Fifth Amendment claims, plaintiffs ask this court to authorize a damages remedy against a new category of defendants in a setting far different than in *Bivens*, *Davis*, or *Carlson*. Here, plaintiffs sue our nation's highest-ranking law enforcement official, along with the Chief of the U.S. Park Police, for their alleged high-level decisions about the dispersal of a crowd in front of the White House. Whom they have chosen to sue alone illustrates this case presents a new context. *See Abbasi*, 137 S. Ct. at 1860 (rank of officers is a meaningful difference); *LKQ Corp. v. United States*, No. 18-CV-1562, 2019 WL 3304708, at *11 (D.D.C. July 23, 2019) (concluding that claims against "high-ranking" officials

are meaningfully different from the line agents sued in *Bivens*).

Moreover, as the Supreme Court reiterated in *Hernandez*, "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." 140 S. Ct. at 743. Here, plaintiffs' Fifth Amendment substantive due process claim is nothing like the gender discrimination claim under the equal protection component of the Due Process Clause in *Davis*. Likewise, *Abbasi* limited *Bivens* to the "search-and-seizure context in which it arose"—*i.e.*, a Fourth Amendment claim against line-level narcotics agents for "handcuffing a man in his own home without a warrant." 137 S. Ct. at 1856, 1860. That is nothing like the crowd dispersal order at Lafayette Park at issue here. Further, plaintiffs' alleged basis for their suit against the individual defendants highlights yet another difference between their claims and the trio of *Bivens* cases: the "generality of the official action" at issue. *Id.* at 1860. "[T]he implied causes of action recognized by *Bivens* and its limited progeny have generally been made against individuals … who have engaged in some personal misconduct in a direct and particularized interaction with a plaintiff…" *Mejia-Mejia v. U.S. Imm. & Cust. Enf't*, No. 18-1445, 2019 WL 4707150, at *4 (D.D.C. Sept. 26, 2019). Absent from their claims against the individual defendants in this case is any interaction with plaintiffs.

Finally, plaintiffs ask the court to create a remedy in a setting that would interfere with the functioning of the other branches of government. "The Supreme Court has never implied a *Bivens* remedy in a case involving the military, national security, or intelligence." *Rumsfeld*, 683 F.3d at 394. Instead, it has expressed reticence about impinging on the national security prerogatives of the coordinate branches. *See Hernandez*, 140 S. Ct. at 744, 747 (denying *Bivens* remedy for cross-border shooting). The national security implications of securing the President and the White House grounds raise comparable concerns.

Because "*Bivens* claims are now a distinctly 'disfavored' remedy [] subject to strict limitations," the novelty of the context of this case "should alone require dismissal of the plaintiffs' damage claims" against the Attorney General and Park Police Chief. *Hernandez v. Mesa*, 885 F.3d 811, 818 (5th Cir. 2018), *aff'd on other grounds*, 140 S. Ct. 735 (2020); *see also Meshal v. Higgenbotham*, 804 F.3d 417, 426 (D.C. Cir. 2015) (noting that "the absence of any *Bivens* remedy in similar circumstances" is itself "highly probative" of the conclusion that plaintiffs' putative *Bivens* claims should be dismissed). Nonetheless, as described below, multiple special factors should cause the court to "pause," *Hernandez*, 140 S. Ct. at 743, and refuse to extend *Bivens* into this context.

### C.  Plaintiffs' Claims Directly Implicate Numerous Special Factors That Counsel Against Authorizing a *Bivens* Remedy.

The Supreme Court has identified a wide range of factors for courts to assess before implying a *Bivens* remedy in a particular context. *Abbasi*, 137 S. Ct. at 1860-63. *Abbasi* instructs courts to "concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1857-58. "[I]f there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." *Id.* at 1858.

This case is fraught with the same concerns that have prompted the Supreme Court (as well as the D.C. Circuit) to refuse to recognize a damages remedy. No less than four separate special factors are implicated by plaintiffs' suit: (1) core constitutional separation-of-powers concerns; (2) congressional activity in the field; (3) the availability of alternative processes; and (4) administrability concerns. Any one of these factors counsel against implying a remedy here.

"Taken together," they "dictate that it would be inappropriate," *Chappell v. Wallace*, 462 U.S. 296, 304 (1983), to imply the remedy that plaintiffs seek.

**1.   Plaintiffs' Claims Raise Core Separation-of-Powers Concerns.**

When a party seeks to assert an implied cause of action, "separation-of-powers principles are or should be central to the analysis." *Abbasi*, 137 S. Ct. at 1857. The Supreme Court accordingly instructs courts to "consider the risk of interfering with the authority of the other branches." *Hernandez*, 140 S. Ct. at 743. While the creation of an implied remedy always raises separation-of-powers concerns, where, as here, the Constitution commits exclusive authority to Congress or the Executive in a given sphere, that factor weighs especially heavily against authorizing a damages remedy.

The Constitution reserves questions of national security for the political branches. *Abbasi*, 137 S. Ct. at 1861 (citing U.S. CONST. art. I, § 8; art. II, § 1, § 2). "[C]ourts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs" unless "Congress specifically has provided otherwise." *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988). The Supreme Court therefore has emphasized that "[j]udicial inquiry into the national-security realm raises 'concerns for the separation of powers in trenching on matters committed to the other branches.'" *Abbasi*, 137 S. Ct. at 1861 (quoting *Christopher v. Harbury*, 536 U.S. 403, 417 (2002)). These concerns are "even more pronounced" in the context of "a claim seeking money damages rather than a claim seeking injunctive or other equitable relief." *Id.*; *accord Meshal*, 804 F.3d at 421-22 (cataloguing cases in the "national security arena" in which courts have refused to imply a *Bivens* remedy); *Vanderklok v. United States*, 868 F.3d 189, 207 (3d Cir. 2017) (no First Amendment *Bivens* action against TSA agent in part because of national security implications inherent in airport screening). This court should not

countenance an implied damages action either.

The decision to disperse protesters from Lafayette Park—whether to facilitate the President's walk to St. John's Church (FAC ¶¶ 1, 4, 95) or to expand the White House security perimeter following days of civil unrest (*id.* ¶¶ 55, 91, 93)—raises national security concerns that counsel against the creation of a new, freestanding damages remedy. The Nation has an "overwhelming interest in protecting the safety" of the President. *Watts v. United States*, 394 U.S. 705, 707 (1969) (per curiam). The public interest in "the protection of the President" is "undoubtedly of the utmost importance. Few events debilitate the nation more than the assassination of a President." *Stigile v. Clinton*, 110 F.3d 801, 803 (D.C. Cir. 1997). The necessity of averting harm to the President, by thwarting actual hazards to his safety but also by preventing security breaches at the White House Complex, cannot be ignored.

Courts have recognized that the personal safety of the President is a security priority "underscored in importance by the tragic assassinations" of the past. *Quaker Action Group v. Hickel*, 421 F.2d 1111, 1117 (D.C. Cir. 1969). That is because "[a]t stake is not merely the safety of one man, but also the ability of the executive branch to function in an orderly fashion and the capacity of the United States to respond to threats and crises affecting the entire free world." *White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984); *Roy v. United States*, 416 F.2d 874, 877 (9th Cir. 1969) ("A President's death in office has worldwide repercussions and affects the security and future of the entire nation."). Indeed, "safeguarding the President is [] of overwhelming importance in our constitutional system." *Wood v. Moss*, 572 U.S. 744, 748 (2014).

Although plaintiffs describe the protests as peaceful, FAC ¶ 53, for those whose mission it is to protect the President, the presence of thousands of unscreened demonstrators across from

the White House presented a threat, especially if, as alleged, the decision to expand the perimeter was to permit the President to walk across the park to St. John's Church. Whatever the motivation, the mere fact of the President's presence in a large, unscreened crowd itself implicates national security. It "cannot be denied that a public gathering presents some measure of hazard to the security of the President and the White House," especially thousands of demonstrators at a time of civil unrest. *A Quaker Action Group v. Morton*, 516 F.2d 717, 731 (D.C. Cir. 1975) ("*QAG IV*"); *e.g.*, *McCabe v. Parker*, 608 F.3d 1068, 1071 (8th Cir. 2010) (security zone around rally "to ensure the safety of President Bush"); *Menotti v. City of Seattle*, 409 F.3d 1113, 1117, 1120, 1124 (9th Cir. 2005) (security zone around site of meeting attended by President Clinton). Even more so if individuals, who have not been searched or screened, are within weapons range, as here. *Moss*, 572 U.S. at 760-62 (describing 200-300 protesters "within weapons range" of the President as posing "a potential security risk" and noting that close surveillance would not have been possible for so large a crowd congregating nearby).

Officials must make crucial decisions about who is, or what could pose, a risk to the President's safety. "Agencies charged with the protection of the President must be permitted, within reason, to anticipate novel security threats and act to avert them." *White House Vigil for ERA Comm.*, 746 F.2d at 1534 n.107. This is not to suggest plaintiffs here personally had designs to harm anyone. But those who are charged with protecting the President and the White House Complex must assess all potential threats including, for example, infiltration by bad actors into peaceful crowds or other situations that exacerbate the risk of a security breach, such as the size or location of a crowd. *See id.* at 1533 n.106 ("We are concerned instead with persons who harbor less beneficent intentions."); *Moss*, 572 U.S. at 760-62; *Mahoney v. U.S. Marshals Serv.*, 454 F. Supp. 2d 21, 33-35 (D.D.C. 2006).

14

Even if the President had not walked through the park, the unprecedented civil unrest prompting a state of emergency by local officials, coupled with thousands of unscreened individuals at "the White House's doorstep" (FAC ¶ 3) has national security implications, too. Simply put, "the need for effective security in the vicinity of the White House is great." *White House Vigil for ERA Comm.*, 746 F.2d at 1533. As the "nerve center for America's national security network" the White House has "facilities for coordinating the activities of American diplomats, intelligence agents and military personnel around the globe." *Id*. As a result, "[j]ust as the White House area is a unique situs for first amendment activity, it is also a unique situs for considerations of presidential and national security." *Id*. (quotation marks omitted).

"Matters touching on national security and foreign policy fall within an area of executive action where courts hesitate to intrude absent congressional authorization." *Meshal*, 804 F.3d at 426. Congress has entrusted the Secret Service with the responsibility of protecting the President. It is charged by statute with the physical security of the President, his family, the White House, Treasury Building, and grounds. 18 U.S.C. §§ 3056, 3056A. U.S. Park Police perform presidential protection and escort functions as well as protect Lafayette Park. *See* Pub. L. 90-331, § 2, 82 Stat. 170 (1968) (permitting Secret Service Director to request the assistance of other agencies for presidential protection); 54 U.S.C. § 102701 & 41 Fed. Reg. 44876 (1976) (designating U.S. Park Police to maintain law and order and protect persons and property within areas of the National Park System).

Here, plaintiffs seek to extend *Bivens* liability to the leader of the U.S. Park Police as well as the Attorney General, our Nation's highest-ranking law enforcement official, *see* 28 U.S.C. §§ 503, 509, for the decisions they allegedly made to ensure the security of the President and the White House. Recent Supreme Court precedent, however, does not support such an extension. In

*Hernandez*, for example, the Supreme Court recognized that the regulation of the conduct of agents at the border "unquestionably has national security implications" and found that "the risk of undermining border security provides reason to hesitate before extending *Bivens* into this field." 140 S. Ct. at 747. Regulating the conduct of those charged with ensuring presidential and White House safety has analogous, if not more profound, national security implications. A new judicially-created damages remedy here would be at odds with "[p]reserving the constitutionally prescribed balance of powers." *Lebron v. Rumsfeld*, 670 F.3d 540, 548 (4th Cir. 2012). Because plaintiffs ask this court to imply a damages remedy in an arena committed to the political branches, separation-of-powers concerns compel the rejection of plaintiffs' request.

### 2. Creating a Damages Remedy Would Be Inconsistent With Congress's Activity in the Field.

This court also should decline to expand *Bivens* here because the Supreme Court has advised against implying a damages remedy when doing so would be inconsistent with Congress's activity in the field. *Chappell*, 462 U.S. at 304; *Abbasi*, 137 S. Ct. at 1862. As the D.C. Circuit teaches, if "Congress has legislated pervasively on a particular topic but has not authorized the sort of suit that a plaintiff seeks to bring under *Bivens,* respect for the separation of powers demands that courts hesitate to imply a remedy." *Klay*, 758 F.3d at 376; *Liff v. Office of Inspector Gen. for U.S. Dep't of Labor*, 881 F.3d 912, 920 (D.C. Cir. 2018). That is in part because when Congress engages on a subject, it can act "with a greater ability to evaluate the broader ramifications of a remedial scheme by holding hearings and soliciting the views of all interested parties, than we possess, constrained as we are by the limited factual record of a single case." *Lebron*, 670 F.3d at 552 (citation and quotation marks omitted); *Davis*, 681 F.3d at 381 (stating that in most cases "Congress, not the judicial branch, is in the best position to prescribe the scope of relief available for the violation of a constitutional right"). Given Congress's

activity in the field of presidential and White House security, this court should reject plaintiffs' request that the court arrogate the legislative task of authorizing a new cause of action for damages.

Congress has legislated extensively to enhance presidential and White House security but has never authorized a damages remedy against federal officials performing that mission. Congress's attention to presidential security spans more than a century. Dating back to the assassination of President McKinley in 1901, and exacerbated by the assassinations of President Kennedy and other key leaders in the 1960s, Congress has repeatedly increased presidential protection, enhanced security for the White House and its grounds, and enacted criminal laws addressing actions that imperil the security of the White House and our Nation's leaders.[5]

In so doing, Congress often has recognized the tension between the unflinching need for presidential protection and the importance of safeguarding civil liberties. Congress has worked to achieve a delicate balance through its promulgation of statutes and continuing oversight. Starting primarily with the President's Commission on the Assassination of President Kennedy, the "Warren Commission" recommended substantial improvements to presidential protection, while weighing the concomitant need for the protection of individual liberties. *See* Warren Commission Report, pp. 454-69 (1964), https://www.archives.gov/research/jfk/warren-commission-report/chapter-8.html#intro. Congress did not thereafter enact legislation that would

---

[5] *See, e.g.*, 34 Stat. 708 (1906); 38 Stat. 23 (1913); 39 Stat. 919 (1917); 40 Stat. 120 (1917); Pub. L. 67-300, 42 Stat. 841 (1922); Pub. L. 71-221, 46 Stat. 328 (1930); Pub. L. 82-79, 65 Stat. 121, 122 (1951); Pub. L. 87-829, 76 Stat. 956 (1962); Pub. L. 89-186, 79 Stat. 791 (1965); Pub. L. 91-217, 84 Stat. 74-75 (1970); Pub. L. 91-644, 84 Stat. 1880, 1892 (1971); Pub. L. 94-524, 90 Stat. 2475 (1976); Pub. L. 97-308, 96 Stat. 1451 (1982); Pub. L. 98-587, 98 Stat. 3110 (1984); Pub. L. 106-544, 114 Stat. 2715 (2000); Pub. L. 112-98, 126 Stat. 263 (2012); Pub. L. 112-257, 126 Stat. 2413 (2013); 3 U.S.C. §§ 201-9 (current version at 18 U.S.C. § 3056); 18 U.S.C. § 871; 18 U.S.C. § 3056A; Shawn Reese, Cong. Rsch. Serv., RL34603, The U.S. Secret Service: History and Missions (2014), https://crsreports.congress.gov/product/pdf/RL/RL34603.

impose liability on federal officials who might injure someone in performing protective functions. Instead, Congress enacted 18 U.S.C. § 1751, making it a federal crime to assassinate the President. Shortly thereafter, Congress made it a crime to knowingly remain in restricted areas, including an area that the President is (or will be) visiting. 18 U.S.C. § 1752.

Congress revisited the Commission's findings in 1976, convening the Select Committee on Assassinations in the United States House of Representatives, which also considered the delicate balance of interests at stake. *See, e.g.*, *Final Report: Summary of Findings and Recommendations*, *H. Select Comm. on Assassinations*, H. R. REP. No. 95-1828, pt. 2, at 464 (1979) ("The committee was acutely aware of the problem of insuring that civil liberties are preserved, while affording adequate protection to the institutions of democratic society and to public figures."); *see also* H. R. REP. No. 97-725 (1982), *reprinted in* 1982 U.S.C.A.A.N. 2624, 2625-26 (balancing speech and safety of protectees in construing "threat" under 18 U.S.C. § 879). More recently, in response to the closure of Pennsylvania Avenue in front of the White House to vehicular traffic following the 1995 Oklahoma City bombing, Congress held several hearings, again balancing the interest in reopening the street with security concerns. *E.g.*, *Information Hearing on the Closing of Pennsylvania Avenue*: *Hearing Before the Subcomm. on Dist. of Columbia of the H. Comm. on Gov't Reform and Oversight*, 104th Cong. (1995); *America's Main Street: The Future of Pennsylvania Avenue: Hearing Before the Subcomm. on Dist. of Columbia of the H. Comm. on Gov't Reform*, 107th Cong. (2001).

In response to the September 11, 2001 terrorist attacks in particular, Congress allocated emergency funds to federal agencies, including Secret Service and Park Police, to enhance security. *See, e.g*., Pub. L. 107-117, 115 Stat. 2334 (2002); *see also* S. REP. No. 107-109, at 190, 206 (2002) (recommending funds to Secret Service for additional White House security

measures and to Park Police for increased patrols, recognizing the Park Police also provides
"security patrols around the White House perimeter" and security escorts for the President).
Following 9/11, Pennsylvania Avenue in front of the White House was temporarily closed to
pedestrian traffic, supplemented by the installation of jersey barriers and, later, retractable
bollards. *See* THE WHITE HOUSE HISTORICAL ASS'N, *History of the White House Fence*,
https://www.whitehousehistory.org/press-room/press-timelines/history-of-the-white-house-fence
(last visited October 1, 2020). The Department of Interior, including the U.S. Park Police, was
also charged with enhancing and expanding security measures at national monuments and icons.
*See* Pub. L. 110-53, 121 Stat. 544 (2007); Homeland Security Presidential Directive 7: *Critical
Infrastructure Identification, Prioritization, and Protection* (2003), https://www.cisa.gov/
homeland-security-presidential-directive-7. Congress specifically underscored the national
security functions of protecting the President by reorganizing the Secret Service under the
umbrella of the newly-formed Department of Homeland Security. 6 U.S.C. § 381. It expanded
the Secret Service's jurisdiction to include investigating certain terrorist threats. *See* Pub. L. 107-
56, 115 Stat. 272 (2001). It has also twice amended the statute primarily governing the Secret
Service, 18 U.S.C. § 3056, in order to reauthorize and broaden its protective mission. *See* Pub. L.
109-177, 120 Stat. 192, 253, 256 (2006) (amending portions of 18 U.S.C. §§ 1751, 1752, 1028,
3056 and 3056A); Pub. L. 112-257, 126 Stat. 2413 (2013) (amending 18 U.S.C. § 3056).

And, in this past decade, in response to security violations on the White House grounds,
Congress convened a series of hearings to address security breaches and potential security
enhancements. *See*, *e.g*., *The U.S. Secret Service and Presidential Protection: An Examination of
a System Failure*: *Hearing Before the H. Comm. on Homeland Sec*., 111th Cong. (2009); *White
House Perimeter Breach: New Concerns About the Secret Service*: *Hearing Before the H.*

19

*Comm. on Oversight and Gov't Reform*, 113th Cong. (2014). Additionally, Congress now statutorily requires the Department of Homeland Security to investigate alleged constitutional abuses by its employees through its Office for Civil Rights and Civil Liberties and report to Congress on the Department's response to such allegations. 6 U.S.C. § 111(b)(1)(G); § 113(d)(3); § 345. Similarly, through its promulgation of Section 1001 of the USA PATRIOT Act, Congress directed the Inspector General of the Department of Justice to "review information and receive complaints alleging abuses of civil rights and civil liberties" by its employees and officials. Pub. L. 107-56, 115 Stat. 272, 391 (2001).

These complaint procedures supplement Congress's authorization for Inspectors General throughout the Executive Branch to investigate and report on misconduct by federal officers. Pub. L. 95-452, 92 Stat. 1101 (1978); 5 U.S.C. App. 3, § 12; *see generally Abbasi*, 137 S. Ct. at 1862 (refusing to recognize a *Bivens* remedy in part because Congress's interest had been "frequent and intense" including, at its behest, the launch of an OIG investigation into detention conditions). As relevant here, Congress requested, and the Inspector General for Interior has launched, an investigation into the U.S. Park Police's actions on June 1 in Lafayette Park that are the subject of this very suit. FAC ¶ 112. And, Congress's oversight continues. It has already held several hearings on the incident underlying this suit at which both of the individual defendants testified. *Id*. ¶¶ 112-113.

For over a century, Congress has expanded the mission of the Secret Service and Park Police, encouraged cooperation between law enforcement agencies in the protective function mission, and recognized the delicate policy considerations at stake, but has never seen fit to create a private right of action against those performing the essential mission of protecting the President and White House grounds. Such "institutional silence speaks volumes and counsels

strongly against judicial usurpation of the legislative function." *De La Paz v. Coy*, 786 F.3d 367, 377 (5th Cir. 2015); *Lebron*, 670 F.3d at 556 (holding that the court "cannot regard the legislative failure to provide [the plaintiff] with the monetary damages he seeks from each defendant as an invitation to design some preferred remedial regime of [its] own"). The body of Congressional action shows that Congress has made deliberate choices, endorsed a panoply of mechanisms through which individualized claims of misconduct can be raised and wrongdoers punished, and exercised careful oversight and control over matters relating to the protective mission. Congress's considered choices in this field militate against judicial implication of a damages remedy that Congress never approved.

Finally, although plaintiffs have dismissed their individual-capacity claims against the Secretary of Defense and the Commander of the D.C. National Guard, their amended complaint remains replete with assertions about the involvement of the D.C. National Guard and military personnel in the dispersal of the crowd from Lafayette Park. *E.g.*, FAC ¶¶ 1, 4-5, 55, 57, 75, 82-83, 85, 87. To the extent plaintiffs seek to hold the currently named individual defendants personally liable for the actions of any military personnel, that is not only a misuse of a personal-capacity suit, *Abbasi*, 137 S. Ct at 1860, but there is no doubt that pervasive Congressional activity in the field of military affairs counsels against this court fashioning a standalone damages remedy for injuries resulting from such conduct. *See Rumsfeld*, 683 F.3d at 397 (concluding that special factors precluded suit against Secretary of Defense by a contractor who was subjected to military detention because "[i]t would be inappropriate for this Court to presume to supplant Congress's judgment in a field so decidedly entrusted to its purview."). That is because Congress has exercised its plenary control over the military by enacting statutes regulating military life and establishing an internal system of justice, all while "taking into

account the special patterns that define the military structure." *Chappell*, 462 U.S. at 302; *United States v. Stanley*, 483 U.S. 669, 683-84 (1987); *Hernandez*, 140 S. Ct. at 746-47 (noting it has "declined to extend *Bivens* where doing so would interfere with the system of military discipline created by statute and regulation."). Congress's failure to authorize a personal damages action against individual soldiers or military leaders shows that "[a]ny action to provide a judicial response by way of such a [judicially-imposed damages] remedy would be plainly inconsistent" with that activity. *Chappell*, 462 U.S. at 304.

### 3.   Alternative, Existing Processes Preclude Plaintiffs' Claims.

Yet another reason this court should "refrain from providing a new and freestanding remedy in damages" is the availability of "alternative, existing process[es]" to protect the interests at stake. *Abbasi*, 137 S. Ct. at 1858 (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)). Any sort of process can preclude a *Bivens* remedy, including "administrative, statutory, equitable, and state law remedies." *Vega v. United States*, 881 F.3d 1146, 1154 (9th Cir. 2018). "So long as the plaintiff ha[s] an avenue for some redress, bedrock principles of separation of powers foreclose[] judicial imposition of a new substantive liability." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 69 (2001). As the Supreme Court in *Abbasi* advised, "when alternative methods of relief are available, a *Bivens* remedy usually is not." 137 S. Ct. at 1863.

Plaintiffs could have pursued (and are pursuing) a variety of equitable and other remedies. For claims of ongoing constitutional violations, plaintiffs can seek injunctive relief, which *Abbasi* confirmed weighs against fashioning a remedy under *Bivens*. 137 S. Ct. at 1865. In this very case, plaintiffs have done so, seeking equitable relief for the very same conduct giving

rise to their *Bivens* claims. *Compare* Counts One through Three *with* Four.[6] Indeed, plaintiffs

effectively seek to modify decisions regarding where, when, and how groups can protest near the

White House, a claim, which if permitted at all, is equitable in nature. Where equitable relief is

an alternative option for vindicating constitutional interests, whether through the Administrative

Procedures Act, 5 U.S.C. §§ 701, *et seq.*, or otherwise, courts have concluded these processes

militate against creating an additional remedy in damages. *Mejia-Mejia*, 2019 WL 4707150, at

*5 (availability of alternative mechanisms such as "injunctive relief against the relevant agencies

and government officials in their official capacities" weighed against inferring *Bivens* claim);

*Jangjoo v. Sieg*, 319 F. Supp. 3d 207, 217-18 (D.D.C. 2018) (APA counsels against creating

*Bivens* remedy); *see also W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir.

2009) (noting that because the APA's procedures are available when no other adequate

alternative remedy exists, it "further indicates Congress's intent that courts should not devise

additional, judicially crafted default remedies."); *Miller v. U.S. Dep't Agric.*, 143 F.3d 1413,

1416 (11th Cir. 1998) (APA precludes *Bivens* action). The existence of some "form of equitable

relief" like the above "usually precludes" courts "from authorizing a *Bivens* action." *Abbasi*, 137

S. Ct. at 1865.

    Additionally, damages claims under state tort law or the Federal Torts Claims Act, 28

U.S.C. §§ 1346, 2671-80, may provide other potential avenues for relief for certain claims

---

[6] The viability of those claims will rise or fall on their own basis. Yet, it is the availability of the avenue, and not the ultimate success of such claims, that forecloses the implication of a *Bivens* remedy. *See Malesko*, 534 U.S. at 73-74 (refusing to imply a remedy in part because plaintiff could seek injunctive relief, not because he successfully did so); *Vega*, 881 F.3d at 1155 ("That Vega's state law claims ultimately failed to satisfy the requirements of [state] law, or federal pleading standards, does not mean that he did not have access to alternative or meaningful remedies"); *cf. Wilkie*, 551 U.S. at 552 (plaintiff "took advantage of some opportunities, and let others pass; although he had mixed success, he had the means to be heard.").

depending on the facts. Although in 1980, the Supreme Court ruled that the FTCA alone did not displace an otherwise appropriate *Bivens* action for the denial of prison medical care, *Carlson*, 446 U.S. at 23, more recently, the Supreme Court has noted that the availability of state tort law may provide "alternative means for relief" counseling against judicial implication of a remedy in damages. *See Malesko*, 534 U.S. at 73-74; *Minneci v. Pollard*, 565 U.S. 118, 125 (2012); *accord Wilkie*, 551 U.S. at 551; *see also Vanderklok*, 868 F.3d at 201-4. Since *Abbasi*, numerous courts have found that the potential availability of FTCA relief is among the factors militating against permitting a *Bivens* remedy in a variety of contexts. *Oliva v. Nivar*, - F.3d -, 2020 WL 5227472, at *4 (5th Cir. Sep. 2, 2020) (excessive force claim against VA security officer); *Oliveras v. Basile*, 440 F. Supp. 3d 365, 373 (S.D.N.Y. 2020) (collecting cases) (observing that "*Carlson*'s analysis of that issue may not have survived [*Abbasi*]."). Congress has also provided remedies against non-federal actors through the federal civil rights statutes, *e.g.*, 42 U.S.C. § 1983, an avenue plaintiffs are already pursuing in their amended complaint. Finally, to the extent plaintiffs claim that they were injured by military or National Guard personnel, other potential avenues for relief include the Military Claims Act, 10 U.S.C. § 2733, and its companion, the National Guard Claims Act, 32 U.S.C. § 715. In describing the Military Claims Act, the *en banc* Seventh Circuit explained, "that Congress has provided for compensation tells us that it has considered how best to address the fact that the military can injure persons by improper conduct." *Vance v. Rumsfeld*, 701 F.3d 193, 201 (7th Cir. 2012). Congress "decided that compensation should come from the Treasury rather than from the pockets of federal employees." *Id.*; *see also Doe v. Meron*, 929 F.3d 153, 170 (4th Cir. 2019) (concluding that the existence of the MCA counseled against implying a *Bivens* remedy against military personnel under the Fourth and Fifth Amendments). The D.C. Circuit teaches that courts need "not parse the specific applicability of th[e] web of …

remedies" to a plaintiff's circumstances. *Liff*, 881 F.3d at 921. Rather, when these processes are evaluated in conjunction with all of the special factors implicated here, there is a more than sufficient basis to refuse plaintiffs' invitation to authorize a new kind of federal litigation.

### 4.   Weighty Administrability Concerns Counsel Against Implying a *Bivens* Remedy.

*Abbasi* advises that when adjudication of a case is rife with practical concerns, courts should hesitate before implying a remedy. *See Abbasi*, 137 S. Ct. at 1856. Even before *Abbasi*, courts refrained from permitting a *Bivens* remedy when a case presented claims replete with "administrability concerns." *See Meshal*, 804 F.3d at 427 (detailing practical factors counseling hesitation); *Lebron*, 670 F.3d at 553 (cataloging a series of administrability problems). At least three separate, but interrelated, concerns plague plaintiffs' putative *Bivens* claims: (a) the risk of intrusion into sensitive communications; (b) the delicate balancing of interests when it comes to presidential protection; and (c) the workability issues pervasive in claims that could be lodged by classes and inherent in claims based on motive.

**a**. One reason this court should not imply a remedy here is that adjudication of plaintiffs' *Bivens* claims would invite, if not require, discovery into high-level communications and the decision-making processes of the President, the Attorney General, and other high-ranking law enforcement and military officials. Both the Supreme Court and the D.C. Circuit caution against allowing plaintiffs to use a judicially-implied cause of action as a means to probe the motives, discussions, and deliberations of our nation's leaders, especially in the context of national security. *See Abbasi*, 137 S. Ct. at 1861; *Wilson v. Libby*, 535 F.3d 697, 710 (D.C. Cir. 2008) ("We also cannot ignore that, if we were to create a *Bivens* remedy, the litigation of the allegations in the amended complaint would inevitably require judicial intrusion into matters of national security and sensitive intelligence information."). The source of the hesitation is two-

fold: the recognition that disclosure of such deliberations could "interfere in an intrusive way with sensitive functions of the Executive Branch," coupled with the disruptive nature and costs of the discovery and trial processes, all in the context of a damages suit Congress never approved. *See Abbasi*, 137 S. Ct. at 1861.

The nature of plaintiffs' suit illustrates that these twin concerns are both implicated here. First, plaintiffs sue the individual defendants for high-level planning and decision-making, asserting that protesters were removed from Lafayette Park by the individual defendants' subordinates in order to facilitate a walk by the President to St. John's Church and to suppress plaintiffs' speech. FAC ¶¶ 8, 137. They explicitly tie these alleged decisions to the orders and desires of the President. *E.g., id.* ¶¶ 1, 4, 51, 54, 59-61, 95-96. Probing the bases for the individual defendants' decisions undoubtedly would require discovery into "the whole course of discussions and deliberations that led to the … acts being challenged." *Abbasi*, 137 S. Ct. at 1860. In turn, the disclosure of confidential communications between the President, the Attorney General, and other Cabinet officials, and particularly those regarding the security of the White House or the President, could "interfere in an intrusive way with sensitive functions of the Executive Branch." *Id.*; *Lebron*, 670 F.3d at 551 (refusing to imply a *Bivens* remedy, observing, "it takes little enough imagination to understand that a judicially devised damages action would expose past executive deliberations affecting sensitive matters of national security to the prospect of searching judicial scrutiny."); *K.O. v. U.S. Imm. & Cust. Enf't*, - F. Supp. 3d -, No. 20-309, 2020 WL 3429697, at *10 (D.D.C. June 23, 2020) (stating claims that reach into Executive Branch deliberations and conversations close to the President gave court "more reason to pause before allowing a *Bivens* action that could reach them"), *appeal filed*, No. 20-5255 (Aug. 26, 2020). The Supreme Court has found such an intrusion to high-ranking Executive Branch

decision-makers to be a factor weighing against implying a remedy. *Abbasi*, 137 S. Ct. at 1861.

Second, "the burden and demand of litigation might well prevent [the individual defendants]—or, to be more precise, future officials like them—from devoting the time and effort required for the proper discharge of their duties." *Abbasi*, 137 S. Ct. at 1860; *Vance*, 701 F.3d at 203 ("A *Bivens*-like remedy could cause other problems, including diverting Cabinet officers' time from management of public affairs to the defense of their bank accounts."); *Mejia-Mejia*, 2019 WL 4707150, at *5 (refraining from implying a *Bivens* claim in part because "the discovery required to gain details on individual defendants' motivations could dampen the candor of conversations and advice rendered by officials within the executive branch."). This factor recognizes that the "time and administrative costs attendant upon intrusions" by discovery, *Abbasi*, 137 S. Ct. at 1856, coupled with the prospect of dampening the candor of conversations at the highest levels of the government, would have substantial social costs beyond those imposed by a typical civil case. The presence of both of these concerns at this level of authority counsels against the court devising its own remedy in damages.

**b**. Administrability concerns are especially pronounced when claims are brought against those who are charged with protecting the security of the President. As discussed above, underlying this case is the sensitive balance between First Amendment rights and the critical interest in protecting the White House Complex and the President. As the D.C. Circuit observed, "[t]he balance that must be struck between First Amendment rights and other public interests is especially delicate when one of those interests is the safety of the President." *White House Vigil for ERA Comm. v. Watt*, 717 F.2d 568, 572 (D.C. Cir. 1983) (per curiam). "[T]he President and Vice President, by the nature of their positions, are always at some risk," *Stigile*, 110 F.3d at 807 n.2 (Rogers, J., concurring), and that is especially true when, as here, the President is outdoors

near a large crowd of people. *See QAG IV*, 516 F.2d at 731. In order to resolve plaintiffs' claims, this court would be required to wrestle with such issues as how an acceptable level of protection should be attained, for what acceptable purposes, using what methods. *Cf. Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 299 (1984) (criticizing lower court's lack of deference in finding National Park Service regulation "unnecessary," and stating the time, place, and manner decisions do not "assign to the judiciary the authority to replace the Park Service as the manager of the Nation's parks or endow the judiciary with the competence to judge how much protection of park lands is wise and how that level of conservation is to be attained"). The concern here is that plaintiffs ask the court to do so in the context of an implied damages cause of action that Congress has not provided. In other words, plaintiffs ask this court to re-weigh the equities faced by high-ranking members of a coordinate branch and command the government to exercise its discretion in a highly particularized way—all in the context of a personal damages suit.

The D.C. Circuit has recognized that while imposing personal liability can promote certain interests, it may also result in substantial costs not just for the individual defendant, but for citizens "who depend on the vigorous enforcement of federal law." *Loumiet*, 948 F.3d at 381. As the court observed, "judges are not well-suited" to decide "how to balance these competing considerations in various contexts." *Id*. This fundamental concern about implied causes of action is only magnified when the security of the White House and President is at stake. Indeed, in the context of national security in particular, the Fourth Circuit explained: "It is inescapable, to be sure, that the branches of government will sometimes interact, and the courts will be called upon to take up sensitive matters. In those instances, however, Congress has often provided courts with specific means and mechanisms to consider delicate questions without imperiling national security." *Lebron*, 670 F.3d at 554. That is why the Supreme Court instructs that when a case

involves "a host of considerations that must be weighed and appraised, [devising a remedy] should be committed to those who write the laws, rather than those who interpret them." *Abbasi*, 137 S. Ct. at 1857 (quotation marks and citation omitted).

**c**. The nature of plaintiffs' claims against the individual defendants exacerbates the concerns catalogued above. While plaintiffs are three individuals, their putative *Bivens* claims could be brought by hundreds of others. A *Bivens* claim is not usually available "against individuals who have applied a general policy that affected plaintiff and others in similar ways." *Mejia-Mejia*, 2019 WL 4707150, at *4. Rather, *Bivens* claims "have generally been made against individuals—a police officer, a supervisor, or a federal prison guard—who have engaged in some personal misconduct in a direct and particularized interaction with a plaintiff." *Id*. That is because "*Bivens* is not designed to hold officers responsible for the acts of their subordinates." *Abbasi*, 137 S. Ct. at 1860. *Abbasi* also explains that even when a claim is "confined to the conduct of a particular Executive Officer in a discrete instance" the suit still may call into question the implementation of general policy. *Id.* at 1860. Here, plaintiffs challenge the alleged decisions of Attorney General Barr and Chief Monahan as applied to everyone at Lafayette Park, rather than a claim stemming from a particularized interaction between a defendant and a plaintiff. Claims against government leaders for their judgments as applied towards a large group of people is a mismatch for *Bivens* and raises similar workability concerns as those that challenge a policy. Allowing claims to proceed wholly divorced from a personal interaction between a plaintiff and defendant would have sweeping implications not only for an individual defendant, but for "government operations systemwide." *Id*. at 1858. Indeed, permitting such a claim "risks a torrent of new litigation that could burden both the Executive Branch and the judiciary." *Mejia-Mejia*, 2019 WL 4707150, at *5. *Abbasi* warned, "[i]t is not necessarily a

judicial function to establish whole categories of cases in which federal officers must defend against personal liability claims in the complex sphere of litigation." *Abbasi*, 137 S. Ct. at 1858. Congress is in a better position to do so.

All of the foregoing concerns are further underscored with respect to claims that involve inquiry into a defendant's motive. State of mind is "easy to allege and hard to disprove." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 585 (1998)). As a result, courts recognize that such claims are especially difficult to administer. *Loumiet*, 948 F.3d at 385 (refusing to expand *Bivens* to First Amendment retaliation claims in part because such motive-based claims are easy to allege); *Bistrian v. Levi*, 912 F.3d 79, 96 (3d Cir. 2018) (same). The D.C. Circuit thus observed in the context of a First Amendment retaliation claim, "there is a hard 'balance to be struck' in considering whether to create a damages remedy for the kind of claim that [plaintiff] seeks to press here. That decision is best left to Congress." *Loumiet*, 948 F.3d at 385 (citation omitted); *cf. Storms v. Shinseki*, 319 F. Supp. 3d 348, 355 (D.D.C. 2018) ("[I]n the complex, fraught arena of free speech, Congress is better suited than the Judiciary to determine whether a damages action should arise"). Congress, in the first instance, should balance the considerations and decide whether to authorize such a class of damages claims.

In the end, Congress has been entrusted with the "substantial responsibility to determine whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government." *Abbasi*, 137 S. Ct. at 1856. Congress "can tailor any remedy to the problem perceived" and is "in a far better position than a court to evaluate the impact of a new species of litigation against those who act on the public's behalf." *Wilkie*, 551 U.S. at 562 (citation and quotation marks omitted). Each factor catalogued

above provides ample justification for concluding that the decision to authorize a damages remedy in this context rests with Congress, not the courts. *See Abbasi*, 137 S. Ct. at 1848. Together, they unquestionably provide "reasons to think Congress might doubt the efficacy or necessity of a damages remedy" here. *Id.* at 1858. The *Bivens* claims should be dismissed.

## II.     The Posse Comitatus Act Creates No Private Right of Action.

Plaintiffs cannot pursue a civil suit for damages against the individual defendants under the Posse Comitatus Act, 18 U.S.C. § 1385 (FAC ¶ 151). As an initial matter, it is unclear against whom plaintiffs bring this claim; they do not identify any actions by the individual defendants. In any event, the Posse Comitatus Act provides no private right of action for damages. *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 511 (2d Cir. 1994); *see also Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002); *Smart v. Holder*, No. 09-101, 2009 WL 2498213, at *4, 6 (W.D. Tex. Aug. 12, 2009) (collecting cases); *Kervin v. City of New Orleans*, No. 06-3231, 2006 WL 2849861, at *3 (E.D. La. Sept. 28, 2006) (same).

Nor should any cause of action be implied. The Act provides that those who violate it "shall be fined … or imprisoned not more than two years or both." 18 U.S.C. § 1385. Such a "bare criminal statute" with "no other statutory basis for inferring that a civil cause of action exists, is insufficient to imply Congress intended to create a concomitant civil remedy." *See Lee v. USAID*, 859 F.3d 74, 77-78 (D.C. Cir. 2017); *Sai v. Trump*, 325 F. Supp. 3d 68, 71-72 (D.D.C. 2018) (citations omitted) (explaining that "courts have found that violations of Title 18 are properly brought by the United States government through criminal proceedings and not by individuals in a civil action" unless the statute provides for a private right of action). Plaintiffs' Posse Comitatus Act claim against the individual defendants should be dismissed.

**III.    Qualified Immunity Bars Plaintiffs' Individual-Capacity Claims Against Attorney General Barr and Chief Monahan.**

Given governing precedent and the many special factors implicated here, this court should dismiss the individual-capacity constitutional claims on special factors grounds alone. *See Camreta v. Greene*, 563 U.S. 692, 705 (2011) (citations omitted) (describing Court's principle of judicial restraint which requires "that courts avoid reaching constitutional questions in advance of the necessity of deciding them."); *cf. Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (per curiam) (noting it "would be imprudent" to resolve a Fourth Amendment claim when "doing so may be unnecessary to resolve" the case in light of special factors).[7] Nonetheless, because plaintiffs have not alleged that Barr or Monahan violated any clearly established constitutional or statutory right, plaintiffs cannot overcome their entitlement to qualified immunity.

**A.  The Framework for the Qualified Immunity Defense.**

The doctrine of qualified immunity ensures that only conduct that unquestionably violates the Constitution will subject officials to personal liability. *Harlow v. Fitzgerald,* 457 U.S. 800, 814-19 (1982). Qualified immunity shields officials from the necessity of defending against tort liability so long as their conduct does not violate clearly established rights of which a reasonable official would have known. *See id.* at 818. This "demanding standard" protects "all but the plainly incompetent or those who knowingly violate the law." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Qualified immunity shields federal officials from damages unless a plaintiff "pleads facts

---

[7] The principle of constitutional avoidance similarly suggests that even if this court chooses to address the constitutional claims, it "can enter judgment without ever ruling" on plaintiffs' claim "that a particular right exists" or whether the facts alleged show a violation of a constitutional right—as long as prior case law has not "clearly settled" the right. *Camreta*, 563 U.S. at 705-6; *accord Pearson v. Callahan*, 555 U.S. 223, 232, 237-41 (2009).

showing:" (1) that the official violated a constitutional right, and (2) the right was clearly established at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). In order to overcome the first prong, plaintiffs must allege specific acts by which a defendant personally violated their constitutional rights. *See Iqbal*, 556 U.S. at 676. A plaintiff "must plead that *each* Government-official defendant, through the official's *own individual actions*, has violated the Constitution." *Id.* (emphasis added). To overcome the second prong, plaintiffs must show that the right allegedly violated by a particular defendant was clearly established at the time of the conduct. *Moss*, 572 U.S. at 757. "The contours of a right [must be] sufficiently clear that every reasonable official would have understood that what he [was] doing violate[d] that right." *al-Kidd*, 563 U.S. at 741 (citation and quotation marks omitted). In other words, qualified immunity applies unless existing precedent shows that the unlawfulness of a defendant's conduct is "beyond debate." *Id.* It is plaintiffs' burden "to show that the particular right in question—narrowly described to fit the factual pattern confronting the officers—was clearly established." *Dukore v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015) (citation omitted).

### B. Plaintiffs Fail to Allege the Personal Participation of Barr and Monahan in the Violation of Any Constitutional or Statutory Right.

Plaintiffs cannot overcome the first prong of qualified immunity. They fail to plead facts establishing the personal participation of Barr or Monahan in any alleged violation under the Constitution or the Posse Comitatus Act. *See Iqbal*, 556 U.S. at 675. Plaintiffs allege only Barr's limited role in giving a non-specific order to clear Lafayette Park, and Monahan's role in concurring with a subordinate's unspecified changes to unidentified "normal 'rules of engagement'" (ROE). FAC ¶¶ 4, 55. Absent are allegations that Barr or Monahan gave any orders linked to these specific plaintiffs. This deficiency is not remedied by asserting undifferentiated and collective "Defendants" were "personally involved," "personally ordered

law enforcement personnel" to clear the Park, "personally supervised the execution of that order, and/or personally carried it out." *Id.* ¶ 139. Such conclusory and ambiguous allegations alone are insufficient to demonstrate the particularized participation necessary for each defendant to satisfy prong one, because "mere conclusory statements[] do not suffice." *Iqbal*, 556 U.S. at 678. *Iqbal* teaches that such allegations are "not entitled to the assumption of truth." *Id.* at 679. Allegations like this improperly force the court to speculate how non-specific conduct resulted in a violation. Reminiscent of the "supervisory liability" theory *Iqbal* rejected, *see id.* at 676-77, they obfuscate each individual's actual conduct, failing to concretely identify what each defendant did and how that resulted in the violation claimed. Because plaintiffs fail to identify each defendant's "own individual actions," *id.*, or allege how those specific actions violated their rights, Barr and Monahan are entitled to qualified immunity.

*Bivens* liability depends on personal conduct, not the position an individual holds. It is well-settled that, regardless of the alleged violation, officials may not be held liable for the unconstitutional conduct of their subordinates under a respondeat superior or vicarious liability theory. *Id.; DeBrew v. Atwood*, 792 F.3d 118, 131 (D.C. Cir. 2015) ("*Bivens* claims cannot rest merely on respondeat superior. The complaint must at least allege that the defendant federal official was personally involved in the illegal conduct.") (quotation marks and citation omitted).

The allegations that Barr issued an order to clear the Park, and Monahan agreed with unspecified changes to an unalleged ROE, FAC ¶¶ 4, 55, do not plausibly allege their personal involvement in any tactical execution or the manner in which the order was carried out. They certainly do not establish any personal participation in any specific constitutional violations that plaintiffs allege may have taken place at the hands of subordinates. In particular, plaintiffs fail to plausibly allege that either Barr or Monahan was responsible for seizing them with excessive

force or without sufficient suspicion under the Fourth Amendment or that their speech was subject to content-specific discrimination by either of them in violation of the First Amendment. Any inference that the Attorney General ordered officers to use certain types of force or engage in the specific tactics alleged is especially implausible. *Id*. ¶¶ 4, 55, 107, 109. The same holds true for Monahan, who is not alleged to have given any order. *Id.* ¶ 55. Finally, plaintiffs have failed to specify any action by either of them in violation of the Posse Comitatus Act. *Id*. ¶¶ 143-151.[8] For these reasons, plaintiffs cannot satisfy prong one. Their claims must be dismissed.

**C. Plaintiffs Fail to Allege a Violation of a Clearly Established Constitutional Right.**

Plaintiffs' claims independently fail under the second prong of the qualified immunity standard because plaintiffs do not demonstrate that Barr or Monahan violated any clearly established constitutional right.

**1. Plaintiffs Fail to Allege a Violation of a Clearly Established First Amendment Right.**

Plaintiffs' First Amendment claim fails for two reasons under prong two. First, plaintiffs fail to allege that actions of Barr or Monahan denied them the ability to protest. Plaintiffs merely contend they were moved back one block allegedly so the President could take a photo at St. John's Church. FAC ¶¶ 4, 8, 63, 77, 91, 94-96. The protests were not stopped and plaintiffs could have continued protesting after being moved, just as they did in the following days, even though not at their preferred location. *Id.* ¶¶ 73, 79, 87. Second, they fail to allege their views were subject to content-specific discrimination by Barr or Monahan. All protesters, regardless of

---

[8] Because plaintiffs fail to proffer any factual allegations linking either individual defendant to their Posse Comitatus Act claim, they also cannot establish that either one of them violated clearly established law. Suffice it to say that it is not clearly established that Barr, through his alleged order to clear Lafayette Park, or Monahan, through his alleged concurrence with unspecified changes to the Park Police's "normal" ROE, violated 18 U.S.C. § 1385.

viewpoint, were moved from Lafayette Park. Plaintiffs try to suggest bias against their speech based on the *President's* alleged views and on completely different events involving different issues at different locations on different dates. *Id.* ¶¶ 8, 47-49, 119. They allege nothing about Barr or Monahan. Plaintiffs' claim fails because the relocation of protestors for valid non-content reasons—particularly when it involves the safety and security of the President, like it does here—is not a denial of First Amendment rights. *Moss*, 572 U.S. at 759-60; *Mahoney*, 454 F. Supp. 2d at 33. There are no allegations that moving plaintiffs one block was so unreasonable that it denied them their rights or that the reason they were moved was due to content-specific speech, especially given that all protesters, regardless of the content of their speech, were equally dispersed. It is therefore not sufficiently clear that extending the security perimeter approximately one block would violate plaintiffs' First Amendment right or be a knowing violation of plaintiffs' rights. *Id.*; *Wesby*, 138 S. Ct. at 589-90 (2018). Moreover, *Moss* is unequivocal that the safety and security of the President is paramount, even when last-minute route changes made by the President affected protesters' preferred choice in location. 572 U.S. at 748 ("safeguarding the President is … of overwhelming importance") (citation omitted).

While the First Amendment generally prohibits government restrictions on speech based on content, *see Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), the government may establish reasonable restrictions on the time, place, and manner of the protected speech. *Hill v. Colorado*, 530 U.S. 703, 719-30 (2000); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Moss*, 572 U.S. at 757 ("[T]he fundamental right to speak secured by the First Amendment does not leave people at liberty to publicize their views 'whenever and however and wherever they please.'") (citations omitted). Time, place, and manner restrictions are valid provided they are "justified without reference to the content of the regulated speech," "narrowly tailored to serve a

significant governmental interest," and "leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791 (citation omitted); *see A.N.S.W.E.R. Coal. v. Basham*, 845 F.3d 1199, 1208 (D.C. Cir. 2017). A restriction is content neutral if it "serves purposes unrelated to the content" of the speech, regardless of whether "it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791 (citation omitted). Under the circumstances plaintiffs allege Barr and Monahan confronted, it would not be clear to a reasonable official that their alleged decisions violated the Constitution, *al-Kidd*, 563 U.S. at 741, or were not in line with Supreme Court jurisprudence governing valid time, place, and manner restrictions. *Ward*, 491 U.S. at 791.

Here, "the safety of the President [i]s a 'paramount interest,'" *White House Vigil for ERA Comm.*, 746 F.2d at 1532-33 (citations omitted), justifying substantial limitations on the manner of expression. *See Moss*, 572 U.S. at 748, 758-59; *Watts*, 394 U.S. at 707; *cf. Stigile*, 110 F.3d at 803-04. The government also has a related and additional strong interest in protecting the White House and its occupants. *See QAG IV*, 516 F.2d at 727-37; *see also United States v. Musser*, 873 F.2d 1513, 1517-18 (D.C. Cir. 1989); *United States v. Caputo*, 201 F. Supp. 3d 65, 72 (D.D.C. 2016). Further, a limitation on such speech "need not be the least restrictive or least intrusive means" of furthering the government's interests, or be satisfactory to the speaker, or effective in allowing the speaker to reach the intended audience. *Ward*, 491 U.S. at 798-99, 802-3; *Basham*, 845 F.3d at 1215-16; *White House Vigil*, 746 F.2d at 1537-38; *see also Marcavage v. City of New York*, 689 F.3d 98, 107-8 (2d Cir. 2012) (finding alternative channels to be adequate despite fact that those channels did not put protesters within "sight and sound" of the intended audience).

Because courts have held that extending the security perimeter for the safety of the President is a valid reason to move protestors, *e.g.*, *Moss*, 572 U.S. at 759; *Menotti*, 409 F.3d at

1133-34, 1140-41; *McCabe*, 608 F.3d at 1071, 1078, it cannot plausibly be inferred that an order to expand the security perimeter here was an order by Barr or Monahan for subordinates to deny plaintiffs' First Amendment rights. FAC ¶¶ 4, 55, 119, 137. That is particularly true here, where protesters were only moved back and could have continued their protest.

Moreover, as the Supreme Court recently held, retaliatory motive and injury alone are not enough. *Nieves*, 139 S. Ct. at 1722 (quoting *Hartman v. Moore*, 547 U.S. 250, 259-60 (2006) ("some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway")). Instead, plaintiffs must establish a causal connection—the "but for" link—between the defendants' animus against their speech and their alleged injury; "the motive must *cause* the injury." *Nieves*, 139 S. Ct. at 1722 (original emphasis); *Hartman*, 547 U.S. at 260. Plaintiffs fail to allege the "but for" required, and have not alleged anything linking the supposed motives of Barr and Monahan to their claimed injury.

Plaintiffs make no factual allegations about the particular language of Barr's order to clear Lafayette Park, his motive, or how subordinates reasonably would have interpreted it. FAC ¶¶ 4, 55, 91. At best, the complaint simply suggests Barr requested an extension of the perimeter to protect the President, and that Monahan may have agreed with some ROE changes. It does not, however, plausibly allege that Barr or Monahan ordered the perimeter extended to chill the plaintiffs' speech. Referencing the President's statements regarding protests, *e.g. id*. ¶¶ 8, 47-49, 119, do not plausibly show anything about Barr or Monahan and certainly not that Barr or Monahan intended to suppress or chill the plaintiffs' speech. To the contrary, as alleged, the orders were content neutral because they excluded all people from the Park, regardless of the views expressed. *Hill*, 530 U.S. at 719; *Clark*, 468 U.S. at 295-96; *Basham*, 845 F.3d at 1208-09.

The vandalism, rioting, and looting experienced by D.C. in the days leading up to June 1

—resulting in the Mayor's declaration of a state of emergency and imposition of a curfew compounded by the fire so close to the White House the night before—further support Barr's order. FAC ¶¶ 46, 50, 61-62, 69, 90; *see also In re Sealed Case*, 148 F.3d 1073, 1078 (D.C. Cir. 1998) (per curiam) ("[T]he greatest danger to the President arises when he is in public").[9] Barr's and Monahan's alleged actions served the interest in presidential security just as directly as the relocation of protesters in *Moss*. 572 U.S. at 750-51. As in *Moss*, the alleged order to move protesters was facially neutral and did not constitute viewpoint discrimination under clearly established law. *Id*. at 759-60. And here, just as in *Moss*, it does not matter whether they could have relied on supposedly less restrictive alternatives to the clearing of the Park to protect the President, because no clearly established precedent requires such alternatives. *Id*. at 760-61.

Finally, any line-level law enforcement officers' alleged use of excessive force to remove plaintiffs does not clearly establish that the actions of Barr or Monahan violated the First Amendment. Conclusory use of force allegations do not, alone, transform an otherwise neutral restriction on speech into impermissible retaliation or viewpoint discrimination. *Cf. Lash v. Lemke*, 786 F.3d 1, 10 (D.C. Cir. 2015) ("A plaintiff pressing a First Amendment retaliatory force claim must show, among other things, that the officer who used force against him had 'retaliatory animus.'") (citation omitted). Because no controlling authority or legal principle made it obvious to all reasonable officials that dispersing protesters from Lafayette Park under the circumstances would be unconstitutional, it was not clearly established Barr or Monahan violated plaintiffs' First Amendment rights.

---

[9] Both Barr and Monahan affirmed that Lafayette Park was cleared to expand the security perimeter. FAC ¶¶ 91, 93. However, even if protesters were dispersed to facilitate the President's walk to St. John's Church as plaintiffs allege, *id*. ¶¶ 95-96, the governmental interest in protecting the President clearly supports the alleged actions of Barr and Monahan here.

### 2. Plaintiffs Fail to Allege a Violation of a Clearly Established Fourth Amendment Right.

Not only have plaintiffs fail to allege Barr and Monahan personally participated in violating their rights, plaintiffs also fail to show they violated a clearly established Fourth Amendment right. Law enforcement officers may seize a person under the Fourth Amendment either by a "show of authority," such as a command to halt, or "by means of physical force." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). The threshold defining feature of a physical-force seizure is an actual physical impact on a subject's person. That impact is a "seizure" if it is intentionally applied and designed to restrain his freedom of movement. *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596-97 (1989). Unlike a "show of authority" seizure, a physical-force seizure does not require that the subject yield to the officer's control. Instead, under *California v. Hodari D.*, 499 U.S. 621 (1991), the "application of physical force to restrain movement" is a "seizure" under the Fourth Amendment, "even when it is ultimately unsuccessful." *Id*. at 626. In light of these principles it is assumed, for present purposes only, that those subjected to the physical force alleged in the complaint were "seized" under the Fourth Amendment. Despite this, under certain circumstances the government's interest in public order and law enforcement can permit law enforcement officers to "seize" in the Fourth Amendment sense a large cohesive crowd based on probable cause to believe that some, though not all, of its members engaged in criminal behavior, for example when acting as a unit. *Bernini v. City of St. Paul*, 665 F.3d 997, 1003 (8th Cir. 2012); *cf. Carr v. Dist. of Columbia*, 587 F.3d 401, 407-10 (D.C. Cir. 2009); *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1195 (9th Cir. 2015).

Here, plaintiffs allege an officer issued warnings via megaphone directing protesters to disperse. FAC ¶ 56. When Buchanan heard officers' order to "move" and saw officers come forward, Buchanan and Dagrin walked quickly away to their car to leave. *Id*. ¶¶ 70-71, 76-77.

When Field heard an officer tell people to "vacate the premises" and saw the officers move forward, she first moved to intercept officers but then she too walked away and left the protest. *Id.* ¶¶ 82-86. As she was leaving, Field claims she was hit in the back of her thigh with "something," but does not identify what hit her or by whom she was hit. *Id.* ¶ 84. Notwithstanding these allegations—which, again, do not implicate any personal participation by either Barr or Monahan—there are no allegations indicating either were aware at the time of the circumstances regarding the specific force used in clearing Lafayette Park, let alone any specific instances of conduct directed towards any of the three plaintiffs, which is required for personal liability. Under the circumstances alleged, neither Barr nor Monahan unlawfully seized plaintiffs, and thus neither engaged in any Fourth Amendment violation. And, even if plaintiffs were seized by unidentified line-level subordinate officers, merely alleging a supervisory individual defendant like Barr or Monahan ordered the Park cleared or agreed with an unspecified ROE is insufficient to warrant personal liability for others' acts.[10]

A government official cannot be held liable for a subordinate's alleged violation of the Fourth Amendment in seizing or using force against someone unless the official was aware of the circumstances rendering the force excessive and approved the particular tactics at issue. *See Int'l Action Ctr. v. United States*, 365 F.3d 20, 28 (D.C. Cir. 2004); *cf. Barham v. Ramsey*, 434 F.3d 565, 577-78 (D.C. Cir. 2006) (concluding it had no jurisdiction to address police chief's personal liability as there was a material dispute whether he knew the circumstances when he

---

[10] Plaintiffs allege they were seized when officers "terminated their freedom of movement." FAC ¶ 124. None of the plaintiffs, however, allege they were detained by anyone, let alone by Barr or Monahan. Instead, they were free to walk away and leave the area at all times—which is exactly what they did after being told to disperse. *Id.* ¶¶ 70-71, 76-77, 82-86. Through their own allegations, plaintiffs concede their freedom of movement was not tantamount to a seizure even though they were not able to protest in their preferred location. Plaintiffs' allegations are insufficient to support their Fourth Amendment claim.

ordered subordinates to make mass arrests); *McNair v. Coffey*, 279 F.3d 463, 466-67 (7th Cir. 2002) (concluding officer who requested backup was entitled to qualified immunity because he was not responsible for the responding officers' display of force); *Tracy v. Neuberger*, 840 F. Supp. 2d 1183, 1191 (D. Minn. 2012) (granting qualified immunity to supervising officer because no causal connection was shown between his mass arrest order and the allegedly unlawful conduct of line officers in arresting plaintiff). It is not clearly established that a supervisor's generalized order to disperse people, without more, would render him liable for any line-level officers' tactics towards plaintiffs. Consequently, because plaintiffs failed to show Barr or Monahan violated a clearly established Fourth Amendment right, Barr and Monahan are immune from this claim.

### 3. Plaintiffs Fail to Allege a Violation of a Clearly Established Fifth Amendment Right.

Barr and Monahan are entitled to qualified immunity for the Fifth Amendment claim because plaintiffs fail to allege the violation of a due process right, let alone a clearly established one. To the extent plaintiffs seek to assert a claim under substantive due process, this claim essentially rehashes their flawed First and Fourth Amendment claims. Because plaintiffs' substantive due process claim is based on the very same conduct as those claims, the court should analyze this claim under the contours of the First and Fourth Amendments, rather than generalized notions of substantive due process. *County of Sacramento v. Lewis*, 523 U.S. 833, 842-43 (1998) (explaining that a substantive due process claim is inappropriate when the claim is covered by the Fourth Amendment); *Albright v. Oliver*, 510 U.S. 266, 273-75 (1994) (rejecting due process claim because it is properly considered under the Fourth Amendment, the more specific constitutional right implicated by plaintiff's allegations); *Abdelfattah v. U.S. Dep't Homeland Sec.*, 787 F.3d 524, 541 (D.C. Cir. 2015) (explaining that plaintiff's claim of an illegal

seizure was cognizable under the Fourth Amendment and therefore "cannot proceed under the

doctrine of substantive due process"); *Elkins v. District of Columbia*, 690 F.3d 554, 562 (D.C.

Cir. 2012) (Fourth Amendment); *Kiser v. Kamdar*, 831 F.3d 784, 791 (6th Cir. 2016) (First

Amendment); *Hufford v. McEnaney*, 249 F.3d 1142, 1151 (9th Cir. 2001) (First Amendment).

Plaintiffs' Fifth Amendment claim therefore should be dismissed.

However, even if the court were to analyze the claim under the rubric of substantive due

process, plaintiffs still have failed to allege that Barr or Monahan violated a clearly established

right. The complaint is devoid of any factual allegations identifying their conduct in this regard,

let alone conduct that is "so egregious, so outrageous, that it may fairly be said to shock the

contemporary conscience." *Lewis*, 523 U.S. at 847 n.8. Because plaintiffs cannot meet their

burden of alleging either the personal participation of Barr and Monahan in a violation of any

rights, or any clearly established constitutional violation, they are entitled to qualified immunity.

## IV.     Plaintiffs Cannot Obtain Equitable Relief From Defendants in Their Individual Capacities (Causes of Action 1-3, 5).

Finally, as pleaded, plaintiffs' request for equitable relief appears to be directed to

defendants in their official capacities only. In describing the defendants they sue, plaintiffs state

that they are suing the President and others in their official capacities and Defendants Barr and

Monahan in their official and individual capacities. FAC ¶¶ 16, 19. In their first and second

Prayer for Relief, plaintiffs seek equitable relief from "Defendants." In their First, Second and

Third Causes of Action, plaintiffs do not specify the relief they are seeking, yet again refer to

"Defendants." They do not specify against whom they bring their Fifth Cause of Action.

Insofar as plaintiffs seek to obtain equitable relief from the individual defendants

personally, they cannot. Equitable relief "is not available against a defendant sued in his

individual capacity." *Leyland v. Edwards*, 797 F. Supp. 2d 7, 12 (D.D.C. 2011); *Corsi v.*

*Mueller*, 422 F. Supp. 3d 51, 68-69 (D.D.C. 2019); *cf. Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (defining the practical and doctrinal differences between personal and official capacity actions). That is because the government is the real party in interest in a suit for equitable relief where the suit is based on an employee's performance of his or her official duties. *Dugan v. Rank*, 372 U.S. 609, 620 (1963) ("The general rule is that a suit is against the sovereign . . . if the effect of the judgment would be to restrain the Government from acting, or to compel it to act.") (quotation marks and citations omitted). The government's interest in such a suit is apparent because "[i]njunctive relief is sought that would require [the employees] to exercise their official powers in certain ways." *Libby v. Marshall*, 833 F.2d 402, 405 (1st Cir. 1987). In contrast, an employee's personal interest in litigation is limited to whether or not he or she is required to pay damages with his or her own personal assets.

Courts therefore focus the inquiry on whether the government's own interests are at stake. *Hatfill v. Gonzales*, 519 F. Supp. 2d 13, 24 (D.D.C. 2007). "Regardless of the manner by which a plaintiff designates the action, a suit should be regarded as an official-capacity suit ... when ... the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Id.* (citation and quotation marks omitted). Indeed, it is only by acting as a government official that the individual defendants could comply with a decree from the court ordering them to perform their government duties in one way or another. *See id.* at 19 (reporting that courts have held that "[t]here is no basis for suing a government official for declaratory and injunctive relief in his or her individual or personal capacity"); *Gerlich v. U.S. Dep't of Justice*, 659 F. Supp. 2d 1, 19 n.20 (D.D.C. 2009) ("Declaratory relief is inappropriate in individual capacity suits."); *see also Kirby v. City of Elizabeth*, 388 F.3d 440, 452 n.10 (4th Cir. 2004) (concluding that injunctive relief can only be awarded against an employee in official capacity);

*Wolfe v. Strankman*, 392 F.3d 358, 360 n.2 (9th Cir. 2004); *Frank v. Relin*, 1 F.3d 1317, 1327 (2d Cir. 1993); *Feit v. Ward*, 886 F.2d 848, 858 (7th Cir. 1989). Accordingly, to the extent plaintiffs seek equitable relief in the First, Second, Third, and Fifth Causes of Action, it can only be obtained, if at all, from defendants in their official capacities, not from them personally.

## **CONCLUSION**

All individual-capacity claims asserted against William Barr and Gregory Monahan should be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

Dated: October 1, 2020                    Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

DOUGLAS G. SMITH
Deputy Assistant Attorney General

C. SALVATORE D'ALESSIO, JR.
Acting Director, Torts Branch

*/s/ James G. Bartolotto*
JAMES G. BARTOLOTTO, DC Bar 441314
Senior Trial Counsel, Torts Branch, Civil Division
United States Department of Justice
175 N Street, NE
Washington, DC 20002
Tel: (202) 616-4174; F: (202) 616-4314
Email: James.Bartolotto@usdoj.gov

*/s/ Sarah E. Whitman*
SARAH E. WHITMAN
MA Bar 657726, LCvR 83.2
Senior Trial Attorney, Torts Branch, Civil Division
United States Department of Justice
175 N Street, NE
Washington, DC 20002
Tel: (202) 616-0089; F: (202) 616-4314
Email: Sarah.Whitman@usdoj.gov

*Counsel for Defendants William Barr and Gregory Monahan, in their individual capacities*