IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BLACK LIVES MATTER D.C.<br>  c/o Washington Lawyers' Committee for Civil<br>  Rights & Urban Affairs<br>  700 14th Street, NW, Suite 400<br>  Washington, D.C. 20005,<br><br>and<br><br>KEARA SCALLAN<br>  c/o Washington Lawyers' Committee for Civil<br>  Rights & Urban Affairs<br>  700 14th Street, NW, Suite 400<br>  Washington, D.C. 20005,<br><br>LIA POTEET<br>  c/o Washington Lawyers' Committee for Civil<br>  Rights & Urban Affairs<br>  700 14th Street, NW, Suite 400<br>  Washington, D.C. 20005,<br><br>DUSTIN FOLEY<br>  c/o Washington Lawyers' Committee for Civil<br>  Rights & Urban Affairs<br>  700 14th Street, NW, Suite 400<br>  Washington, D.C. 20005,<br><br>and<br><br>EDEN X. FOLEY<br>  c/o Washington Lawyers' Committee for Civil<br>  Rights & Urban Affairs<br>  700 14th Street, NW, Suite 400<br>  Washington, D.C. 20005,<br><br>on behalf of themselves and all others similarly<br>situated,<br><br>        *Plaintiffs*,<br><br>    v.<br><br>WILLIAM P. BARR<br>  c/o U.S. Department of Justice<br>  950 Pennsylvania Avenue, N.W.<br>  Washington, D.C. 20530, | Case No. 1:20-cv-01469-DLF<br><br>(consolidated with:<br> No. 1:20-cv-1542-DLF)<br><br>**FOURTH AMENDED CLASS**<br>**ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1

MARK ADAMCHIK,
CARA SEIBERLING,
THOMAS LOCASCIO,
NICHOLAS JARMUZEWSKI,
JEFFREY HENDRICKSON,
SEAN COX,
BRYAN MCDONALD,
LAWRENCE SINACORE,
JONATHAN DANIELS,
LUIS FELICIANO,
SEAN KELLENBERGER
   Officers, U.S. Park Police
   1100 Ohio Drive, S.W.
   Washington, D.C. 20242,

JEFFERY CARROLL,
ANTHONY ALIOTO,
JEFFERY BUCHANAN,
TIMOTHY HARGROVE,
CHRISTOPHER MEYER,
CLIFTON MURPHY,
TIFFANY PAYNE,
JUSTIN TAYLOR,
DANIEL M. THAU,
ANTHONY A. WILLIS,
   Officers, D.C. Metropolitan Police Department
   c/o Office of the Attorney General
   441 4th Street, N.W.
   Washington, D.C. 20001,

and

UNITED STATES OF AMERICA
   950 Pennsylvania Avenue NW
   Washington, D.C. 20530,

       *Defendants.*

**FOURTH AMENDED CLASS ACTION COMPLAINT[1]**

**(for injunctive relief and damages; violation of First and Fourth Amendment rights, Federal Tort Claims Act, First Amendment Assemblies Act, and D.C. tort law)**

1.      This case is about a brutal attack by federal and local law enforcement against peaceful demonstrators who were protesting police brutality targeted at Black people.

2.      Just after 8:00 pm on May 25, 2020, George Floyd, a 46-year-old father, son, brother, and African American man, was accused of a non-violent offense and arrested by the Minneapolis police. In the process of his arrest, Mr. Floyd was handcuffed and fell to the pavement. Less than ten minutes after the police arrived, a police officer who participated in Mr. Floyd's arrest placed his knee and the weight of his body on Mr. Floyd's neck as Mr. Floyd lay on the ground. For eight minutes and forty-six seconds, the officer held his knee on Mr. Floyd's neck as Mr. Floyd pleaded for relief. Other officers held his legs or stood by and watched while he died. Among Mr. Floyd's final words were "please, please, please, I can't breathe." These words are reminiscent of the words spoken by Eric Garner before he was killed by a New York City police officer in 2014, which have since become a tragic rallying cry for people seeking to address racial inequities and reform the American criminal justice system. These are some of the words that a group of peaceful demonstrators chanted on June 1, 2020, in Lafayette Square, across the street from the White House in Washington, D.C.

3.      On June 1, 2020, a group of demonstrators, including Plaintiffs, gathered peacefully in Lafayette Square to protest the gross, systemic injustices perpetrated by law enforcement against Black people in the United States, exemplified by the recent brutal murders

---

[1] In omitting from this Fourth Amended Complaint defendants and claims from the Third Amended Complaint that have since been dismissed, Plaintiffs do not waive their right to appeal those dismissals. *See, e.g., Jefferson v. Harris*, 285 F. Supp. 3d 173, 180 (D.D.C. 2018); *BEG Invs., LLC v. Alberti*, 85 F. Supp. 3d 13, 50 (D.D.C. 2015).

of George Floyd and Breonna Taylor, a Black woman who was shot eight times and killed in March 2020 by three Louisville police officers who entered her home in the middle of the night without knocking. Without provocation, the federal officer Defendants fired (or ordered to be fired) tear gas, pepper spray capsules, rubber bullets, and flash bangs into the crowd and physically charged at the protestors to shatter the peaceful gathering, forcing demonstrators to flee the area. Demonstrators who fled west away from the Square quickly encountered a formation of Defendant officers of the District of Columbia Metropolitan Police Department, who likewise fired tear gas at demonstrators as they fled. Many peaceful demonstrators were injured, some severely, by this coordinated and unprovoked attack.

4.    Defendants had no legitimate basis to destroy the peaceable gathering. At the time of the attack, the President was giving a speech, safely inside the White House compound on the opposite side of the White House from the demonstrators. The shifting justifications offered in the aftermath of the attack—many of them implausible and/or later contradicted by the Administration itself—were shams to deflect attention from the real reason that the Administration decided to employ violence: to suppress the demonstrators' message.  President Trump consistently demonstrated hostility towards viewpoints different than his own, and in the days and moments leading up to the attack he expressed his intent to violently attack protesters and "dominate" them.

5.    Moreover, regardless of the Administration's rationale, the violent dispersal of peaceful demonstrators who pose no threat is a clear violation of the First Amendment under an unbroken line of case law dating back half a century.

6.    The police violence against Plaintiffs and other lawful, peaceful demonstrators on June 1, 2020 is a continuation of an unlawful history of oppression of civil rights activists. The

peaceful assembly of people seeking systemic change in the criminal justice system, like the assembly of Plaintiffs and others on June 1, 2020 in Lafayette Square, is based on a decades-old history of civil rights activism in this nation. Following the long tradition of those who marched for voting rights on Sunday, March 7, 1965, in Selma, Alabama,[2] Plaintiffs seek to address racial inequities. And like that "Bloody Sunday" fifty-five years ago, Plaintiffs' peaceful, lawful assembly was met by police violence.

       7.     For Defendants to describe their actions as "domination" is telling. To dominate is to establish supremacy by subjugation of others. It is precisely such domination—in the form of centuries of white supremacy and subjugation of Black lives—that was the core focus of the peaceful demonstration in Lafayette Square. Just as in Tulsa,[3] Scottsboro,[4] Anniston,[5]

---

[2] Ronald J. Krotoszynski, Jr., *Celebrating Selma: The Importance of Context in Public Forum Analysis*, 104 Yale L.J. 1411 (1995).

[3] Alicia Lee and Sara Sidner, *99 years ago today, America was shaken by one of its deadliest acts of racial violence*, CNN, June 1, 2020, https://www.cnn.com/2020/06/01/us/tulsa-race-massacre-1921-99th-anniversary-trnd/index.html.

[4] N. Jeremi Duru, *The Central Park Five, the Scottsboro Boys, and the Myth of the Bestial Black Man*, 25 Cardozo L. Rev. 1315, 1334 (2004) (describing state violence against nine black boys accused of raping two white women in 1931; while the women eventually recanted and confessed to making up the story, the "Scottsboro boys" spent years in prison).

[5] Terry Gross, *Get On the Bus: The Freedom Riders of 1961*, NPR, Jan. 12, 2006, https://www.npr.org/2006/01/12/5149667/get-on-the-bus-the-freedom-riders-of-1961 (describing a white mob's attack on a bus of freedom riders in 1961, while the city government remained unresponsive).

Birmingham,[6] Selma,[7] Philadelphia,[8] Los Angeles,[9] Ferguson,[10] New York City,[11] Baltimore,[12] Minneapolis,[13] and countless other times in our nation's bloody history, the Lafayette Square assault was violence against Black people and their supporters committed by state actors. What differentiates the actions here from the others is that the President and Attorney General of the United States ordered the violence.

8.    Defendants' actions to shut down the Lafayette Square demonstration are a manifestation of the very despotism against which the First Amendment was intended to protect. On behalf of themselves and all others similarly situated, Plaintiffs seek to uphold, against uncivil, unwarranted, unjust, and blatantly unlawful attack, cherished rights enshrined in the First

---

[6] Steven H. Hobbs, *Alabama's Mirror: The People's Crusade for Civil Rights*, 6 Ala. C.R. & C.L. L. Rev. 1, 2 (2014) (describing the 1963 attack on African American children who were marching peacefully for civil rights by Birmingham Commissioner of Public Safety Eugene "Bull" Connor).

[7] J. Gerald Hebert & Renata E. B. Strause, *The Future of the Voting Rights Act*, 64 Rutgers L. Rev. 953, 953–54 (2012) (describing how police attacked civil rights activists calling for equal voting rights in Selma, Alabama in 1965).

[8] Lindsey Norward, *The day Philadelphia bombed its own people*, Vox, Aug. 15, 2019, https://www.vox.com/the-highlight/2019/8/8/20747198/philadelphia-bombing-1985-move.

[9] Cydney Adams, *March 3, 1991: Rodney King beating caught on video*, CBS News, Mar. 3, 2016, https://www.cbsnews.com/news/march-3rd-1991-rodney-king-lapd-beating-caught-on-video/.

[10] Dep't of Justice, Report Regarding the Criminal Investigation Into the Shooting Death of Michael Brown by Ferguson, Missouri Police Officer Darren Wilson, Mar. 4, 2015, https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/04/doj_report_on_shooting_of_michael_brown_1.pdf.

[11] Joseph Goldstein & Marc Santora, *Staten Island Man Dies From Chokehold During Arrest, Autopsy Finds*, N.Y. Times, Aug. 1, 2014, https://www.nytimes.com/2014/08/02/nyregion/staten-island-man-died-from-officers-chokehold-autopsy-finds.html.

[12] Leah Donnella, *Reflecting on the Death of Freddie Gray, One Year Later*, NPR, Apr. 20, 2016, https://www.npr.org/sections/codeswitch/2016/04/20/474668796/reflecting-on-the-death-of-freddie-gray-one-year-later.

[13] Chris McGreal, *Dispatch from Minneapolis: The Night the City Cracked Down on George Floyd Protests*, The Guardian, May 31, 2020, https://www.theguardian.com/us-news/2020/may/31/minneapolis-george-floyd-protests-saturday-crackdown.

and Fourth Amendments to the Constitution and foundational to our Democracy: the rights to peaceful assembly, petition for redress of grievances, freedom of speech, freedom of the press, and freedom from unwarranted seizures by the government.

## PARTIES

9.     Plaintiff Black Lives Matter D.C. ("BLMDC") is a District of Columbia limited liability corporation. As the local chapter of the nationwide "Black Lives Matter" movement, BLMDC organizes against systemic racism—in particular the racially disproportionate use of state-sanctioned violence against the Black community—through protests, public accountability campaigns, coalition-building, and other programming. Members of BLMDC were demonstrating in Lafayette Square on June 1, 2020. Other members of BLMDC were engaged in cop-watch activities and in providing aid to demonstrators.

10.     Plaintiff Keara Scallan was demonstrating peaceably in Lafayette Square on June 1, 2020.

11.     Plaintiff Lia Poteet was demonstrating peaceably in Lafayette Square on June 1, 2020.

12.     Plaintiffs Dustin Foley and his daughter Eden X. Foley, who was 15 years old at the time of the events described here, were demonstrating peaceably in Lafayette Square on June 1, 2020. (Eden will hereinafter be referred to by her initials, E.X.F., to distinguish her from the elder Foley.)

13.     During the events at issue, Defendant William P. Barr was the Attorney General of the United States. He is sued in his individual capacity. He personally issued the order that resulted in the unlawful actions complained of in this lawsuit.

14.     During the events at issue, Defendant Mark Adamchik was a Major in the United States Park Police. He is sued in his individual capacity. Defendant Adamchik was the incident

commander at Lafayette Square on the evening of June 1, 2020, and gave the immediate order for the law enforcement officers at the Square to attack the peaceably assembled protesters at approximately 6:30 pm.

15.    During the events at issue, Defendant U.S. Park Police Officer Lawrence Sinacore was a U.S. Park Police officer. He participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

16.    During the events at issue, Defendant U.S. Park Police Officer Cara Seiberling was a U.S. Park Police officer. She participated in dispersing the demonstration at Lafayette Square on June 1. She is sued in her individual capacity.

17.    During the events at issue, Defendant U.S. Park Police Officer Sean Kellenberger was a U.S. Park Police officer. He participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

18.    During the events at issue, Defendant U.S. Park Police Officer Bryan McDonald was a U.S. Park Police officer. He participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

19.    During the events at issue, Defendant U.S. Park Police Officer Thomas LoCascio was a U.S. Park Police officer. He participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

20.    During the events at issue, Defendant U.S. Park Police Officer Nicholas Jarmuzewski was a U.S. Park Police officer. He participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

21.     During the events at issue, Defendant U.S. Park Police Officer Jeffrey Hendrickson was a U.S. Park Police officer. He participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

22.     During the events at issue, Defendant U.S. Park Police Officer Sean Cox was a U.S. Park Police officer. He participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

23.     During the events at issue, Defendant U.S. Park Police Officer Jonathan Daniels was a U.S. Park Police officer. He participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

24.     During the events at issue, Defendant U.S. Park Police Officer Luis Feliciano was a U.S. Park Police officer. He participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

25.     During the events at issue, Defendant Jeffery Carroll was an Assistant Chief of the D.C. Metropolitan Police Department (MPD), who managed its Homeland Security Bureau. He supervised, directed, or ordered the conduct of other MPD officers as described below. He is sued in his individual capacity.

26.     During the events at issue, Defendant Anthony Alioto was a sworn member of the MPD. He supervised, directed, or ordered the conduct of other MPD officers as described below. He is sued in his individual capacity.

27.     During the events at issue, Defendant Clifton Murphy (badge number S800) was a sworn officer of the MPD. He participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

28.    During the events at issue, Defendant Christopher Meyer (badge number 4895) was a sworn officer of the MPD. He participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

29.    During the events at issue, Defendant Daniel Thau (badge number S580) was a sworn officer of the MPD. He participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

30.    During the events at issue, Defendant Timothy Hargrove (badge number 3176) was a sworn officer of the MPD. He participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

31.    During the events at issue, Defendant Jeffery Buchanan (badge number 4790) was a sworn officer of the MPD. He participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

32.    During the events at issue, Defendant Tiffany Payne (helmet number 5751) was a sworn officer of the MPD. She participated in dispersing the demonstration at Lafayette Square on June 1. She is sued in her individual capacity.

33.    During the events at issue, Defendant Justin Taylor (helmet number 5705) was a sworn officer of the MPD. He participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

34.    During the events at issue, Defendant Anthony A. Willis (helmet number 5453) was a sworn officer of the MPD. He participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

35.    Defendant United States of America is the governing entity that operates and oversees the U.S. Park Police, the U.S. Secret Service, the D.C. National Guard, and the Federal

Bureau of Prisons. In this case, the United States acted through its agents, Defendants Barr, Adamchik, Seiberling, LoCascio, Jarmuzewski, Hendrickson, Cox, McDonald, Sinacore, Daniels, Feliciano, Kellenberger, and other officers of the U.S. Park Police, U.S. Secret Service, D.C. National Guard, and Federal Bureau of Prisons who ordered and/or carried out the attack on the peaceably assembled protesters on June 1, 2020. All these actors were operating within the scope of their employment and under color of the law of the United States.

## JURISDICTION AND VENUE

36.     The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 because this action presents federal questions in seeking to redress the deprivation of rights under the First and Fourth Amendments to the U.S. Constitution and in raising claims under 42 U.S.C. § 1983 and under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2401 & 2671–80. The FTCA also confers jurisdiction. 28 U.S.C. § 1346(b)(1). The claims under the statutory and common law of the District of Columbia arise from the same events as the federal claims and therefore fall within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

37.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because all of the events giving rise to the claims took place in the District of Columbia.

## ADMINISTRATIVE EXHAUSTION

38.     On March 22, 2021, Plaintiffs Scallan, Poteet, Foley, and E.X.F. submitted claims via Standard Form 95 to the U.S. Park Police, Federal Bureau of Prisons, D.C. National Guard, and on March 24, 2021, they all submitted claims via Standard Form 95 to the U.S. Secret Service.

39.     These claims documented the claims and injuries of Plaintiffs Scallan, Poteet, Foley, and E.X.F. arising from the attack on the peaceably assembled protesters and requested

damages of $500,000 each for personal injury. Ms. Poteet additionally claimed $1,028.70 in property damage.

40.    More than six months have passed since Plaintiffs submitted their claims, and the agencies have not issued final dispositions of these claims.

41.    Plaintiffs have therefore exhausted their administrative remedies under the FTCA.

## FACTUAL BACKGROUND

42.    Beginning on May 29, 2020, demonstrators began to gather daily in Lafayette Square to protest police brutality against Black people in the United States of America, and specifically the recent murders of George Floyd, a Black man killed by police officers, and Breonna Taylor, a Black woman killed by police officers who broke into her home and shot her without provocation or reason.

43.    Lafayette Square is located directly across Pennsylvania Avenue from the White House and is a public venue frequently and historically used by activists to protest and exercise First Amendment rights. As a public park, and as *the* public park closest to the White House, Lafayette Square is a traditional public forum where First Amendment rights are at their apex.

**President Trump Made Clear His Intent To Infringe on Demonstrators' Constitutional and Civil Rights**

44.    In the days and hours leading up to the events of June 1, 2020, President Trump repeatedly advocated the use of force against Black demonstrators and civil rights activists who were protesting in D.C. and around the nation.

45.    On May 29, President Trump posted on social media about the protests, stating that "when the looting starts, the shooting starts," which is a racist slogan used by a former Miami police chief Walter Headley in 1967 to advocate for police brutality and discriminatory

practices targeting African Americans.[14] On the same day, President Trump issued a tweet describing all protesters as "THUGS."

46.    On May 31, President Trump tweeted, "These people [civil rights protesters] are ANARCHISTS. Call in our National Guard NOW."

47.    On May 31, after a series of tweets about the protests, President Trump retweeted a tweet stating that "This isn't going to stop until the good guys are willing to use overwhelming force against the bad guys."

48.    On May 31, President Trump retweeted the statement, "The radical-left formally divorced itself from America last night. They are domestic terrorists and enemies of the United States. They should be treated as such."

49.    On June 1, prior to the violent attack on the demonstrators, President Trump had a conference call with governors. On this call, he urged the governors to "dominate your city and your state." He then issued an ominous warning of what was to come in a few short hours: "In Washington we're going to do something people haven't seen before."

50.    During the call, in the context of a discussion about arrests, when South Carolina Governor Henry McMaster stated that "I think we have to be careful, but we've got to be tough," President Trump corrected him, stating that "You don't have to be too careful."

51.    On the call with governors, Secretary of Defense Esper said that governors needed to "dominate the battle space," where the so-called "battle space" was the streets of the United States of America where people had gathered to peaceably protest.

---

[14] Barbara Sprunt, *The History Behind 'When the Looting Starts, The Schooting Starts'*, NPR, May 29, 2020, https://www.npr.org/2020/05/29/864818368/the-history-behind-when-the-looting-starts-the-shooting-starts.

52.    On the same day, President Trump told senior advisors that they had to show that they could control the streets of Washington and the area around the White House. A Justice Department spokesperson said that President Trump directed Attorney General Barr to personally lead the response to the unrest. That day, Attorney General Barr directed the Federal Bureau of Prisons and other federal law enforcement agencies to send "riot teams" and other specialized agents to control the protests in Washington, D.C.[15]

53.    On the same day, President Trump said to the Chairman of the Joint Chiefs, referring to civil rights demonstrators: "Can't you just shoot them. Just shoot them in the legs or something."[16]

54.    At the same time law enforcement officers were violently attacking demonstrators in Lafayette Square, President Trump gave remarks in the White House Rose Garden. He painted all the demonstrators as violent and vowed to take immediate action against them, stating "I have strongly recommended to every governor to deploy the National Guard in sufficient numbers that we dominate the streets," and "[if] a city or a state refuses to take the actions that are necessary to defend the life and property of their residents, then I will deploy the United States military and quickly solve the problem for them."[17]

55.    On June 5, 2020, just a few days after the attack that is the focus of this complaint, President Trump retweeted a message expressing feeling "sicken[ed]" by "[t]he fact that [George Floyd] has been held up as a martyr."

---

[15] Ryan Lucas, *Attorney General Steps Up Federal Law Enforcement Response to Protests*, NPR, June 1, 2020, https://www.npr.org/2020/06/01/867059312/attorney-general-steps-up-federal-law-enforcement-response-to-protests.

[16] Mark T. Esper, A Sacred Oath 339 (2022).

[17] Statement by the President, Whitehouse.gov, June 1, 2020 6:43 PM, https://trumpwhitehouse.archives.gov/briefings-statements/statement-by-the-president-39/.

56.    President Trump's statements about Black demonstrators and civil rights activists were markedly different from his comments about other demonstrators. President Trump has routinely been sympathetic to protesters whose views align with his own.

57.    For example, in the spring of 2020, President Trump expressed support when heavily armed and predominantly white demonstrators threatened lawmakers and stormed statehouses to object to coronavirus stay-at-home rules. On April 17, President Trump posted a series of tweets encouraging these armed and predominantly white demonstrators, including "LIBERATE MICHIGAN!"; "LIBERATE MINNESOTA!"; and "LIBERATE VIRGINIA, and save your great 2nd Amendment. It is under siege!" Similarly, in response to the 2017 white nationalist Unite the Right rally in Charlottesville, Virginia, President Trump said, "You had very fine people, on both sides."

58.    President Trump was even happy to have demonstrators in Lafayette Square so long as their message aligned with his views. On May 30, 2020, while criticizing the protesters outside the White House, he specifically encouraged his supporters to engage in a counter-demonstration, tweeting: "The professionally managed so-called 'protesters' at the White House had little to do with the memory of George Floyd. The @SecretService handled them easily. Tonight, I understand, is MAGA NIGHT AT THE WHITE HOUSE???"

**Violent Attacks on Demonstrators in Lafayette Square**

59.    On June 1, 2020, Plaintiffs and other civil rights activists assembled in Lafayette Square in Washington, D.C. to protest police brutality against Black people. Plaintiffs Scallan, Poteet, Foley, and E.X.F.; members and supporters of Plaintiff Black Lives Matter D.C.; and other class members assembled peacefully in Lafayette Square. People present in Lafayette Square, including Plaintiffs, chanted "I can't breathe" in remembrance of George Floyd's last

words, knelt, raised their hands up, and engaged in other legal activities to protest police brutality against Black people.

60.     Plaintiffs and other class members were exercising their First Amendment rights to assemble, speak, and petition the government in Lafayette Square. Plaintiffs and other class members were engaging in political speech to address, through the exercise of their constitutional rights, the infection of overt and systemic racism in the American criminal justice system. Black people are arrested at twice the rate of their population, detained pretrial at a rate three-and-a-half times higher than white people, and imprisoned at a rate of almost six times that of white people. Black people are three times more likely to be killed by the police than white people. This is part of the system that Plaintiffs sought to change.

61.     Law enforcement officers from local and federal law enforcement agencies and the military surrounded Plaintiffs and other civil rights activists assembled in Lafayette Square. The involved law enforcement agencies included, at least, U.S. Park Police, Arlington County Police Department, U.S. Secret Service, D.C. National Guard, and Federal Bureau of Prisons.

62.     The law enforcement officers who surrounded Plaintiffs and class members at Lafayette Park were largely unidentifiable to Plaintiffs.  Many such officers took steps to deliberately conceal their identities.

63.     Some officers displayed no identifying information, concealing both the agency they were associated with and their identification.

64.     Other officers did not wear name tags or badge numbers, or had their identifying information partially or mostly obstructed.

65.     Many of the officers were armed with batons; some officers were armed with devices that could deploy chemical irritants (like tear gas or pepper spray) that obstruct people's

breathing and burn their eyes; and some officers were armed with short shields that doubled as weapons when wielded aggressively to bludgeon people.

66.     MPD officers took up a position one block west, in a formation lining the north and west sides of the intersection of 17th and H Streets NW.

67.     Defendant Alioto was among the officers who supervised MPD officers in establishing a blockade on 17th Street NW, facing south.

68.     Defendants Murphy, Meyer, Thau, Hargrove, Buchanan, Payne, Taylor, and Willis formed part of the 17th Street NW MPD blockade.

69.     Defendants Alioto, Murphy, Meyer, Thau, Hargrove, Buchanan, Payne, Taylor, and Willis were wearing gas masks in preparation for the assault on the demonstrators.

70.     At 6:03 pm, approximately 30 minutes before attacking the assembled demonstrators, law enforcement officers in and around Lafayette Square donned gas masks in preparation for their deployment of tear gas, smoke canisters, and/or pepper spray and pepper balls against Plaintiffs and other class members.

71.     At approximately 6:08 pm, Defendant Barr entered Lafayette Square.

72.     At 6:10 pm, Defendant Barr was behind the law enforcement officials in Lafayette Square pointing north towards St. John's Church.

73.     The Department of Justice subsequently acknowledged that Defendant Barr personally ordered that Lafayette Square be cleared.

74.     Federal law enforcement officers, including Defendant McDonald, appeared at the demonstration and began to stand in double lines, wearing shields and other riot gear.

17

75.     At approximately 6:30 pm, without audible warning or provocation, Defendant Adamchik ordered the law enforcement officers present at Lafayette Square to attack the peaceably assembled protesters.

76.     Gregory Monahan, Acting Chief of the Park Police, testified to Congress weeks after the attack that Defendant Adamchik was the incident commander who gave the order to more forward, who authorized the use of weapons, and who had "full command and control of that operation."[18]

77.     Immediately following Defendant Adamchik's order, law enforcement officers, including Defendants LoCascio, Jarmuzewski, Hendrickson, and McDonald, rushed forward and attacked the assembled protesters without audible warning or provocation. In doing so, law enforcement officials assaulted Plaintiffs Scallan, Poteet, Foley, E.X.F, and the other demonstrators present.

78.     Plaintiffs did not hear law enforcement officers asking the demonstrators to disperse or leave Lafayette Square.

79.     Plaintiffs did not hear law enforcement officers issue any warnings before using force to remove demonstrators from Lafayette Square.

80.     At the time of Defendant Barr's and Defendant Adamchik's orders concerning the attack and at the time of the attack itself, the Plaintiffs and the members of the Plaintiff class were not engaging in unlawful conduct.

---

[18] *Unanswered Questions About the U.S. Park Police's June 1 Attack on Peaceful Protestors at Lafayette Square: Hearing Before the H. Comm. on Natural Resources*, 116th Cong., at 115 (July 28, 2020) (testimony of Gregory T. Monahan), *at* https://www.congress.gov/116/chrg/CHRG-116hhrg40718/CHRG-116hhrg40718.pdf.

81.    At the time of Defendant Barr's and Defendant Adamchik's orders concerning the attack and at the time of the attack itself, the Plaintiffs and the members of the Plaintiff class were not engaging in any conduct that posed a threat of violence against any person, property, or public safety generally.

82.    A National Guardsman who was on the scene later testified to Congress: "Having served in a combat zone, and understanding how to assess threat environments, at no time did I feel threatened by the protesters or assess them to be violent. In addition, considering the principles of proportionality of force and the fundamental strategy of graduated responses specific to civil disturbance operations, it was my observation that the use of force against demonstrators in the clearing operation was an unnecessary escalation of the use of force."[19] He further stated, "From my observation, those demonstrators—our fellow American citizens—were engaged in the peaceful expression of their First Amendment rights. Yet they were subjected to an unprovoked escalation and excessive use of force."[20]

83.    At the time of the attack, President Trump was safely within the White House compound. At around 6:43 pm, while the attack on the demonstrators was ongoing, President Trump began giving a speech in the Rose Garden, which is on the opposite side of the White House from the side facing Lafayette Square.

84.    Meanwhile, in and around Lafayette Square, law enforcement officers used force to disrupt the protest and drive Plaintiffs and other class members out of Lafayette Square and its

---

[19] *Id.* at 120 (prepared statement of Adam DeMarco).
[20] *Id.* at 118 (testimony of Adam DeMarco).

vicinity. Officers fired flash-bang shells, tear gas, pepper spray, smoke canisters, pepper balls, rubber bullets, and/or other projectiles and other chemical irritants into the crowd.[21]

85.    Although the U.S. Park Police initially denied that the agency used "tear gas" on the crowd, an agency spokesperson subsequently clarified that it used "an irritant derived from pepper plants. 'I'm not saying it's not a tear gas, but I'm just saying we use a pepper ball that shoots a powder.'"[22] MPD officers also deployed tear gas cannisters directly at the fleeing demonstrators. Police canisters gathered after the demonstration confirm that officers used tear gas, including CS tear gas. Nathan Baca, a reporter with WUSA9, tweeted on June 4, 2020: "Breaking: police canisters gathered by @wusa9 crews Monday night show federal police DID use artificial CS tear gas in addition to natural OC gas on #BlackLivesMatter." These photographs accompanied the tweet:

  

---

[21] *See* Ashley Parker, Josh Dawsey & Rebecca Tan, *Inside the Push to Tear-gas Protesters Ahead of a Trump Photo Op*, Wash. Post, June 1, 2020, https://www.washingtonpost.com/politics/inside-the-push-to-tear-gas-protesters-ahead-of-a-trump-photo-op/2020/06/01/4b0f7b50-a46c-11ea-bb20-ebf0921f3bbd_story.html; Reuters, *Graphic Warning: Peaceful Protesters Fired at with Tear Gas, Rubber Bullets by U.S. Military Police*, YouTube, June 1, 2020, https://www.youtube.com/watch?v=UrMoqSPZym0; Dan Zak et al., *'This Can't Be Happening': An Oral History of 48 Surreal, Violent, Biblical Minutes in Washington*, Wash. Post, June 2, 2020, https://www.washingtonpost.com/lifestyle/style/this-cant-be-happening-an-oral-history-of-48-surreal-violent-biblical-minutes-in-washington/2020/06/02/6683d36e-a4e3-11ea-b619-3f9133bbb482_story.html.
[22] Alex Ward, *US Park Police said using "tear gas" in a statement was a "mistake." It just used the term again*, Vox, June 5, 2020, https://www.vox.com/2020/6/5/21281604/lafayette-square-white-house-tear-gas-protest.

*[Image description: three silver canisters with labels identifying them as "SPEDE-HEAT CS Long Range 150 YD"; serial numbers; and "SKAT SHELL."]*

86.     The officers hit, punched, shoved, and otherwise assaulted the demonstrators with their fists, feet, batons, and shields, including demonstrators whose backs were turned from the police and who were trying to flee the officers. Officers mounted on horseback, including Defendant Seiberling, pushed protesters west down H Street toward 17th, and other officers assaulted protesters as they tried to escape. Many demonstrators were knocked to the ground. The police action "injected danger into what had been a calm protest as those in the street fled mounted police to avoid being trampled, struck by projectiles or gassed."[23]

87.     One protester was holding a bandage to his face and walking down H Street toward 17th Street alongside the U.S. Park Police officers on horseback. Defendant Sinacore and a group of other Park Police officers rushed him from behind and slammed him against the wall of a building. The protester tried to run away, but Defendant Sinacore chased him down and beat him with his baton.

88.     Defendant Feliciano joined in the initial charge. When one of the protesters scrambled to get out of the way of the charging line and crossed Defendant Feliciano's path, Defendant Feliciano leaned his weight behind his shield and bashed the protester.

89.     Defendant Cox formed part of the line of officers advancing down H Street NW and charged after the protesters who continued fleeing from the officers' attack down H Street NW.

---

[23] Jonathan Allen, Dartunorro Clark & Rebecca Shabad, *Police, National Guard Clash with Protesters to Clear Streets Before Trump Photo Op*, NBC News, June 1, 2020, https://www.nbcnews.com/politics/politics-news/after-night-significant-damage-d-c-mayor-bowser-imposes-earlier-n1221126.

90.     Law enforcement officers attacked the civil rights activists with no audible warning, forcefully ejected them from Lafayette Square, and pursued them for several blocks thereafter.

91.     Defendant Feliciano continued his charge and pursued protesters westward down H Street NW as they retreated. While fleeing other officers, one protester bumped into Feliciano. Defendant Feliciano subsequently lashed out with his shield, causing that protester to stumble.

92.     Law enforcement officers also made unprovoked assaults on journalists in Lafayette Square who were reporting on the protests.

93.     For example, Defendant Kellenberger beat Australian news correspondent Amelia Brace in the back with his baton as she was fleeing with her cameraman.

94.     A journalist holding a microphone in her hand was also among the group of people assembled on the sidewalk of H Street NW. As the journalist attempted to flee alongside the protesters, Defendant Daniels charged into them, shoving the journalist aside.

95.     As some demonstrators attempted to flee west, a formation of MPD officers stationed one block west of the Square attacked these demonstrators, including with tear gas.

96.     Defendant Thau discharged a tear gas grenade launcher into the crowd of fleeing protesters.

97.     MPD officers, including Defendants Buchanan, Hargrove, Meyer, Murphy, Payne, Taylor, Thau and Willis, chased demonstrators south down 17th Street NW, further driving them away from Lafayette Square.

98.     Defendants Carroll and Alioto directed and oversaw the launching of tear gas by MPD officers and the officers' pursuit of the demonstrators down 17th Street NW.

99.    Defendants began their attack on the Lafayette Square demonstrators, both at and in the vicinity of the Square, well before the 7:00 pm curfew.

100.    Both the officers stationed at Lafayette Square and those stationed a block west of the Square attacked demonstrators and physically drove them away from Lafayette Square without audible warning or justification.

101.    At no time before or during the attack on the demonstrators did any of the Defendants give any indication that Plaintiffs or any demonstrators would be permitted to resume their demonstration nearby—either at a prescribed location or after having moved a prescribed distance away from Lafayette Square.

102.    None of the Defendants otherwise provided any alternative means or space for the demonstration that they had forcibly terminated.

**Defendants' Illegal Actions Caused and Are Causing Injuries to Plaintiffs**

***Plaintiff Black Lives Matter D.C.***

103.    Plaintiff Black Lives Matter D.C.'s mission is to end systemic racism, in particular the racially disproportionate use of state-sanctioned violence against the Black community. BLMDC achieves this mission through protests, public accountability campaigns, coalition-building, and other programming.

104.    BLMDC pursued its mission in the days after the death of George Floyd by directing members and individuals affiliated with the organization to attend protests throughout D.C. The organization sponsored an event on May 30, 2020 in which a caravan of cars drove through D.C. and protesters held signs and made statements raising awareness of police violence and racial justice issues. BLMDC has also provided first aid supplies, snacks, and water to demonstrations arranged by other organizations, while also assisting those organizations by

coordinating with them to ensure that, at the events, there are legal observers and individuals prepared to record police officers who commit unlawful actions.

105.    On June 1, 2020, BLMDC provided snacks, masks, waters, and fliers that were disseminated at the Lafayette Square demonstration. BLMDC also dispatched members to record any officer misconduct and ensured that the demonstration had legal observers present.

106.    Multiple members of BLMDC were standing in or near Lafayette Square at the time law enforcement used force to disrupt the protest on June 1, 2020 and experienced Defendants' use of force and chemical irritants.

107.    Defendants' actions have frustrated the mission of BLMDC to fight racial injustice by chilling BLMDC members and supporters from exercising their rights to demonstrate and by creating fear when they do.

108.    Members of BLMDC felt so traumatized by law enforcement's violence at Lafayette Square that they had to take time off from organizing work and skipped calls with coalition members as well as calls with people who participated in social actions.

109.    After the Lafayette Square attack, BLMDC refrained from participating in multiple demonstrations organized by the Movement 4 Black Lives between June 2 and June 3, 2020. This was done to protect BLMDC members from feared harm at the hands of law enforcement.

110.    April Goggans, a leader of BLMDC, noticed a significant reduction in the number of people attending in-person protests after June 1, 2020. People who ordinarily attended in-person protests informed Ms. Goggans that they were afraid to do so because of the violence that occurred at Lafayette Square.

111.    In response to Defendants' actions, BLMDC was forced to:

a.   divert resources to assessing and planning for potential violence by police, including increased needs for medical support and supplies to counteract the effects of chemical agents (for example, the organization purchased goggles to protect demonstrators from chemical irritants and paid for mental health services for a member who was present when Defendants forcibly expelled protesters from Lafayette Square, and suffered trauma as a result);

b.   enhance efforts to educate members and supporters regarding the potential dangers of police violence, how to protect themselves, and what to do if there were another assault like the one in Lafayette Square;

c.   engage in a communications campaign about the events in Lafayette Square to reduce the deterrent effects of Defendants' actions on the participation of their members or supporters;

d.   arrange for transportation from the demonstration for persons injured by Defendants' conduct; and

e.   facilitate medical care for persons injured by Defendants' actions.

112.   The time and effort BLMDC expended due to Defendants' conduct reduced its capacity to plan events and programming consistent with its mission. For example, the time BLMDC spent on assessing safety considerations prevented it from organizing trainings, including a know-your-rights training. This curtailed the organization's capacity to fulfill its mission by effecting community change through peaceful demonstrations.

### *Plaintiff Keara Scallan*

113.   On June 1, 2020, Keara Scallan decided to join the demonstrations near the White House with a friend. At approximately 6:20 pm, Ms. Scallan and her friend walked down 16th Street NW and arrived at the fence surrounding Lafayette Square.

114.    Ms. Scallan witnessed law enforcement in riot gear when she arrived, all of whom were behind the fence.

115.    The crowd at Lafayette Square was non-violent and chanting. Ms. Scallan did not witness any demonstrators provoking law enforcement.

116.    Suddenly and without warning, Ms. Scallan felt the crowd begin to rush towards 17th Street NW. She was pushed against the fence as other demonstrators were running away, and she was briefly separated from her friend.

117.    Ms. Scallan was hit with rubber bullets and felt sudden pain in her face, arm, and leg.

118.    Ms. Scallan saw and heard three flash bang grenades and then noticed two tear gas canisters thrown at her and at other demonstrators.

119.    The irritants in the air made it very difficult to breathe. She had water and baking soda spray with her, but it did nothing to help her burning eyes. Ms. Scallan could hear other demonstrators retching.

120.    After fleeing the irritants in the air, Ms. Scallan reunited with her friend and they aided demonstrators as they got away from the White House. More law enforcement, including U.S. Drug Enforcement Administration vehicles, were blocking demonstrators from returning to Lafayette Square.

121.    Ms. Scallan was traumatized by the attack. She sustained bruises on her arm and cuts on her lips and face, making it painful to use her arm and open her jaw for days. She had difficulty eating and brushing her teeth because of her swollen lips and jaw, and these injuries also made it difficult to speak, which hindered her ability to perform her job in the days following the attack. Ms. Scallan attended fewer protests in the months following the attack than

26

she otherwise would have, because she was anxious about the possibility of further violence from law enforcement.

### *Plaintiff Lia Poteet*

122.    On June 1, 2020, Lia Poteet participated in the peaceful demonstration in Lafayette Square protesting the murder of George Floyd.

123.    Ms. Poteet chose to demonstrate at the White House because she wanted to protest systemic racism and the Trump administration's role in contributing to race-based violence in the United States.

124.    Ms. Poteet arrived in the northeast corner of Lafayette Square around 6:15 pm. She perceived the protest as peaceful and did not observe any acts of violence from the protesters around her.

125.    After she arrived in Lafayette Square, Ms. Poteet moved to the front row against the security barricade in front of the statue of Andrew Jackson. Law enforcement officers stood in a line on the opposite side of the barricade. Officers wore all black uniforms or green military uniforms, and held large riot shields and batons.

126.    Shortly before 6:30 pm, Ms. Poteet noticed the law enforcement officers in Lafayette Square begin to move forward in unison towards the protesters. She then heard flash bangs and people screaming. She continued standing with her hands up, holding a sign she had brought with her to the protest in one hand and her phone in the other.

127.    Approximately a minute later, Ms. Poteet saw a law enforcement officer charging directly at her. The officer pushed Ms. Poteet to the ground with his riot shield and the impact knocked her phone out of her hand. The officer began beating Ms. Poteet with his baton. He kicked and/or struck her in the stomach and knocked the wind out of her.

128.    Ms. Poteet attempted to crawl away from this officer and was able to briefly stand up. She made eye contact with him and pointed at the phone by her feet. The officer did not move so Ms. Poteet bent down to pick up her phone. He knocked her over again and started hitting her even harder. During this abuse, the officer kicked and/or struck Ms. Poteet's knee, where she previously had ACL surgery. Another protester eventually helped Ms. Poteet get away from the officer.

129.    Ms. Poteet limped away as quickly as she could, largely unable to inhale because of the officer's blow to her stomach and the surrounding smoke. A flash bang exploded at her right foot and then another one exploded at her left foot. The smoke from the flash bangs made it impossible to take in air without coughing. She went around the block and doubled over until she could breathe reliably again. She then limped to a friend's house and got a ride home from the protest.

130.    Two days after the attack in Lafayette Square, Ms. Poteet still had welts on her torso and bruises from the beating. Her knee was bruised and swollen for more than a week.

131.    Ms. Poteet was never able to locate or recover her phone, which the officer's initial assault had knocked out of her hand and which his continued abuse prevented her from picking up off the ground.

132.    Ms. Poteet was traumatized by the unprovoked violence committed against her by law enforcement officers. In the days following the attack, Ms. Poteet's injuries and her fear of further police violence kept her from attending political protests that she otherwise would have attended. When she recovered enough to begin protesting again, she remained fearful that she would again be attacked when exercising her First Amendment rights. As a result, she felt anxiety when she protested, sometimes left protests earlier than she otherwise would have, and

otherwise limited her demonstration activities (for instance, avoiding being near law enforcement officers, keeping an eye out for ways to escape if necessary, and trying to position herself near the edge of the protest). The steps she took to protect herself from potential further harm distracted her from listening to speakers, engaging with other protesters, and holding signs to the same extent she did these things at protests before June 1, 2020. Ms. Poteet's fear and anxiety rose when she heard loud noises at protests; on one occasion shortly after June 1, 2020, Ms. Poteet heard a cooler lid slam while at a protest and believed she and the other demonstrators were being attacked until she identified the source of the sound. Additionally, since the June 1, 2020, attack, Ms. Poteet has experienced a lingering fear of law enforcement officers generally, which has caused anxiety when she has interacted with police even outside the protest context.

### Plaintiffs Dustin and Eden Foley

133.    Dustin Foley worked in law enforcement as a community services officer for approximately a decade in California before moving to Virginia with his family and opening his own business.

134.    On the afternoon of June 1, 2020, Mr. Foley and his daughter Eden ("E.X.F."), who was then fifteen years old, traveled to Lafayette Square to demonstrate and to distribute peanut butter and jelly sandwiches and water bottles to other protesters. They parked several blocks west of Lafayette Square and brought the sandwiches and water with them from their car in a wagon.

135.    When Mr. Foley and E.X.F. arrived at Lafayette Square, they came upon a group near the northwest corner of Lafayette Square that had set up a food and beverage station. They decided to leave the wagon of sandwiches and water with this group for ease of access by fellow protesters.

136.    Mr. Foley and E.X.F. then stood near the security barricade on the north perimeter of Lafayette Square, which was lined with demonstrators.  Mr. Foley and E.X.F. perceived the demonstrators as peaceful.

137.    At approximately 6:00 pm, Mr. Foley and E.X.F. saw Defendant Barr enter Lafayette Square and approach law enforcement officials.  Mr. Foley and E.X.F. also saw additional officers in military uniforms begin to gather and join those already in the Square.

138.    Mr. Foley and E.X.F. decided to leave around this time because they were unsettled by the sight of the additional military and concerned about the actions that law enforcement might take against demonstrators.

139.    After a short walk, Mr. Foley and E.X.F. realized that they had forgotten to pick up their wagon, so they returned to the food and beverage station at the northwest corner of Lafayette Square.

140.    Within minutes, the law enforcement officers gathered in Lafayette Square began to attack the assembled crowd, including Mr. Foley and E.X.F.

141.    Mr. Foley and E.X.F. heard flash bangs and witnessed people screaming and running frantically. Soon thereafter, Mr. Foley and E.X.F. began to feel the effects of chemical irritants that were wafting through the air, which made them cough.

142.    From the time they returned to the Square for their wagon until the deployment of force against the crowd of which they were a part, neither Mr. Foley nor E.X.F. heard or saw any threatening or aggressive behavior by protestors or heard any warnings that they needed to leave the area or that force was about to be deployed against the crowd.

143.    As the officers from Lafayette Square pushed forward and forced demonstrators to retreat, Mr. Foley and E.X.F. hurried west on H Street NW to the intersection with 17th Street NW.

144.    At the intersection of 17th and H Streets NW, Mr. Foley and E.X.F. encountered a line of law enforcement officers wearing riot gear, standing shoulder-to-shoulder, blocking off H Street to the west and the 17th Street to the north.

145.    Mr. Foley and E.X.F. have since learned that these officers were with the Metropolitan Police Department.

146.    Mr. Foley and E.X.F. turned south down 17th Street NW and continued to move away from the area by walking along the western sidewalk, which was covered by construction scaffolding.

147.    Shortly after they turned down 17th Street NW, the MPD officers began firing tear gas canisters at the demonstrators, including Mr. Foley and E.X.F., who were fleeing Lafayette Square down 17th Street NW.

148.    Both Mr. Foley and E.X.F. immediately felt the severe effects of the tear gas fired by the MPD officers, including burning eyes and difficulty breathing.  E.X.F. experienced significant symptoms, and had difficulty opening or seeing out of her eyes.

149.    As the street filled up with tear gas, Mr. Foley and E.X.F. attempted to take shelter at the south end of the scaffolding so E.X.F. could recover from the effects of the gas and to avoid additional tear gas that advancing MPD officers had fired further south on 17th Street NW. A fellow demonstrator attempted to help E.X.F. by pouring water into her eyes.

150.    As the MPD officers continued marching down 17th Street NW and deploying

tear gas in Mr. Foley and E.X.F.'s direction, Mr. Foley announced to the officers (with hands

raised) that his daughter had been injured and pleaded with the officers for medical attention.

151.    The MPD officers provided no assistance and instead yelled at Mr. Foley and

E.X.F. to move, even though the only place to go was into the cloud of tear gas that had been

deployed further down the street.

152.    Mr. Foley and E.X.F. obeyed the officers, and as a result fled into a cloud of tear

gas that further exacerbated their symptoms.

153.    Mr. Foley and E.X.F. ultimately reached the car and drove home, with E.X.F.

continuing to experience symptoms of the tear gas following the encounter with MPD.

154.    Mr. Foley and E.X.F. were both severely traumatized by the attack on them at

Lafayette Square. They had difficulty sleeping because of the trauma and struggled to come to

terms with the unprovoked violence committed against them by the law enforcement officers, as

well as the officers' failure to offer any medical attention or support.

155.    Mr. Foley developed an anxiety disorder as a result of the attack, and he was

diagnosed with reactive airway disease and asthma. His relationships with family and friends

suffered dramatically in the months following the attack. During subsequent participation in

protests to call for racial justice, the presence of law enforcement has made Mr. Foley anxious to

the point of trembling.

156.    After the attack, E.X.F. had difficulty being in the presence of law enforcement

and has not felt safe asking for police assistance when she needed it. She has suffered from

anxiety and regular flashbacks to moments during the June 1, 2020, law enforcement attack on

her and her father.

### Aftermath of the Lafayette Square Attack

157.    The actions described above occurred at least in substantial part at the behest of President Trump, Attorney General Barr, and/or other senior White House officials; Attorney General Barr personally ordered law enforcement officers to forcibly remove Plaintiffs and other class members from Lafayette Square and its vicinity.[24]

158.    On June 1, 2020, at 7:01 pm, President Trump and his senior advisors, including Attorney General Barr, Secretary of Defense Esper, White House Chief of Staff Mark Meadows, and Ivanka Trump, walked from the White House to St. John's Church, located across Lafayette Square from the White House. The President paused for a few minutes on the sidewalk outside the church for a photo opportunity, made brief remarks, and then walked back to the White House.

159.    The next day, June 2, President Trump praised the results of the prior evening's law enforcement attack, tweeting that "D.C. had no problems last night. Many arrests. Great job done by all. Overwhelming force. Domination." Two days later, he tweeted a letter calling the protesters "terrorists."

160.    In the hours and days following the attack, Defendant Barr and other members of the Administration gave a series of at least four shifting, contradictory, quickly disavowed, and/or implausible explanations for the attack:

a.    *The curfew.* The White House deputy press secretary initially put out a statement hours after the attack saying that the attack had occurred "to

---

[24] Carol D. Leoning et al., *Barr Personally Ordered Removal of Protesters Near White House, Leading to Use of Force Against Largely Peaceful Crowd*, Wash. Post, June 2, 2020, https://www.washingtonpost.com/politics/barr-personally-ordered-removal-of-protesters-near-white-house-leading-to-use-of-force-against-largely-peaceful-crowd/2020/06/02/0ca2417c-a4d5-11ea-b473-04905b1af82b_story.html.

help enforce the 7 p.m. curfew."[25] But the attack occurred 25 to 30 minutes before the curfew, and Mayor Bowser, who had instituted the curfew, condemned the attack in a tweet, pointing out that it occurred "[a] full 25 minutes before the curfew" and admonishing that the attack "will make the job of @DCPoliceDept officers more difficult."

b.    *False claims of violence*. A U.S. Park Police statement from June 2, 2020, said that the attack occurred "[t]o curtail the violence that was underway."[26] Along similar lines, Defendant Barr stated in a June 7 interview that "projectiles were being hurled at the police" by "a very rowdy and noncompliant crowd."[27] In a June 8, 2020 press conference, the White House press secretary reiterated these claims. These claims were contradicted not only by news reports, video footage, and eyewitness accounts (as detailed in the allegations above), but also by Defendant Barr himself, who admitted in his June 7 interview that, "This was not an operation to respond to that particular crowd."[28] Defendant Barr later reiterated in congressional testimony on July 28 that the federal law

---

[25] Alana Wise, *Trump Says He'll Deploy Military To States If They Don't Stop Violent Protests*, Nat'l Public Radio, June 1, 2020, https://www.npr.org/2020/06/01/867420472/trump-set-address-protests-against-police-killings-in-white-house-remarks#:~:text=In%20a%20statement%2C%20Judd%20Deere,by%20the%20U.S.%20Park%20Police.%22.

[26] U.S. Park Police, *June 2 Statement from United States Park Police acting Chief Gregory T. Monahan about the actions taken over the weekend to protect life and property* (June 4, 2020; originally released June 2, 2020), *at* https://www.nps.gov/subjects/uspp/6_2_20_statement_from_acting_chief_monahan.htm.

[27] *Transcript: Attorney General William Barr on "Face the Nation," June 7, 2020*, CBS News, *at* https://www.cbsnews.com/news/bill-barr-george-floyd-protests-blm-face-the-nation-transcript/.

[28] *Id.*

enforcement attack "didn't turn on the nature of the crowd."[29] A National

Guardsman who was on the scene later testified to Congress that the

"demonstrators . . . were engaged in the peaceful expression of their First

Amendment rights" but "were subjected to an unprovoked escalation and

excessive use of force."[30]

c.    *Moving the security perimeter*. Defendant Barr stated on June 7 that the

reason for the attack was to move the security perimeter.[31] However, that

explanation is inconsistent with the scale of the force used, as well as with

its timing; the materials for perimeter fencing did not arrive until hours

later, according to congressional testimony.

d.    *Protecting St. John's Church*. The White House Press Secretary claimed

on June 8, 2020, that "the burning at St. John's [on May 31] is what

prompted the decision to move the perimeter." But the fence that was built

following the June 1 attack to secure an expanded perimeter around

Lafayette Square did not encompass St. John's, which remained outside

of, and across H Street NW from, the fence.

---

[29] *Hearing Before the House Comm. on the Judic.*, 116th Cong. (July 28, 2020) (testimony of William P. Barr), *at* https://www.c-span.org/video/?473384-1/attorney-general-barr-testifies-justice-department-mission-programs (video at 2:18:00 to 2:18:07).

[30] *See* paragraph 82 above.

[31] *Transcript: Attorney General William Barr on "Face the Nation," June 7, 2020*, CBS News, *at* https://www.cbsnews.com/news/bill-barr-george-floyd-protests-blm-face-the-nation-transcript/.

## CLASS ACTION ALLEGATIONS

161.    Plaintiffs Scallan, Poteet, and Dustin Foley (collectively, the "Representative Plaintiffs") bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4), as representatives of the class and subclass defined as follows:

The Personal Injury Class: All individuals present at Lafayette Square, defined here as the area in Washington, D.C. between the north side of the White House and H Street NW and between Madison Place and Jefferson Place NW, or the streets or sidewalks adjacent to or surrounding Lafayette Square (including specifically: H Street NW between 15th and 17th Streets NW, Vermont Avenue between H and I Streets NW, 16th Street between H and I Streets NW, 17th Street NW between H and G Streets NW, and Connecticut Avenue between H and I Streets NW), on June 1, 2020, at, around, or shortly after 6:30 pm, when the events described in paragraphs 59-102 above took place, who incurred any injury, illness, or impairment as the result of Defendants' actions.

The FTCA Personal Injury Subclass: All individuals in the Personal Injury Class who, on or before June 1, 2022, sought compensation by filing a Standard Form 95 with the U.S. Park Police, U.S. Secret Service, Federal Bureau of Prisons, D.C. National Guard, and/or any other federal agency whose officers participated in the attack described at paragraphs 59-102.

162.    The following persons and entities are excluded from the proposed classes: Defendants, their employees, co-conspirators, officers, legal representatives, heirs, successors; counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

163.    Plaintiffs Scallan, Poteet, and Dustin Foley are proposed as representatives of the Personal Injury Class and the FTCA Personal Injury Subclass.

164.    Each of the proposed classes meets the requirements of Federal Rules of Civil Procedure 23(a), (b)(3) and/or (c)(4).

165.    The members of the Personal Injury Class are so numerous that joinder is impracticable. The crowd assembled on June 1, 2020 at Lafayette Square and the streets and sidewalks around Lafayette Square included hundreds, perhaps thousands of people. At

approximately 6:30 pm, or shortly thereafter, Defendants used physical force, chemical irritants (i.e., tear gas, pepper spray, pepper balls, and/or other inhalants), and impact munitions to force these individuals to cease all protesting activity, disassemble, and leave Lafayette Square and the surrounding areas immediately.

166.    Defendants dispersed these chemical irritants throughout the crowd and thereby assaulted a significant number of people. Moreover, there were hundreds of law enforcement officers in attendance, many wielding riot shields and batons, and many shooting rubber bullets or other impact munitions. The number of people assaulted by these individuals is therefore also numerous, particularly given the sudden and unannounced manner in which law enforcement overran and attacked the protesters.

167.    The members of FTCA Personal Injury Subclass are also too numerous to be individually joined to this action. It would be impracticable for plaintiffs to name and join individually all individuals who were injured by Defendants' actions and subsequently filed a Standard Form 95 seeking compensation for these injuries. It is likely that more than forty such individuals exist, because in the wake of the attack by Defendants, undersigned counsel disseminated to a list of approximately 300 protesters "Know Your Rights" materials explaining to injured demonstrators how to file Standard Form 95 to preserve their rights under the Federal Tort Claims Act. These protesters were all individuals who had contacted undersigned counsel in 2020 to learn about their rights in the wake in the Lafayette Square attack, so it is reasonably likely that forty or more of them filed FTCA claims once they were informed about the process. Neither Plaintiffs nor undersigned counsel can identify every person who filed such forms because filers were under no obligation to share their form with Plaintiffs or undersigned

counsel. Thus, based on the likely total number of filers and—independently—because they cannot be individually identified, joinder is impracticable.

168.    Representative Plaintiffs' claims are typical of the claims of all class members. Representative Plaintiffs' claims arise out of the same events and course of conduct that gives rise to the claims of the other class members. Representative Plaintiffs and all class members had their constitutional, statutory, and common law rights violated and were harmed by the same wrongful conduct.

169.    Representative Plaintiffs will fairly and adequately protect and represent the interests of the classes. Representative Plaintiffs' interests are coincident with, and not antagonistic to, those of the classes. In addition, Representative Plaintiffs are represented by counsel who are experienced and competent in the prosecution of civil rights litigation and have particular expertise with respect to class actions based on civil rights violations.

170.    Questions of law and fact common to the classes include:

a.    whether the Classes were entitled under the First Amendment to peacefully demonstrate at that time and location;

b.    whether law enforcement officers adequately informed protesters that they should disperse or leave Lafayette Square on June 1, 2020 before using force against them;

c.    whether law enforcement officers rushed and attacked the protesters who had assembled at Lafayette Square on June 1, 2020;

d.    whether and to what extent law enforcement officers' conduct was justified by a government interest and appropriately tailored to that interest;

e.    what the rules of engagement issued to law enforcement officers were and who authorized them;

f.    who authorized the use of flash-bang shells, tear gas, smoke canisters, pepper balls, other chemical irritants, rubber bullets and/or other projectiles on the crowd;

g.    whether and to what extent law enforcement officers fired flash-bang shells, tear gas, smoke canisters, pepper balls, and/or rubber bullets into the crowd;

h.	whether and to what extent the use of force to overrun and disperse the peaceful protest at Lafayette Square violated the First Amendment rights of the Class members to assemble, speak and petition the government;

i.	whether and to what extent the use of physical force to overrun and disperse a peaceful protest violated the rights of the Class members under the Fourth Amendment to be free from unreasonable seizures;

j.	whether Defendants acted in reckless or callous indifference to the rights of the Class members;

k.	whether Defendants acted because of the viewpoints being expressed by the protesters; and

*l.*	whether Defendants' actions were tortious under the common law of the District of Columbia and/or violated the D.C. First Amendment Assemblies Act.

171.	Questions of law and fact common to members of each class will predominate over any questions that may affect only individual class members, because Defendants have acted on grounds generally applicable to members of the classes.

172.	Class treatment is a superior method for the fair and efficient adjudication of the controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in the same forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

173.	Class treatment is manageable, and Plaintiffs know of no management difficulties that would preclude class certification in this case.

174.	Representative Plaintiffs reserve the right to seek to certify common questions related to Defendants' knowledge, intent, and actions.

39

**CLAIMS FOR RELIEF**

**CLAIM 1:**
**VIOLATION OF FIRST AMENDMENT RIGHTS TO SPEECH, ASSEMBLY, AND PETITION /** *BIVENS* (against federal defendants for damages)

[omitted as dismissed]

**CLAIM 2:**
**VIOLATION OF FOURTH AMENDMENT RIGHT TO FREEDOM FROM UNREASONABLE SEIZURE /** *BIVENS* (against federal defendants for damages)

[omitted as dismissed]

**CLAIM 3:**
**FIRST AMENDMENT / THREATENED VIOLATION OF FREEDOMS OF SPEECH, ASSEMBLY, AND PETITION** (against federal defendants for injunctive relief)

[omitted as dismissed]

**CLAIM 4:**
**FOURTH AMENDMENT / THREATENED UNREASONABLE SEIZURE** (against federal defendants for injunctive relief)

[omitted as dismissed]

**CLAIM 5:**
**VIOLATION OF 42 U.S.C. § 1985(3)** (against all defendants)

[omitted as dismissed]

**CLAIM 6:**
**VIOLATION OF 42 U.S.C. § 1986** (against all defendants)

[omitted as dismissed]

**CLAIM 7:**
**VIOLATION OF FIRST AMENDMENT RIGHTS TO SPEECH, ASSEMBLY, AND PETITION / 42 U.S.C. § 1983**

**(Plaintiffs Foley and E.X.F., and the Personal Injury Class, against Defendants MPD Officers Carroll, Alioto, Buchanan, Hargrove, Meyer, Murphy, Payne, Taylor, Thau, and Willis)**

175.    Plaintiffs bring this claim on their own behalf and on behalf of the Personal Injury Class.

176.    The actions of Defendants MPD Officers Buchanan, Hargrove, Meyer, Murphy, Payne, Taylor, Thau, and Willis—namely, the suppression of a peaceful demonstration and the viewpoint it represented—and the actions of Defendants Carroll and Alioto in directing and overseeing these actions, deprived Plaintiffs and the Personal Injury Class of their rights under the First Amendment to the United States Constitution to freedom of speech, freedom of assembly, and freedom to petition the government for a redress of grievances.

177.    Defendants deliberately violated well-established protections for the exercise of speech and assembly in public places.

178.    Defendants' actions were based on and/or taken in retaliation for the viewpoint being expressed by the demonstrators.

179.    Defendants' violent actions were not a reasonable regulation of the time, place, or manner of Plaintiffs' and the Personal Injury Class's First Amendment protected activity. These actions were not justified by a compelling—or even substantial—government interest. Even assuming, arguendo, that there was a government interest in clearing Lafayette Square and its vicinity of demonstrators, Defendants' actions were not narrowly tailored to serve that government interest in a lawful manner.

180.    Defendants are jointly and severally liable to Plaintiffs and the Personal Injury Class pursuant to 42 U.S.C. § 1983 for this violation of their rights.

181.    Defendants acted with reckless or callous indifference to the federally protected rights of Plaintiffs and the Personal Injury Class and therefore are liable for punitive damages.

**CLAIM 8:**
**VIOLATION OF FOURTH AMENDMENT RIGHT TO FREEDOM FROM**
**UNREASONABLE SEIZURE / 42 U.S.C. § 1983** (against D.C. defendants for damages)

[omitted as dismissed]

**CLAIM 9:**
**FIRST AMENDMENT / THREATENED VIOLATION OF FREEDOMS OF SPEECH, ASSEMBLY, AND PETITION/42 U.S.C. § 1983** (against D.C. defendants for injunctive relief)

[omitted as dismissed]

**CLAIM 10:**
**FOURTH AMENDMENT / THREATENED UNREASONABLE SEIZURE/42 U.S.C. § 1983** (against D.C. defendants for injunctive relief)

[omitted as dismissed]

**CLAIM 11:**
**FEDERAL TORT CLAIMS ACT, 28 U.S.C. §§ 1346(b), 2401 & 2671–80 (ASSAULT)**

**(Plaintiffs Scallan, Poteet, Foley, and E.X.F., and the FTCA Personal Injury Subclass, against Defendant United States of America)**

182.    Plaintiffs bring this claim on their own behalf and on behalf of the FTCA Personal Injury Subclass. As described in paragraphs 38-41, Plaintiffs have administratively exhausted their claims, and as described in paragraph 161, the FTCA Personal Injury Subclass is defined to include only individuals who have likewise exhausted their claims.

183.    The actions of Defendants Seiberling, LoCascio, Jarmuzewski, Hendrickson, Cox, McDonald, Sinacore, Daniels, Feliciano, and Kellenberger—namely, the use of physical force, including but not limited to chemical agents, frightening loud munitions, batons and shields, and a physical charge at Plaintiffs and class members, in order to suppress a peaceful demonstration and to forcibly cause Plaintiffs' and class members' movement to halt or force them to move from the area in and around Lafayette Square, all without a warrant or probable cause—and the actions of Defendants Barr and Adamchik, in ordering such uses of force, were intended to and did unlawfully attempt and threaten physical harm to Plaintiffs and the FTCA Personal Injury Subclass.

184.    The law enforcement proviso to the FTCA's intentional tort exception, 28 U.S.C. § 2680(h), waives the United States' sovereign immunity for claims of assault undertaken by

42

"investigative or law enforcement officers of the United States Government" acting within the scope of their employment.

185.    Because U.S. Park Police officers and the Attorney General are federal employees authorized to execute searches, seize evidence, and/or make arrests for violations of federal law, Defendants Barr, Adamchik, Seiberling, LoCascio, Jarmuzewski, Hendrickson, Cox, McDonald, Sinacore, Daniels, Feliciano, and Kellenberger qualify as investigative or law enforcement officers of the United States Government under 28 U.S.C. § 2680(h).

186.    Because Defendants Barr, Adamchik, Seiberling, LoCascio, Jarmuzewski, Hendrickson, Cox, McDonald, Sinacore, Daniels, Feliciano, and Kellenberger were acting within the scope of their employment, Defendant United States is liable for their assault on the Plaintiffs and the FTCA Personal Injury Subclass.

**CLAIM 12:**
**FEDERAL TORT CLAIMS ACT, 28 U.S.C. §§ 1346(b), 2401 & 2671–80 (BATTERY)**

**(Plaintiffs Scallan, Poteet, Foley, and E.X.F., and the FTCA Personal Injury Subclass, against Defendant United States of America)**

187.    Plaintiffs bring this claim on their own behalf and on behalf of the FTCA Personal Injury Subclass. As described in paragraphs 38-41, Plaintiffs have administratively exhausted their claims, and as described in paragraph 161, the FTCA Personal Injury Subclass is defined to include only individuals who have likewise exhausted their claims.

188.    The actions of Defendants Seiberling, LoCascio, Jarmuzewski, Hendrickson, Cox, McDonald, Sinacore, Daniels, Feliciano, and Kellenberger—namely, the use of physical force, including but not limited to chemical agents, frightening loud munitions, batons and shields, and a physical charge at Plaintiffs and class members, in order to suppress a peaceful demonstration and to forcibly cause Plaintiffs' movement to halt or force them to move from the area in and around Lafayette Square, all without a warrant or probable cause—and the actions of Defendants

Barr and Adamchik, in ordering such uses of force, were intentional acts that caused Plaintiffs and the FTCA Personal Injury Subclass to experience harmful or offensive bodily contacts.

189.    The law enforcement proviso to the FTCA's intentional tort exception, 28 U.S.C. § 2680(h), waives the United States' sovereign immunity for claims of battery undertaken by "investigative or law enforcement officers of the United States Government" acting within the scope of their employment.

190.    Because U.S. Park Police officers and the Attorney General are federal employees authorized to execute searches, seize evidence, and/or make arrests for violations of federal law, Defendants Barr, Adamchik, Seiberling, LoCascio, Jarmuzewski, Hendrickson, Cox, McDonald, Sinacore, Daniels, Feliciano, and Kellenberger qualify as investigative or law enforcement officers of the United States Government under 28 U.S.C. § 2680(h).

191.    Because Defendants Barr, Adamchik, Seiberling, LoCascio, Jarmuzewski, Hendrickson, Cox, McDonald, Sinacore, Daniels, Feliciano, and Kellenberger were acting within the scope of their employment, Defendant United States is liable for their battery of the Plaintiffs and the FTCA Personal Injury Subclass.

### CLAIM 13:
### D.C. FIRST AMENDMENT ASSEMBLIES ACT, D.C. Code § 5-331.04(c)
**(Plaintiff Black Lives Matter D.C. against Defendants Barr, Adamchik, Seiberling, LoCascio, Jarmuzewski, Hendrickson, Cox, McDonald, Sinacore, Daniels, Feliciano, and Kellenberger)**

192.    The D.C. First Amendment Assemblies Act provides: "No time, place, or manner restriction regarding a First Amendment assembly shall be based on the content of the beliefs expressed or anticipated to be expressed during the assembly[.]" D.C. Code § 5-331.04(c).

193.    A First Amendment Assembly is a "demonstration, rally, parade, march, picket line, or other similar gathering conducted for the purpose of persons expressing their political, social, or religious views." D.C. Code § 5-331.02(2).

194.    Members of Plaintiff BLMDC were present at a First Amendment Assembly at Lafayette Square Park on June 1, 2020, when Defendants attacked them.

195.    The First Amendment Assemblies Act gives rise to a private right of action, because it sets forth "standards for police conduct" that "may be relied upon . . . in any action alleging violation of statutory or common law rights." D.C. Code § 5-331.17.

196.    BLMDC and its members fall within the group for whose special benefit the statute was enacted, as the Act is "intended to protect persons," like BLMDC and its members, "who are exercising First Amendment rights in the District of Columbia." *Id.*

197.    The Act's purpose is consistent with a private cause of action, as it provides that "the declared public policy of the District of Columbia [is] that persons and groups have a right to organize and participate in peaceful First Amendment assemblies on the streets, sidewalks, and other public ways, and in the parks of the District of Columbia." D.C. Code § 5-331.03.

198.    The actions of Defendants Seiberling, LoCascio, Jarmuzewski, Hendrickson, Cox, McDonald, Sinacore, Daniels, Feliciano, and Kellenberger—namely, the suppression of a peaceful demonstration—and the actions of Defendants Barr and Adamchik, in ordering that suppression, was "based on the content of the beliefs expressed," in violation of D.C. Code § 5-331.04(c). The orders and views of President Trump, detailed at paragraphs 44-58 above, demonstrate that the Assembly would not have been suppressed had it been expressing a pro-Administration message.

199.    The First Amendment Assemblies Act's prohibition on viewpoint discrimination implements "a core postulate of free speech law": that "[t]he government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019).

200.    Accordingly, this claim is "brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A).

201.    Defendants acted with deliberate violence or oppression and in willful disregard for the rights of BLMDC and its members. Furthermore, Defendants' conduct was outrageous or reckless toward the safety of BLMDC members. Defendants are thus liable for punitive damages.

## CLAIM 14:
## NEGLIGENCE PER SE / D.C. FIRST AMENDMENT ASSEMBLIES ACT, D.C. Code § 5-331.04(c)

**(Plaintiff Black Lives Matter D.C. against Defendants Barr, Adamchik, Seiberling, LoCascio, Jarmuzewski, Hendrickson, Cox, McDonald, Sinacore, Daniels, Feliciano, and Kellenberger)**

202.    The D.C. First Amendment Assemblies Act provides: "No time, place, or manner restriction regarding a First Amendment assembly shall be based on the content of the beliefs expressed or anticipated to be expressed during the assembly[.]" D.C. Code § 5-331.04(c).

203.    A First Amendment Assembly is a "demonstration, rally, parade, march, picket line, or other similar gathering conducted for the purpose of persons expressing their political, social, or religious views." D.C. Code § 5-331.02(2).

204.    Members of Plaintiff BLMDC were present at a First Amendment Assembly at Lafayette Square Park on June 1, 2020, when Defendants attacked them.

205.    The D.C. First Amendment Assemblies Act imposes a specific duty of care regarding the policing of protests: not to impose a "time, place, or manner restriction regarding a

First Amendment assembly . . . based on the content of the beliefs expressed or anticipated to be expressed during the assembly," D.C. Code § 5-331.04(c).

206.    The First Amendment Assemblies Act exists to promote safety. As demonstrators and an advocacy organization exercising their First Amendment rights to protest and to associate with others, BLMDC and its members are among the class the statute is designed to protect. *See* D.C. Code § 5-331.17 ("The provisions of this subchapter are intended to protect persons who are exercising First Amendment rights in the District of Columbia[.]").

207.    The actions of Defendants Seiberling, LoCascio, Jarmuzewski, Hendrickson, Cox, McDonald, Sinacore, Daniels, Feliciano, and Kellenberger—namely, the suppression of a peaceful demonstration—and the actions of Defendants Barr and Adamchik, in ordering that suppression, was based on the content of the beliefs expressed. The orders and views of President Trump, detailed at paragraphs 44-58 above, demonstrate that the demonstration would not have been suppressed had it been expressing a pro-Administration message.

208.    Defendants' actions give rise to liability to Plaintiff BLMDC under the doctrine of negligence per se because Defendants breached their statutory duty under the First Amendment Assemblies Act to refrain from imposing a time, place or manner restriction on speech "based on the content of the beliefs expressed." D.C. Code § 5-331.04(c).

209.    The First Amendment Assemblies Act's prohibition on viewpoint discrimination implements "a core postulate of free speech law": that "[t]he government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019).

210.    Accordingly, this claim is "brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A).

211.    Defendants acted with deliberate violence or oppression and in willful disregard for the rights of BLMDC and its members. Furthermore, Defendants' conduct was outrageous or reckless toward the safety of BLMDC members. Defendants are thus liable for punitive damages.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully pray that the Court:

212.    Certify the case as a class action on behalf of the proposed Classes;

213.    Designate Plaintiffs Scallan, Poteet, and Dustin Foley as representatives of the Personal Injury Class and the FTCA Personal Injury Subclass;

214.    Designate Plaintiffs' counsel as Class Counsel;

215.    Issue a judgment declaring that the acts of Defendants described herein violate the federal constitutional and statutory provisions specified, as well as the D.C. First Amendment Assemblies Act and the common law of the District of Columbia;

216.    Award compensatory and punitive damages to Plaintiffs and the Personal Injury Class according to proof at trial, including damages for pain and suffering;

217.    Award compensatory damages to Plaintiffs and the FTCA Personal Injury Subclass according to proof at trial, including damages for pain and suffering;

218.    Award Plaintiffs' costs of suit and attorney's fees; and

219.    Provide such other and further relief as the Court may deem just, proper, and appropriate.

## JURY DEMAND

220.    Plaintiffs request a trial by jury on any and all issues raised by this Complaint which are triable by right of a jury.

Dated: April 12, 2024                        Respectfully submitted,

_/s/ Scott Michelman_
Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
Michael Perloff (D.C. Bar No. 1601047)
Joy Holden (D.C. Bar No. 90021283)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
smichelman@acludc.org

Kaitlin Banner (D.C. Bar No. 1000436)
Dennis Corkery (D.C. Bar No. 1016991)
WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS AND
URBAN AFFAIRS
700 14th Street, NW, Suite 400
Washington, D.C. 20005
(202) 319-1000
kaitlin_banner@washlaw.org

Arthur Ago (D.C. Bar No. 463681)
David Brody (D.C. Bar No. 1021476)
Arusha Gordon (D.C. Bar No. 1035129)
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street N.W., Suite 900
Washington, D.C. 20005
(202) 662-8600
aago@lawyerscommittee.org

John A. Freedman (D.C. Bar No. 453075)
David E. Kouba (D.C. Bar No. 483145)
Sonia Tabriz (D.C. Bar No. 1025020)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20004
(202) 942-5000
John.Freedman@arnoldporter.com

_Counsel for Plaintiffs_[32]

---

[32] Counsel wish to acknowledge the assistance of paralegal Elaine Stamp in the investigation of the facts and the preparation of this complaint.