UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BLACK LIVES MATTER D.C., et al., *Plaintiffs*, v. WILLIAM P. BARR, et al., *Defendants*. | Case No. 1:20-cv-01469-DLF<br><br>Consolidated with No. 20-01542 (DLF) |

**PLAINTIFFS' OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISMISS**

The government's two arguments for dismissing the individual Plaintiffs' Federal Tort Claims Act ("FTCA") claims are easily rejected, as they depend on taking a blinkered view of the complaint in contravention of Supreme Court and Circuit precedent governing motions to dismiss. Binding case law instructs that district courts should not read complaints as a series of stand-alone paragraphs unconnected to each other, or require all the necessary elements to be contained within a single paragraph. Rather, complaints must be read as a whole. The government's approach of cherry-picking isolated sentences from a complaint and ignoring the rest will not do.

In the operative Fourth Amended Complaint, Plaintiffs have made thorough and detailed factual allegations concerning the involvement of federal law enforcement officers in the attack against the Plaintiffs—including plausible allegations establishing each of the elements of assault and of battery. Under basic principles of District of Columbia tort law, these allegations are not undermined by the involvement of a few local law enforcement officers in the assault. The motion to dismiss, ECF 239 ("MTD"), should therefore be denied as to the individual Plaintiffs' FTCA claims.

1

As for the claims by Plaintiff Black Lives Matter-DC ("BLMDC") for which the United States has been substituted, any dismissal should be without prejudice, so that BLMDC can take advantage of the FTCA's savings clause, 28 U.S.C. § 2679(d)(5), which exists precisely to protect claims like these where the United States has been substituted—as explained further below.

## BACKGROUND

The facts summarized here, well known already to the Court from years of prior proceedings, are taken from the Plaintiffs' Fourth Amended Class Action Complaint, ECF 213 ("4AC"), read in the light most favorable to the Plaintiffs. *See Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017).

On June 1, 2020, peaceful protestors gathered in Lafayette Square across from the White House—the quintessential public forum for constitutionally protected speech—to protest systemic injustices perpetrated by law enforcement in the United States, exemplified by the murder of George Floyd. 4AC ¶¶ 59-60. As demonstrations sparked across the country, then-President Trump aired his animus toward protestors who mobilized in support of Black lives, and he expressed an intent to "dominate" demonstrators who disagreed with him. *See id.* ¶¶ 44-58.

Without provocation, federal officers, at the direction of the Attorney General and the U.S. Park Police incident commander, launched a coordinated, violent attack on Plaintiffs as they were peacefully exercising their First Amendment rights. *See id.* ¶¶ 70-94. The agencies whose officers were involved in the attack included U.S. Park Police, U.S. Secret Service, D.C. National Guard, and Federal Bureau of Prisons, as well as local officers from Arlington County, Virginia. *Id.* ¶ 61. Officers charged at the demonstrators, struck them with batons and shields, and fired tear gas, pepper spray capsules, rubber bullets, and flash bangs into the peacefully gathered crowd, striking the plaintiffs and other demonstrators and forcing them to flee the area. *See id.* ¶¶ 84-94. As

Plaintiffs fled from the square, some of them encountered, one block west of the Square, officers of the D.C. Metropolitan Police Department, who fired tear gas at them as they attempted to reach safety. *See id.* ¶¶ 95-101. As a result of the attacks they endured, the individual Plaintiffs suffered physical injuries and symptoms related to exposure to chemical irritants, and many became fearful of police violence when exercising their constitutional free speech rights. *See id.* ¶¶ 113-56.

## ARGUMENT

Although the legal standards governing Rule 12(b) motions to dismiss are familiar, they warrant particular attention here, because the government's argument repeatedly flouts them.

First, a threshold matter on which the parties agree: Although the government has moved to dismiss under both Rules 12(b)(1) and 12(b)(6), the standards of Rule 12(b)(6) apply to its entire motion, because the nature of the government's 12(b)(1) challenge to jurisdiction is "facial" rather than "factual." "A facial challenge asks whether the complaint alleges facts sufficient to establish the court's jurisdiction," whereas "[a] factual challenge, as the term suggests, disputes the factual bases on which the plaintiff's jurisdictional allegations rely." *Cherokee Nation v. U.S. Dep't of the Interior*, 643 F. Supp. 3d 90, 103-04 (D.D.C. 2022) (cleaned up). The government's motion does not challenge the factual basis for jurisdiction. "[W]here"—as here—"the defendant contests only the legal sufficiency of plaintiff's jurisdictional claims, the standard is similar to that of Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002). This Court has applied this standard in assessing a facial challenge to jurisdiction over an FTCA claim, *see Gutrejman v. United States*, 527 F. Supp. 3d 1, 5 (D.D.C. 2021)—which makes sense because, as the government notes, the failure to state a claim under the FTCA also deprives the court of jurisdiction. MTD 4. Accordingly, the

government agrees that here, "the focus is on the language in the complaint, and whether it sets forth sufficient factual allegations to support a plaintiff's claims for relief." *Id.* The flaws in the government's argument stem from its misapplication of that standard.

A complaint need only provide "a short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When ruling on a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court must accept as true all facts plausibly pleaded in the complaint, drawing all reasonable inferences in plaintiffs' favor. *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023). "Plausibility does not mean certainty," only that the claim "rises 'above the speculative level.'" *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 11 (D.D.C. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To the extent inferences must be drawn to show that the defendant is liable, they must merely be reasonable, *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017), and need not be the only possible inferences. *Evangelou v. District of Columbia*, 901 F. Supp. 2d 159, 170 (D.D.C. 2012). "A complaint survives a motion to dismiss even if there are two alternative explanations, one advanced by the defendant and the other advanced by the plaintiff, both of which are plausible." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (cleaned up). Finally, and perhaps most relevant here, complaints are to be read "as a whole," *Menoken v. Dhillon*, 975 F.3d 1, 11 (D.C. Cir. 2020) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011)), rather than as a series of isolated allegations that may be divorced from one another and attacked as insufficient on their own. As the Supreme Court has instructed, "courts must consider the complaint in its entirety," as the question on a Rule 12(b)(6) motion is "whether all of the facts alleged, taken collectively," state a claim, "not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).

4

### I. Plaintiffs Adequately Allege That Federal Law Enforcement Officers Ordered and Perpetrated the Attack.

While the "intentional tort exception" to the FTCA generally excludes claims for assault and battery, the "law enforcement proviso" expressly permits plaintiffs to bring claims for assault and battery perpetrated by an "investigative or law enforcement officer," meaning "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h); *accord* MTD 8. The government does not dispute that the federal officers whose actions are at issue are "law enforcement officers" within the meaning of the "law enforcement proviso"—and, in fact, they are. *See* 54 U.S.C. § 102701(2)(B)-(C) (Park Police officers authorized to make arrests and execute warrants); 18 U.S.C. § 3056(b), (c)(1)(A), (c)(1)(C) (same, as to Secret Service officers); 18 U.S.C. § 3056A(b)(1)(B), (b)(2) (Secret Service "Uniformed Division" officers authorized to make arrests and "shall possess privileges and powers similar to those of the members of the Metropolitan Police of the District of Columbia"); 18 U.S.C. § 3050 (Bureau of Prisons officers authorized to make arrests); Dep't of Justice Office of Legal Counsel, Mem. Op. for the Acting Assoc. Atty. Gen., Use of the Nat'l Guard to Support Drug Interdiction Efforts in the District of Columbia 91, 93 (Apr. 4, 1989) (concluding that the authorization now codified at D.C. Code § 49-102 to order the D.C. National Guard to perform "other duties, as [the commanding general] may deem proper" is "broad enough to include law enforcement activities" including drug interdiction).[1]

---

[1] *Available at* https://www.justice.gov/file/24191/download. It has long been recognized that the D.C. National Guard, "which is organized, armed, and controlled by the President of the United States, is essentially a component of the federal government," *Clayton v. District of Columbia*, 931 F. Supp. 2d 192, 200 (D.D.C. 2013) (quoting *Lilly v. Schwartz*, 713 F. Supp. 2d 15, 19 n.2 (D.D.C. 2010), in turn quoting *Seegars v. Ashcroft*, 297 F. Supp. 2d 201, 241 (D.D.C. 2004); internal quotation marks omitted)), and that the Guard's members are federal employees for FTCA purposes. *See O'Toole v. United States*, 206 F.2d 912, 917-18 (3d Cir. 1953).

Instead, the government contends that the Fourth Amended Complaint fails to allege the involvement of federal law enforcement officers *in the attack on the Plaintiffs*—despite the complaint's specific allegations detailing the participation of federal law enforcement officers in the acts of assault and battery for which Plaintiffs seek relief. 4AC ¶¶ 61, 74-94, 114-19, 125-29, 137-43. 183-86, 188-91. The government's argument does not withstand even the barest scrutiny, in light of black-letter tort law and the explicit language and clear import of the complaint.

*First*, the government's suggestion that the presence of local law enforcement in the complaint and at the scene somehow diminishes the culpability of the federal officers misreads the complaint and reflects a misunderstanding of tort law. The government tries to muddy the role of the federal officers described in the complaint by pointing to the allegations concerning the *District of Columbia* Metropolitan Police Department ("MPD") police officers, MTD 9-10, but the complaint clearly distinguishes the activities of federal officers (who assaulted protestors in the Square and on H Street abutting the Square) from the activities of the D.C. officers (who assaulted protestors a block away). The federal officers, the complaint repeatedly states, attacked the Plaintiffs and fellow demonstrators *in and at Lafayette Square*. *See* 4AC ¶ 61 (alleging that officers from the "U.S. Park Police, Arlington County Police Department, U.S. Secret Service, D.C. National Guard, and Federal Bureau of Prisons" "surrounded Plaintiffs and other civil rights activists assembled in Lafayette Square"); *id.* ¶¶ 75, 77 ("Defendant Adamchik ordered the law enforcement officers present at Lafayette Square to attack the peaceably assembled protesters. . . . Immediately following Defendant Adamchik's order, law enforcement officers, including Defendants LoCascio, Jarmuzewski, Hendrickson, and McDonald, rushed forward and attacked the assembled protesters without audible warning or provocation.").

By contrast, the complaint alleges that D.C. officers attacked a subset of the demonstrators *one block west of the Square* as they were fleeing. *See id.* ¶ 66 ("MPD officers took up a position one block west [of the Square], in a formation lining the north and west sides of the intersection of 17th and H Streets NW"); *id.* ¶ 95 ("As some demonstrators attempted to flee west, a formation of MPD officers stationed one block west of the Square attacked these demonstrators, including with tear gas."). Thus, the allegations concerning the D.C. officers do not undermine the allegations that it was federal officers who attacked the Plaintiffs in Lafayette Square.

That non-federal officers from Arlington County (unlike their D.C. counterparts) were acting together with the federal officers at the Square, *see* 4AC ¶ 61, also does not undermine the claims concerning the federal officers' actions. Under basic tort principles governing joint tortfeasors, "it is axiomatic that where several independent actors concurrently or consecutively produce a single, indivisible injury, each actor will be held jointly and severally liable for the entire injury." *Wesby v. District of Columbia*, 841 F. Supp. 2d 20, 41 (D.D.C. 2012) (cleaned up), *aff'd*, 765 F.3d 13 (D.C. Cir. 2014), *rev'd on other grounds*, 138 S. Ct. 577 (2018); *accord Louis v. District of Columbia*, 59 F. Supp. 3d 135, 147 (D.D.C. 2014); *see generally* Restatement (Second) of Torts § 876(a) ("For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he does a tortious act in concert with the other[.]"). District of Columbia tort law is in accord. *See, e.g., Leiken v. Wilson*, 445 A.2d 993, 999 (D.C. 1982) ("If two or more tortfeasors produce a single injury, the plaintiff may sue each one for the full amount of the damage and hold the defendants severally liable[.]"); *see also Faison v. Nationwide Mortg. Corp.*, 839 F.2d 680, 686 (D.C. Cir. 1987) (recognizing and applying D.C. law on this point).

Applying these principles, this Court has recognized that concerted acts establish liability for all participants. For example, in an unconstitutional arrest case, this Court held that officers

7

present at the scene who did not conduct the arrests but "actively participated" by signing and completing portions of the arrest forms or providing investigative information to the arresting officers were jointly liable with the officer who conducted the arrests. *See Wesby*, 841 F. Supp. 2d at 41-42. Similarly, in an unconstitutional search case, this Court held that officers who did not conduct the search could be jointly liable where they participated by standing in a strategic position to enable the search to occur. *See Fernandors v. District of Columbia*, 382 F. Supp. 2d 63, 74-75 (D.D.C. 2005). Thus, the federal government cannot dodge responsibility for its own officers' actions just because local law enforcement officers were present and joined in the tortious conduct.

*Second*, the government argues that the officers whom the Fourth Amended Complaint identifies as attacking the Plaintiffs and their fellow demonstrators are not necessarily federal officers at all, because they are not identified explicitly as such in every paragraph describing their actions. *See* MTD 9-11. This is sophistry. The government hangs its hat on the complaint's shorthand references to "law enforcement officers" generally, *see* MTD 9-10, while overlooking the Plaintiffs' clear allegation about which agencies employed the "law enforcement officers" whose actions are at issue and the complaint's detailed allegations about the participation of federal law enforcement officers in tortious acts. Specifically, the complaint begins its account of the attack on the Plaintiffs by identifying the agencies involved: "Law enforcement officers from local and federal law enforcement agencies and the military surrounded Plaintiffs and other civil rights activists assembled in Lafayette Square. *The involved law enforcement agencies included, at least, U.S. Park Police, Arlington County Police Department, U.S. Secret Service, D.C. National Guard, and Federal Bureau of Prisons*." 4AC ¶ 61 (emphasis added). The government's motion quotes from this very paragraph but misleadingly omits the list of agencies in order to characterize it as "refer[ring] to the actions of unidentified 'law enforcement officers.'" MTD 9.

8

After identifying the agencies whose officers were present, the complaint does frequently use the phrase "law enforcement officers"; however, in context, it is quite clear that this phrase is referring to the group of law enforcement officers who had massed at Lafayette Square. For instance—after a brief diversion to describe the position of the MPD officers "one block west" of the Square, 4AC ¶ 66—the complaint states that "approximately 30 minutes before attacking the assembled demonstrators, law enforcement officers in and around Lafayette Square donned gas masks in preparation for their deployment of tear gas, smoke canisters, and/or pepper spray and pepper balls against Plaintiffs and other class members." *Id.* ¶ 70. Having just specified who the "law enforcement officers in and around Lafayette Square" were—officers of the "U.S. Park Police, Arlington County Police Department, U.S. Secret Service, D.C. National Guard, and Federal Bureau of Prisons," *id.* ¶ 61—the complaint is clearly referring to these officers. And the complaint goes on to specify the involvement of *federal* law enforcement officers in the preparation for and execution of the attack on the demonstrators: "Federal law enforcement officers, including Defendant McDonald [identified as a Park Police officer, *id.* ¶ 18], appeared at the demonstration and began to stand in double lines, wearing shields and other riot gear." *Id.* ¶ 74. And then "Defendant Adamchik ordered the law enforcement officers present at Lafayette Square to attack the peaceably assembled protesters." *Id.* ¶ 75. Defendant Adamchik is specifically identified in the complaint as a Major in the U.S. Park Police. *Id.* ¶ 14. And more generally, it is clear, again, which agencies' officers were "the law enforcement officers present at Lafayette Square," because the complaint had already specified the agencies in paragraph 61.

Two paragraphs after describing Defendant Adamchik's order, the complaint states that "law enforcement officers, including Defendants LoCascio [identified as a Park Police officer, *id.* ¶ 19], Jarmuzewski [identified as a Park Police officer, *id.* ¶ 20], Hendrickson [identified as a Park

9

Police officer, *id.* ¶ 21], and McDonald [identified as a Park Police officer, *id.* ¶ 18], rushed forward and attacked the assembled protesters without audible warning or provocation. In doing so, law enforcement officials assaulted Plaintiffs Scallan, Poteet, Foley, E.X.F, and the other demonstrators present." *Id.* ¶ 77. The complaint goes on to describe how the attack unfolded: "Officers fired flash-bang shells, tear gas, pepper spray, smoke canisters, pepper balls, rubber bullets, and/or other projectiles and other chemical irritants into the crowd." *Id.* ¶ 84. And "[t]he officers hit, punched, shoved, and otherwise assaulted the demonstrators with their fists, feet, batons, and shields, including demonstrators whose backs were turned from the police and who were trying to flee the officers." *Id.* ¶ 86.

Although these paragraphs—and the surrounding paragraphs describing the attack, including the particular actions of Park Police Officers Seiberling, Sinacore, Feliciano, Cox, Kellenberger, and Daniels, *see id.* ¶¶ 82, 84-94—refer to "law enforcement officers" or "officers" generically (without the term "federal"), these allegations are clearly about the officers of the agencies identified in paragraph 61. This inference is supported in numerous ways. First, the entire discussion from paragraph 61 onward about the conduct of law enforcement at Lafayette Square is about the same identified group of law enforcement officers; where this section of the complaint diverts briefly to discuss other government actors (such as MPD or President Trump, *see id.* ¶¶ 66-69, 83), it makes clear that they were elsewhere, before returning to the main action by the only group of officers ever described as being at Lafayette Square—those of the "U.S. Park Police, Arlington County Police Department, U.S. Secret Service, D.C. National Guard, and Federal Bureau of Prisons," *id.* ¶ 61. Second, the complaint identifies a U.S. Park Police officer, Mark Adamchik, as the "incident commander" who ordered the attack. *Id.* ¶¶ 75-76. Third, all of the other officers specified by name in paragraphs 77 and 84-94 as participating in the attack are

identified as U.S. Park Police officers earlier in the complaint. *See id.* ¶¶ 15-24. Fourth, the complaint discusses evidence concerning the U.S. Park Police's deployment of chemical irritants—evidence that included a Park Police spokesperson saying that the agency "used 'an irritant derived from pepper plants'" and a journalist's report on social media that "federal police DID use artificial CS tear gas in addition to natural OC gas on #BlackLivesMatter." *Id.* ¶ 85.

For the same reasons, the allegations about the aspects of the attack that injured the specific Plaintiffs at Lafayette Square, *id.* ¶¶ 113-42, can only be read as referring to the actions of officers from the law enforcement agencies identified as being involved in the attack at Lafayette Square: the agencies named at paragraph 61. The description of the harms to Plaintiffs Scallan, Poteet, Foley, and E.X.F. at Lafayette Square (as distinct from the Foleys' experience with D.C. police after they fled the Square) is presented in the context of the overall action by the officers identified at the outset as being present at the Square and participating in the attack as a whole. Rule 8 requires only a "short and plain statement" of the claim; it does not require Plaintiffs to repeat the list of specific agencies over and over rather than using shorthand phrases like "law enforcement officers" and "officers" where the complaint has already made clear the agencies to which these officers belong. The Rules of Civil Procedure are neither so counterintuitive nor so unforgiving.

*Third and finally*, the conduct of federal law enforcement—specifically, Attorney General William Barr and Park Police Major Mark Adamchik—in *ordering* the attack, *id.* ¶¶ 73, 75-76, not only supports the inference that the complaint's references to the "officers" who carried out the Lafayette Square attack must be understood to include officers of the federal agencies identified in paragraph 61 (as explained above), but also provides an independent basis for attributing the tortious conduct to federal law enforcement officers. Under D.C. tort law, "[s]upervisors cannot escape suits brought for tortious acts undertaken by other employees where the harm suffered is

11

fairly attributable to the superiors' own direction[.]" *Maniaci v. Georgetown Univ.*, 510 F. Supp. 2d 50, 71 (D.D.C. 2007); *accord King v. Kidd*, 640 A.2d 656, 667 n.13 (D.C. 1993) (an officer who "directs or countenances the tortious act of a subordinate" is directly liable (cleaned up)); *see generally* Restatement (Second) of Torts § 877(a) (discussing liability for "order[ing]" "the tortious conduct of another"). Attorney General Barr and Park Police Major Adamchik directed officers to clear peaceably assembled protestors in Lafayette Square, 4AC ¶¶ 73, 75-76, and the resulting assaults and batteries of Plaintiffs are "fairly attributable" to these federal officers' directions. *Maniaci*, 510 F. Supp. at 71. The ordering of tortious actions by federal law enforcement officers therefore provides an independent basis for proceeding under the FTCA.

In light of the specific references and inferences catalogued here, the only good-faith, common sense reading of the complaint "as a whole," *Menoken*, 975 F.3d at 11, is that federal law enforcement officers (specifically, from the U.S. Park Police, U.S. Secret Service, D.C. National Guard, and Federal Bureau of Prisons, 4AC ¶ 61) ordered and carried out the attack for which Plaintiffs seek relief in this lawsuit. Were there any doubt, it would be overcome by the requirement that the complaint be read drawing all reasonable inferences in plaintiffs' favor. *Hurd*, 864 F.3d at 678. Indeed, the only way the government can read the Fourth Amended Complaint *not* to allege the involvement of federal law enforcement officers is by simply disregarding allegations of the complaint inconvenient to its argument.

In sum, the Court should reject the government's blinkered approach to the complaint. Plaintiffs have alleged sufficient facts to survive a motion to dismiss and proceed to discovery.

## II. Plaintiffs Plead Valid Claims for Assault and Battery.

The government's second argument, like its first, relies on an incomplete reading of the operative complaint and a failure to apply black-letter principles of D.C. tort law and federal civil

procedure. Under D.C. law, "[a]n assault is an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim. A battery is an intentional act that causes a harmful or offensive bodily contact." *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007) (citation and internal quotation marks omitted).

Plaintiffs have alleged that federal officers "rushed forward and attacked the assembled protesters," 4AC ¶ 77, and "fired flash-bang shells, tear gas, pepper spray, smoke canisters, pepper balls, rubber bullets, and/or other projectiles and other chemical irritants into the crowd," *id.* ¶ 84. And the complaint describes how these acts produced threats to each Plaintiff specifically. *See id.* ¶¶ 116, 118 (Plaintiff Scallan "felt the crowd begin to rush," after which she "saw and heard three flash bang grenades and then noticed two tear gas canisters thrown at her and at other demonstrators"); *id.* ¶¶ 126-27 (Plaintiff Poteet "noticed the law enforcement officers in Lafayette Square begin to move forward in unison towards the protesters," "then heard flash bangs and people screaming," and soon after "saw a law enforcement officer charging directly at her"); *id.* ¶¶ 140-41 ("the law enforcement officers gathered in Lafayette Square began to attack the assembled crowd, including [Plaintiffs] Foley and E.X.F," who "heard flash bangs and witnessed people screaming and running frantically"). The officers' charge, ordered by the incident commander Defendant Adamchik, was plainly an attempt to do physical harm to the Plaintiffs. Discharging weapons and mounting an armed charge incontrovertibly threatens harm to anyone in the path of the attack. And the officers' acts were unlawful because, as this Court has already held, they violated the First Amendment. *See* ECF 160 (opinion on motion to dismiss), at 26.[2]

---

[2] Plaintiffs contend that the officers' acts violated the Fourth Amendment as well; the Court has never resolved this question, having ruled only that any Fourth Amendment violation was not "clearly established." *See id.* at 43. The Court need not resolve the question now, as the First Amendment violation is enough to make the attack "unlawful." Plaintiffs merely note that they reserve the right to argue that, independently, a Fourth Amendment violation occurred.

13

Plaintiffs have alleged that federal officers battered them when the attack described above actually made contact with the demonstrators, including Plaintiffs. *See* 4AC ¶¶ 116-17, 119, 121 (Plaintiff Scallan was "pushed against the fence," then "hit with rubber bullets and felt sudden pain in her face, arm, and leg," while "[t]he irritants in the air made it very difficult to breathe" and her eyes were "burning"; "[s]he sustained bruises on her arm and cuts on her lips and face, making it painful to use her arm and open her jaw for days" and causing "difficulty eating and brushing her teeth" and "speak[ing]"); *id.* ¶¶ 127-30 (Plaintiff Poteet was "pushed . . . to the ground with [an officer's] riot shield"; he "began beating Ms. Poteet with his baton" and "kicked and/or struck her in the stomach and knocked the wind out of her"; when she stood up, "[h]e knocked her over again and started hitting her even harder" including on "Ms. Poteet's knee, where she previously had ACL surgery"; as she fled, she was "largely unable to inhale because of the officer's blow to her stomach and the surrounding smoke" and "[t]he smoke from the flash bangs made it impossible to take in air without coughing"; days later, she "still had welts on her torso and bruises from the beating" and "[h]er knee was bruised and swollen for more than a week"); *id.* ¶ 141 (while at the Square, Plaintiffs "Foley and E.X.F. began to feel the effects of chemical irritants that were wafting through the air, which made them cough"); *see generally id.* ¶ 86 ("The officers hit, punched, shoved, and otherwise assaulted the demonstrators with their fists, feet, batons, and shields, including demonstrators whose backs were turned from the police and who were trying to flee the officers. . . . Many demonstrators were knocked to the ground."). These injuries are self-evidently "harmful bodily contacts."

The government's contention that these allegations fail to include the element of intent, MTD 14, is doubly wrong.

*First* and most simply, the operative complaint specifically alleges that the federal law enforcement officers engaged in their tortious assault and battery with intent. *See* 4AC ¶ 183 (alleging that the actions of the federal officers in using and/or ordering the use of force "were *intended to* and did unlawfully attempt and threaten physical harm to Plaintiffs" (emphasis added)), *id.* ¶ 188 (alleging that the actions of the federal officers in using and/or ordering the use of force "were *intentional* acts that caused Plaintiffs and the FTCA Personal Injury Subclass to experience harmful or offensive bodily contacts" (emphasis added)). The government's attempt to brush off these allegations as "conclusory," ignores Federal Rule of Civil Procedure 9(b), which provides that "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." As the D.C. Circuit has explained in applying Rule 9(b), "Because there is rarely direct evidence of a defendant's mental state, the fact finder often must draw inferences from circumstantial evidence," and so where a mental state "may be alleged generally" under the Rule, the allegations need only "support a plausible inference" of the required mental state. *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 867 (D.C. Cir. 2022). Applying Rule 9(b), this Court has sustained allegations of intent based on the conduct pleaded. *See, e.g., Jefferson v. Collins*, 905 F. Supp. 2d 269, 279, 283 (D.D.C. 2012); *Haralson v. Mgmt. & Training Corp.*, 724 F. Supp. 2d 82, 84 (D.D.C. 2010). Here, intentionality is highly plausible based on Plaintiffs' allegations that the federal officers charged at them, 4AC ¶ 77, and "fired flash-bang shells, tear gas, pepper spray, smoke canisters, pepper balls, rubber bullets, and/or other projectiles and other chemical irritants into the crowd," *id.* ¶ 84. These are by nature intentional acts; it would defy credulity to suggest that such an onslaught was unintentional. Under Rule 9(b), Plaintiffs have amply alleged intent.

*Second* and independent of Rule 9(b), the description in the Fourth Amendment Complaint of the federal officers' attack is sufficient to allege intent as a matter of D.C. law, which adheres

to the "general principle that a factfinder may infer that people intend the natural and probable consequences of their acts knowingly done." *Fleet v. Fleet*, 137 A.3d 983, 988 (D.C. 2016); *accord C.C. v. G.D.*, 320 A.3d 277, 293-94 (D.C. 2024); *see also Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1017 (D.C. Cir. 1991) ("The actor always can be thought to intend the natural consequences of his act."). D.C. tort law recognizes that states of mind, including intent, "can rarely be proven directly; therefore, the requisite intent must be inferred," and this may be done where, for instance, "the circumstances are such that any reasonable person would have known that [the relevant harm] would result" from the defendant's actions. *Waldon v. Covington*, 415 A.2d 1070, 1077 (D.C. 1980) (cleaned up); *see also Hinton v. Sealander Brokerage Co.*, 917 A.2d 95, 102 n.6, 106 (D.C. 2007) (recognizing that intent can be inferred from the "natural and probable consequences" of a person's acts); *King v. Kirlin Enters., Inc.*, 626 A.2d 882, 884 (D.C. 1993) ("The requisite state of mind need not (and usually cannot) be proved by direct evidence, but may be inferred from all the facts and circumstances of the case." (cleaned up)). Even in the criminal context, with its stricter burden of proof, intent to commit an assault "may be inferred from doing the act which constituted the assault." *Macklin v. United States*, 733 A.2d 962, 964 (D.C. 1999) (cleaned up). Thus, this Court has found the element of intent satisfied for assault based on the nature of the conduct at issue and an inference of intent from that conduct. *See Sherrod v. McHugh*, 2017 WL 627377, at *5 (D.D.C. Feb. 15, 2017).[3]

---

[3] It does not matter whether the federal officers aimed their conduct at the individual Plaintiffs specifically; under the principle of "transferred intent," a defendant is liable when he directs an assault or battery at one person but injures another. *See Collier v. District of Columbia*, 46 F. Supp. 3d 6, 16 n.6 (D.D.C. 2014) (general rule); *Rude v. Adeboyeku*, 552 F. Supp. 2d 32, 35 (D.D.C. 2008) (D.C. definition of assault satisfied where perpetrator's intent was "to cause a harmful or offensive contact with . . . a third person"); *Holder v. District of Columbia*, 700 A.2d 738, 744 n.6 (D.C. 1997) (quoting D.C. jury instruction articulating same principle for battery); *accord* Restatement (Second) of Torts §§ 16(2), 20(2), 32(2); *see Evans-Reid*, 930 A.2d at 937 (relying on Restatement in defining elements of assault and battery).

From these principles, it is quite clear that, beyond Plaintiffs' specific allegation of intent under Rule 9(b), the complaint's other allegations adequately plead intent as a matter of D.C. tort law. Any reasonable person would have known that the natural and probable consequences of rushing at the Plaintiffs, 4AC ¶ 77, "fir[ing] flash-bang shells, tear gas, pepper spray, smoke canisters, pepper balls, rubber bullets, and/or other projectiles and other chemical irritants into the crowd," *id.* ¶ 84, and beating and kicking people, *see id.* ¶¶ 127-30, would be to cause anyone in the way both to perceive a threat of harmful or offensive bodily contact and then to experience such contact. A massive, coordinated, multi-modal attack such as the one detailed in the Fourth Amended Complaint does not occur by accident, nor is there any doubt as to what members of a defenseless crowd will suffer if they are charged at, beaten, tear gassed, and shot at with rubber bullets by law enforcement. The harmful or offensive bodily contacts, and threats of such contact, that Plaintiffs suffered were natural and probable consequences of the federal officers' actions recounted in the complaint. Accordingly, the individual Plaintiffs have alleged all the elements of both assault and battery. The government's motion to dismiss these Plaintiffs' FTCA claims (Claims 11 and 12) should be denied.

### III. Any Dismissal of Plaintiff BLMDC's Claims Should Be Without Prejudice Under 28 U.S.C. § 2679(d)(5).

When Congress enacted the Westfall Act, it understood that it would be unjust to give the Attorney General the power to convert a timely claim against a federal employee into a jurisdictionally untimely claim against the United States simply by signing a piece of paper. Congress therefore added a savings clause to the Westfall Act, providing that:

> Whenever an action or proceeding in which the United States is substituted as the party defendant under this subsection is dismissed for failure first to present a claim pursuant to section 2675(a) of this title, such a claim shall be deemed to be timely presented under section 2401(b) of this title if—(A) the claim would have been timely had it been filed on the date the underlying civil action was commenced, and

17

> (B) the claim is presented to the appropriate Federal agency within 60 days after dismissal of the civil action.

28 U.S.C. § 2679(d)(5). That savings clause re-starts the FTCA's claim-filing clock when a claim is dismissed following Westfall Act certification, so that the plaintiff can file a timely FTCA administrative claim. This procedure is available if "the claim would have been timely had it been filed on the date the underlying civil action was commenced." *Id.* § 2679(d)(5)(A).

Here, that criterion is met as to both "the underlying civil action" as a whole and the specific claims at issue. The "underlying civil action" was filed in June 2020, just days after the events at issue. *See* ECF 1. And when the Court permitted BLMDC's claims to be added via amendment, it necessarily recognized that they "relate[d] back" to the original complaint. *See* ECF 199, at 8 ("[I]f the plaintiffs' new amendments did not stem from the same transaction as their old *Bivens* claims, they could not relate back to the plaintiffs' original complaints and would run afoul of D.C.'s statute of limitations for intentional torts and for First Amendment Assemblies Act claims.").

Any dismissal of BLMDC's claims, accordingly, should be without prejudice, so that BLMDC can avail itself of the procedure at § 2679(d)(5) and return to court. Further, the Court should indicate in its Order that any dismissal is without prejudice. *See Hargrove v. Gooding*, 2010 WL 1946953, at *2 (D.D.C. May 14, 2010) (dismissing for failure to exhaust but noting that "Hargrove has sixty days from the date of the order that accompanies this memorandum opinion to file an administrative FTCA claim" and stating that the dismissal was "without prejudice").

## CONCLUSION

The Court should deny the government's motion to dismiss Claims 11 and 12. Any dismissal of Claims 13 and 14 should be without prejudice to Plaintiff BLMDC's exhausting its FTCA claims pursuant to 28 U.S.C. § 2679(d)(5).

Dated:  October 2, 2024

Respectfully submitted,

/s/ Scott Michelman
Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
Michael Perloff (D.C. Bar No. 1601047)
Joy Holden (D.C. Bar No. 90021283)
Simone Wallk[4]
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
smichelman@acludc.org

Kaitlin Banner (D.C. Bar No. 1000436)
WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS AND
URBAN AFFAIRS
700 14th Street NW, Suite 400
Washington, D.C. 20005
(202) 319-1000
kaitlin_banner@washlaw.org

David Brody (D.C. Bar No. 1021476)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
(202) 662-8600
dbrody@lawyerscommittee.org

John A. Freedman (D.C. Bar No. 453075)
David E. Kouba (D.C. Bar No. 483145)
Sonia Tabriz (D.C. Bar No. 1025020)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, D.C. 20004
(202) 942-5000
John.Freedman@arnoldporter.com

*Counsel for Plaintiffs*[5]

---

[4] Not admitted to practice law in any United States jurisdiction. Pursuant to D.C. Ct. App. R. 49(c)(9)(B), providing pro bono legal services in the District of Columbia under the supervision of a D.C. Bar member during pendency of application to D.C. Bar.

[5] Counsel wish to acknowledge the assistance of paralegal Ameerah Adetoro in the preparation of this brief.

19